**EXHIBIT**

A

State Of Maine
Cumberland, ss.

Superior Court
Civil Action
Docket No.: cv-2017-27

Leo S. Paraskevopoulos, )
)
Plaintiff, )
)
v. )
)
Central Maine Medical Center, )
)
Defendant. )
)

## First Amended Complaint and Demand for Jury Trial and Injunctive Relief Sought

Leo S. Paraskevopoulos hereby complains against Defendant Central Maine Medical Center as follows:

## Summary of the Action

1.     After graduating from medical school, Dr. Paraskevopoulos entered the family medicine residency program of Central Maine Medical Center (CMMC). Under the stress of the program, including working 28 hour and longer shifts and 80 hour weeks, Dr. Paraskevopoulos developed symptoms that were diagnosed as bipolar disorder. His requests for reasonable accommodations were ignored. When Dr. Paraskevopoulos tried to request in writing a reasonable accommodation for his disability, program director Dr. Donald "Raj" Woolever refused to accept or even look at

Dr. Paraskevopoulos's request. Dr. Paraskevopoulos was told that by asking for accommodations he was trying to "have it both ways" and that he couldn't say he was qualified to be a medical resident and then ask for an accommodation. CMMC ignored multiple requests from Dr. Paraskevopoulos's treating doctor, herself faculty of a medical residency program, for reasonable accommodations.

2.    When Dr. Paraskevopoulos objected to being disciplined for calling out sick from work for one day as a result of his disability, Dr. Woolever said "Are you threatening me?" and "It sounds like you are threatening me, if you go there things will end up very badly for you."

3.    When Dr. Woolever refused to discuss Dr. Paraskevopoulos's accommodation requests, Dr. Paraskevopoulos made an appointment with CMMC's Human Resources Director to discuss reasonable accommodations. Instead of the meeting he was expecting with the HR Director, however, the meeting included Dr. Woolever, who fired Dr. Paraskevopoulos and gave false reasons for terminating his employment.

4.    Because of CMMC's discriminatory termination of his employment, Dr. Paraskevopoulos most likely will never be able to become a practicing physician. As a result of this intentional discrimination, denial of reasonable accommodations, retaliation, and interference with his rights under the Maine Human Rights Act, the Family Medical Leave Act and Maine Family

2

Medical Leave Requirements law, he is seeking all available remedies, including back pay and benefits, compensatory damages, liquidated damages, injunctive relief, and attorney's fees and expenses.

## Parties

5.    Plaintiff, Dr. Leo S. Paraskevopoulos, is a resident of Fonthill, Ontario, Canada and at the time of the events in this lawsuit was a resident of Portland, Cumberland County, Maine.

6.    Defendant, Central Maine Medical Center, is a Maine corporation with established places of business in Freeport, Cumberland County, Maine and Brunswick, Cumberland County, Maine.

## Jury Trial Demand

7.    Under Me. R.Civ. P. 38(b), Plaintiff hereby demands trial by jury on all issues triable to a jury.

## Venue

8.    Venue is proper in Cumberland County under 14 M.R.S. § 505 as Defendant has established places of business in Cumberland County.

## Factual Allegations

9.    Dr. Paraskevopoulos graduated from medical school in June 2011 and began working at the Central Maine Medical Center's Family Medicine Residency (the Residency) in July 2011.

3

10.     He received numerous positive evaluations from the faculty he worked with, was well liked by his patients, and provided high-quality patient care.

11.     While employed by the Residency, Dr. Paraskevopoulos was often required to work for 28 or more consecutive hours without rest and worked from 60-80 or more total hours in a week.

12.     While experiencing the extreme fatigue that resulted from these long hours of work, Dr. Paraskevopoulos developed for the first time symptoms of bipolar disorder.

13.     Dr. Paraskevopoulos repeatedly reported to his supervisors that he was having mental health issues and repeatedly requested reasonable accommodations including medical leave to seek diagnosis and treatment.

14.     His requests for reasonable accommodations were ignored or rejected without discussion.

15.     On July 13, 2012, Dr. Paraskevopoulos was called into the office of the Residency's Program Director, Dr. Donald Woolever. Dr. Woolever accused Dr. Paraskevopoulos of missing scheduled rounds on one occasion and being late for work three times. The rounds Dr. Paraskevopoulos was accused of missing were not on the schedules Dr. Paraskevopoulos had access to. On the occasions that Dr. Paraskevopoulos was late, Dr. Paraskevopoulos had properly called-in in advance and had obtained coverage for his absence.

4

16.     Dr. Woolever placed Dr. Paraskevopoulos on probation based on these allegations.

17.     Around this time, Dr. Paraskevopoulos had a meeting with associate program director Deborah Taylor. Dr. Paraskevopoulos told Dr. Taylor that he was feeling fatigued, depressed, and mentally unwell. Dr. Paraskevopoulos asked her if she thought he should request a medical leave of absence to seek treatment and she told him that he should not request a leave of absence.

18.     On December 6, 2012, Dr. Paraskevopoulos wrote in an email to his faculty advisor, Dr. Youd from Rumford Hospital, that:

> I have complained of feelings of anxiety, depression, getting distracted by environmental triggers and fatigue during the last year and a half, if these things are reducing my functionality at home I would like to make an apt with a physician here as I haven't seen one for over a year now and I have also made an apt with my pcp in Canada for evaluation over the break. I think a medical mental health evaluation would be beneficial because I can certainly say I'm intrinsically motivated and want to improve, I feel frustrated when I'm not improving at the rate expected. I am currently not on any medications other than Ambien PRN for insomnia and perhaps I would benefit from some medical help or therapy to improve my functionality.

19.     The very next day after Dr. Paraskevopoulos sent this email to Dr. Youd complaining about anxiety and depression, on December 7, 2012, Dr. Paraskevopoulos was called into a meeting with Dr. Woolever, Dr. Youd,

a human resources representative, and another doctor from Rumford
Hospital, Dr. Kreckle.

20.     Because of fatigue and the yet-undiagnosed bipolar disorder
symptoms, Dr. Paraskevopoulos had been having difficulty completing all
outpatient notes within 48 hours and although all notes from the week were
completed, several notes that week had taken longer than 48 hours. The
probation letter six months earlier required Dr. Paraskevopoulos to, among
other things, complete outpatient office notes within 48 hours.

21.     Dr. Woolever asked why Dr. Paraskevopoulos was unable to
complete the notes within 48 hours and Dr. Paraskevopoulos explained that
he had been experiencing a mental health problem and asked for medical
leave so he could seek diagnosis and treatment.

22.     After Dr. Paraskevopoulos asked for a leave of absence to seek
diagnosis and treatment, he was asked to leave the room. About 15 minutes
later Dr. Paraskevopoulos was called back into the room and Dr. Woolever
told Dr. Paraskevopoulos that he could not have a medical leave and that
Dr. Paraskevopoulos had to resign or his employment would be terminated.

23.     CMMC falsely told the Maine Human Rights Commission that a
final decision to terminate Dr. Paraskevopoulos's employment was made
before he sent the December 6, 2012 email to Dr. Youd about his need for
mental health treatment.

6

24.     CMMC falsely claimed that this final termination decision was made in a December 4, 2012 meeting that Dr. Youd attended.

25.     On December 5, 2012, a day after CMMC claimed to the Maine Human Rights Commission it had made the final decision to terminate Dr. Paraskevopoulos's employment at a meeting with Dr. Youd in attendance, Dr. Youd sent Dr. Paraskevopoulos an email discussing plans for evaluating his performance that clearly contemplated his ongoing future employment:

> Leo,
> There need to be ways to measure your knowledge. I challenge you to come up with a plan for measurement.
> You have been saying the items below in the past, but your knowledge has not been improving. How do you propose measuring what you are learning?
> Thanks,
> Stephanie

26.     This email demonstrates that CMMC's statements to the Maine Human Rights Commission that the decision to terminate Dr. Paraskevopoulos's employment was made before he requested reasonable accommodations for his disability were false pretext.

27.     Dr. Youd's December 5, 2012 email demonstrates that CMMC decided to keep Dr. Paraskevopoulos in the program during the December 4,

7

2012, meeting, but that changed after Dr. Paraskevopoulos's December 6, 2012 email concerning his mental health disability and need for reasonable accommodation.

28.     It was the day after this accommodation request, on December 7, 2012, that he was told -- by the same individuals who decided to keep him in the program on December 4, 2012 -- that he must resign or be terminated.

29.     CMMC falsely told the Maine Human Rights Commission that it did not take action to end Dr. Paraskevopoulos's employment on December 7, 2012.

30.     On Sunday December 9, 2012, Dr. Paraskevopoulos's sister Dr. Elena Paraskevopoulos, a family physician, sent an email to all of the Residency program faculty and residents on Dr. Paraskevopoulos's behalf explaining that he was suffering from a mental health problem, that bipolar disorder was suspected, and again requesting medical leave rather than termination.

31.     The next day, on December 10, 2012, Dr. Woolever met with Dr. Paraskevopoulos in his office and said he would grant Dr. Paraskevopoulos a medical leave of absence for approximately three months.

8

32.     Although Dr. Paraskevopoulos was told he was being granted medical leave, Central Maine Medical Center treated the leave as a disciplinary suspension.

33.     In a letter dated December 11, 2012, Dr. Woolever wrote: "Until you have received clearance to return from your leave of absence and that plan is implemented, you are suspended from further participation in the CMMC Residency program."

34.     Shortly after this medical leave began, Dr. Paraskevopoulos was diagnosed with bipolar disorder and began receiving treatment for this disorder.

35.     Dr. Paraskevopoulos returned from medical leave on March 11, 2013. Dr. Paraskevopoulos was immediately placed on probation.

36.     On Friday, April 19, 2013, Dr. Paraskevopoulos called out of work sick because he was suffering acute depression symptoms of his bipolar disorder.

37.     On Tuesday, April 23, 2013, Dr. Paraskevopoulos asked for a meeting with his faculty advisor, Dr. Bethany Picker. At this meeting, he explained to Dr. Picker that the reason he called out of work sick on April 19, 2013 was that he was suffering acute depression symptoms.

38.     About three hours later, Dr. Paraskevopoulos was called into a disciplinary meeting with Dr. Woolever.

9

39.     During this meeting, Dr. Woolever told Dr. Paraskevopoulos that Dr. Picker had informed him of the earlier conversation and that he had concerns about Dr. Paraskevopoulos's integrity, professionalism, and readiness to function as a full-time resident because he had been out sick for one day due to symptoms of his bipolar disorder.

40.     Dr. Paraskevopoulos said that he believed that he did the right thing by calling out sick.

41.     Dr. Woolever responded that it was concerning to him that Dr. Paraskevopoulos called out sick and that as a result he was concerned that Dr. Paraskevopoulos could not function as a successful resident.

42.     Dr. Paraskevopoulos said he felt that Dr. Woolever was suggesting that he should come in to work rather than calling out sick if he suffered from acute depression symptoms again. Dr. Woolever said that it would be inappropriate for Dr. Paraskevopoulos to come in while suffering from acute depression symptoms because Dr. Paraskevopoulos would be endangering patient care if he was ill.

43.     Dr. Paraskevopoulos told Dr. Woolever that it felt like Dr. Woolever was providing negative consequences for calling out sick due to the symptoms of his disease.

44.     At this point, Dr. Woolever demanded: "Are you threatening me?"

10

45.     Dr. Paraskevopoulos said he was not threatening Dr. Woolever, but Dr. Woolever replied: "It sounds like you are threatening me, if you go there things will end up very badly for you."

46.     On April 26, 2013, at a meeting with Dr. Picker, Dr. Picker told Dr. Paraskevopoulos that the faculty had planned to schedule him for a full resident schedule including on-call. Dr. Picker further said that if Dr. Paraskevopoulos could not handle the trial of a full resident schedule, the faculty had 20 other residents to focus their time on and would consider dismissing him from the residency.

47.     Dr. Paraskevopoulos said that he thought this plan may not comply with reasonable accommodation requirements for training a resident with bipolar disease. He explained that he was being treated by Dr. Cindy Boyack, who was the attending for Maine Medical Center's psychiatry residency and she had experience training doctors with bipolar disease. He explained that Dr. Boyack had recommended that he try a full schedule but if that was not successful, his hours should be reduced and another appropriate plan for success be developed. He explained that Dr. Boyak had told him that it would be inappropriate to dismiss him from the residency if a trial of a full schedule was unsuccessful and that it was unpredictable how he would respond to increased hours and especially night hours because his treatment for his bipolar disease was new.

11

48.     Dr. Paraskevopoulos explained that Dr. Boyak had offered to speak to the faculty of the CMMC residency program directly about how to develop an appropriate plan for working with a resident with bipolar disease.

49.     Dr. Woolever said he would rather not communicate directly with Dr. Boyak, but only indirectly through the Medical Professionals Health Program.

50.     Dr. Paraskevopoulos explained that the doctor from the MPHP had met with him only briefly on two occasions and that Dr. Boyak met with him for one hour every week and so had a much better understanding of his disability and needs. He also explained that Dr. Boyak was an expert on how to work with a resident with bipolar disease to make appropriate reasonable accommodations to comply with the law.

51.     Dr. Picker said that before a decision like terminating Dr. Paraskevopoulos's employment, she would contact Dr. Boyack for an opinion.

52.     On July 2, 2013, Dr. Paraskevopoulos's probation was completed successfully and lifted. At a meeting that day to discuss this, Dr. Woolever told Dr. Paraskevopoulos that he was requiring that Dr. Paraskevopoulos complete an additional 7 ½ months of Residency beyond the normal three years.

12

53.      Also on July 2, 2013, Dr. Woolever told Dr. Paraskevopoulos that although he would be given academic credit for completing 5 ½ months of the second year program successfully, he would have to repeat the 5 ½ months of work including repeating 5 ½ months of "night calls" that Dr. Paraskevopoulos had already completed.

54.      The "night calls" involved working 28-hour shifts and resulted in significant sleep deprivation and fatigue. Dr. Paraskevopoulos's psychiatrist, Dr. Boyak, was very concerned that this would trigger worsening symptoms of Dr. Paraskevopoulos's disability and advised against him working these types of shifts.

55.      During the July 2, 2013 meeting, Dr. Paraskevopoulos explained to Dr. Woolever that sleep deprivation was the worst known trigger for symptoms of bipolar disease and that he was thus very concerned that the night calls would not be appropriate given his disability. He requested the reasonable accommodation of not having to repeat the 5 1/2 months of night calls that he had already completed and was being given academic credit for.

56.      Dr. Woolever refused this request outright and did not discuss it further with Dr. Paraskevopoulos.

57.      Dr. Paraskevopoulos then sent an email to Kirk Miklavic, Human Resources Director for CMMC, and explained the situation, including his

13

concern that being forced to repeat the night calls would trigger his bipolar disorder.

58.     Although the email requested a meeting with Mr. Miklavic before the end of the next week, Dr. Paraskevopoulos did not receive a response from Mr. Miklavic for almost two weeks.

59.     Instead of a response from Mr. Miklavic, Dr. Paraskevopoulos received an email from Dr. Picker later that day telling him that Mr. Miklavic had no control over the night call assignment issue. Dr. Picker's July 2, 2013 email stated:

> When it comes to this level of decision making, however, I think you will get little to no input from Tammy, Ned, or HR. It is completely within the program's/Raj's [Dr. Woolever's] purview to decide where educationally you fall and what rotations you get credit for. . . Things like probation and employment status are relevant to HR, things like what level resident and what rotational credit you get are not.

60.     After the July 2, 2013 requests for reasonable accommodation, no one at CMMC ever discussed the possibility of this or other reasonable accommodations with Dr. Paraskevopoulos.

61.     On November 14, 2013, Dr. Paraskevopoulos's psychiatrist, Dr. Boyak, called Dr. Picker to discuss Dr. Paraskevopoulos's disability, need for reasonable accommodations, and his progress. Dr. Picker did not answer the phone and Dr. Boyak left a voice message.

14

62.     On November 15, 2013, Dr. Boyak spoke by phone with Dr. Picker to discuss Dr. Paraskevopoulos's disability, need for reasonable accommodations, and his progress. Dr, Boyak specifically told Dr. Picker that she was concerned that CMMC was requiring Dr. Paraskevopoulos to take overnight call and that the lack of sleep that resulted could lead to hypomania symptoms.

63.     After this request for reasonable accommodation, no one at CMMC ever discussed the possibility of this or other reasonable accommodations with Dr. Paraskevopoulos.

64.     Later on the same day, November 15, 2013, Dr. Woolever called Dr. Paraskevopoulos into his office and told Dr. Paraskevopoulos that he was placing him on probation again.

65.     Dr. Woolever's claimed reasons for placing Dr. Paraskevopoulos on probation were issues with his social interaction with other staff members, such as defensiveness when receiving negative feedback, or "shopping" for positive feedback.

66.     The alleged social interaction issues were well established symptoms of bipolar disorder.

67.     Unfortunately, as a result of bipolar disorder itself, an individual with bipolar disorder like Dr. Paraskevopoulos often cannot perceive that

they are exhibiting these types of symptoms without external feedback. This makes these symptoms difficult to self-identify.

68.     Dr. Paraskevopoulos was not previously aware of any issue with these particular social interaction symptoms.

69.     Dr. Paraskevopoulos, despite requesting feedback on his performance, before being placed on probation he had not previously received feedback that any CMMC staff perceived these particular problems with Dr. Paraskevopoulos's social interactions.

70.     Because he was not previously aware of any alleged or perceived issue in these areas, Dr. Paraskevopoulos had not been able to seek treatment for these symptoms of his bipolar disorder.

71.     On November 18, 2013, Dr. Paraskevopoulos met with Dr. Woolever and Dr. Paraskevopoulos's advisor, Dr. Bethany Picker, about the new probation period. During this meeting, Dr. Paraskevopoulos tried to give Dr. Woolever and Dr. Picker a letter explaining his disability of bipolar disorder, explaining that the alleged deficiencies could be previously unidentified symptoms of his bipolar disorder that he had not yet been able to seek treatment for because he was unable to self-identify them due to his disability and was thus unaware of them before being placed on probation, and requesting reasonable accommodations for Dr. Paraskevopoulos's disability.

16

72.     Among the reasonable accommodations the letter requested were medical leave to seek treatment for these previously unidentified symptoms or an adjustment to his working hours, or daily check-ins to assure expectations were being met.

73.     During the meeting on November 18, 2013, Dr. Woolever and Dr. Picker repeatedly refused to take the letter proffered by Dr. Paraskevopoulos or discuss how his disability was impacting his job performance.

74.     The letter read as follows:

Nov 18th, 2013
Dear Program Director and faculty;

Understanding Bipolar Disease
Some well known documented symptoms of Bipolar Disease are depression, hypomania, insomnia and concentration difficulties. Upon reflection of Dr. Woolever's recent feedback I believe that some relevant Bipolar symptoms that have been difficult to previously self-identify may be contributing to some of my difficulties meeting expectations.

Some previously "difficult to identify" symptoms of Bipolar Disease include:
• Pressured, loud and uncomfortable speech

- A feeling of possibly catastrophizing some negative feedback in the context of perceived fear, resulting in a desire to immediately attempt to fix the problem.
- An increased feeling of defensiveness to negative feedback or criticism.
- An "up" and "down" demeanor
- Difficulty perceiving that others may be "off-put," annoyed, or "rubbed the wrong way" during our interactions together.
- A tendency to be perceived as over confident or grandiose.

It is also well documented that sleep deprivation/fatigue, stress and seasonal changes often trigger or worsen symptoms.

These "more difficult to identify" symptoms have not been previously self-addressed or brought to my psychiatrists attention thus far. I believe they may be contributing to some of the disconnections and misunderstandings between my self-perception and faculties perception of our interactions together. My CBT and medical tx thus far has been primarily focused on preventing symptoms of depression, hypomania, insomnia and difficulty concentrating.

I am just learning how to control, reduce and live with symptoms of Bipolar disease. Perhaps a discussion could be had about the benefits of some reasonable accommodations that for example may include:

- Reducing work hours.
- Exchanging overnight shifts for day shifts.
- Taking another short medical leave of absence to provide the opportunity to focus on improving my treatment plan and wellbeing.
- Daily check-in's to assure expectations are objectively being met.

I am committed to working very hard towards making any changes in order to meet expectations. Thank you for your understanding.

75.     When Dr. Woolever and Dr. Picker refused to take the letter requesting reasonable accommodations, Dr. Paraskevopoulos tried to verbally summarized the letter, including that it was about his disability and issues with his disability at work, but they still refused to take the letter.

76.     After Dr. Woolever and Dr. Picker refused to take the reasonable accommodations request letter when Dr. Paraskevopoulos attempted to hand it to them, Dr. Paraskevopoulos placed the letter in front of Dr. Woolever on the table. Dr. Woolever repeatedly told Dr. Paraskevopoulos that he wouldn't take the letter from the table.

77.     Dr. Paraskevopoulos then asked if Dr. Woolever and Dr. Picker would allow him to read the letter aloud if they would not accept the letter on paper. Dr. Woolever told Dr. Paraskevopoulos that he may not read it. He

then told Dr. Paraskevopoulos that if Dr. Paraskevopoulos wasn't cleared for work, he wouldn't have returned to the residency and that Dr. Woolever wasn't interested in the reasonable accommodation request letter.

78.    When Dr. Paraskevopoulos tried to explain the issues his disability was causing at work, Dr. Woolever told Dr. Paraskevopoulos he wasn't able to listen to information about Dr. Paraskevopoulos's disability because he was not Dr. Paraskevopoulos's medical provider.

79.    Dr. Picker then told Dr. Paraskevopoulos that he couldn't have it both ways, and that Dr. Paraskevopoulos couldn't ask to be treated like a normal resident and then bring up his disability.

80.    When Dr. Paraskevopoulos told Dr. Woolever and Dr. Picker that the deficiencies they were identifying were symptoms of Bipolar Disease and tried to explain, Dr. Woolever told Dr. Paraskevopoulos repeatedly that he was not interested in hearing about symptoms of Dr. Paraskevopoulos's disability.

81.    Dr. Woolever and Dr. Picker never allowed Dr. Paraskevopoulos to discuss the difficulties Dr. Paraskevopoulos's disability was causing for Dr. Paraskevopoulos at work or possible reasonable accommodations for his disability.

82.     Around November 21, 2013, Dr. Paraskevopoulos's psychiatrist, Dr. Boyak, called Dr. Picker to discuss Dr. Paraskevopoulos's disability, need for reasonable accommodations, and his progress.

83.     After this request for reasonable accommodation, no one at CMMC ever discussed the possibility of this or other reasonable accommodations with Dr. Paraskevopoulos.

84.     Around December 5, 2013, Dr. Paraskevopoulos's psychiatrist, Dr. Boyak, again called Dr. Picker to discuss Dr. Paraskevopoulos's disability, need for reasonable accommodations, and his progress. Dr. Boyak specifically discussed with Dr. Picker whether Dr. Paraskevopoulos should be doing overnight call and expressed that she had concerns about CMMC requiring Dr. Paraskevopoulos to do overnight call. Dr. Boyak encouraged Dr. Picker to have the CMMC residency faculty "give him feedback in the moment when they observe his behaviors as being undesirable."

85.     After this request for reasonable accommodation, no one at CMMC ever discussed the possibility of these or other reasonable accommodations with Dr. Paraskevopoulos.

86.     On January 21, 2014, Dr. Paraskevopoulos was scheduled to have a meeting with Mr. Miklavic that he had requested because he had not been allowed to communicate with Dr. Woolever and Dr. Picker concerning his reasonable accommodations.

87.     Instead of the meeting with Mr. Miklavic that he was expecting, Dr. Paraskevopoulos was called into a meeting with Dr. Woolever, Dr. Picker, and Mr. Miklovic.

88.     In this meeting, Dr. Woolever told Dr. Paraskevopoulos it was the end of the road. He told Dr. Paraskevopoulos that Dr. Paraskevopoulos had not met the conditions of the probation agreement. However, all of the reasons Dr. Woolever gave for this claim were false.

89.     For example, Dr. Woolever said Dr. Paraskevopoulos had failed to check his email every day and respond to all email, but this was false. Dr. Paraskevopoulos had checked his email every day and responded to all appropriate email.

90.     Additionally, Dr. Woolever said that Dr. Paraskevopoulos had been warned by his research advisors not to go through with a research proposal but had done it anyway. The truth was that Dr. Paraskevopoulos's research advisors approved of and even helped Dr. Paraskevopoulos prepare the proposal.

91.     Dr. Paraskevopoulos told Dr. Woolever that none of the reasons he gave were true and again requested medical leave and reasonable accommodations for his disability. Dr. Woolever told Dr. Paraskevopoulos that was not an option.

92.     Dr. Paraskevopoulos asked if he would be allowed to resign. Dr. Woolever responded "that was on the table before and you didn't take it" referring to the previous year when Dr. Paraskevopoulos had requested medical leave rather than resign or be terminated.

93.     After pointing out that Dr. Paraskevopoulos had taken medical leave the last time he was asked to resign or be terminated, Dr. Woolever did not offer to let Dr. Paraskevopoulos resign.

94.     Later, after the meeting was over, Mr. Miklavic gave Dr. Paraskevopoulos the option to resign in lieu of termination.

95.     Dr. Paraskevopoulos submitted his resignation letter on January 22, 2014.

96.     After Dr. Paraskevopoulos resigned under threat of termination, Dr. Woolever signed under oath a notarized statement about Dr. Paraskevopoulos, including that:

> Dr. Paraskevopoulos demonstrated a solid medical knowledge base . . . Dr. Paraskevopoulos developed trusting relationships with his patients. He took ownership of his patient care responsibilities and was a strong patient advocate. He worked closely with other members of the health care team to ensure that his patients could gain access to the care they needed. 'Dr. Leo' was well-loved and appreciated by his patients. . . . He worked hard to meet the requirements of our program and to take the best care possible of his patients. He sought help and assistance appropriately and put forth his best effort. . . . Leo has the potential to develop into a fine physician. He has the necessary foundations and a strong work ethic that will help him succeed in a new program.

23

97.     Completing a residency program is a requirement to practice medicine as an independent physician.

98.     Because Dr. Paraskevopoulos completed two and a half years of a residency program and then resigned, no other residency program will accept him.

99.     As a result, Dr. Paraskevopoulos will most likely never be able to practice medicine.

100.     Dr. Paraskevopoulos has applied to hundreds of residency programs and has been denied by all of these programs.

101.     Dr. Paraskevopoulos filed a charge of discrimination with the Maine Human Rights Commission and the Equal Employment Opportunity Commission on November 13, 2014.

102.     After Dr. Paraskevopoulos filed a complaint with the Maine Human Rights Commission and Equal Employment Opportunity Commission, the program director of another residency program called Dr. Woolever for an employment reference for Dr. Paraskevopoulos.

103.     During this phone call, Dr. Woolever and CMMC retaliated against Dr. Paraskevopoulos for filing his discrimination complaints by refusing to provide an employment reference as it normally did for other former employees. Instead, Dr. Woolever refused to talk to the program director who called and she was told that CMMC could not release standard

24

information about Dr. Paraskevopoulos for "legal reasons" and that she would have to contact CMMC's legal counsel for more information.

104. On October 20, 2016, the Maine Human Rights Commission issued a Notice of Right to Sue to Dr. Paraskevopoulos.

105.    On January 26, 2017, the Equal Employment Opportunity Commission issued a Notice of Right to Sue to Dr. Paraskevopoulos.

106.    Under 5 M.R.S.A. § 4622, 33. Dr. Paraskevopoulos has satisfied one or more of the prerequisites to be awarded attorney fees and all available damages under the Maine Human Rights Act.

107.    Dr. Paraskevopoulos has exhausted his administrative remedies for all claims in this action that require administrative exhaustion.

108.    Central Maine Medical Center acted with actual malice and reckless disregard for Dr. Paraskevopoulos's civil rights protected under the Maine Human Rights Act, the Family Medical Leave Act and Maine Family Medical Leave Requirements law.

109.    Dr. Paraskevopoulos was discriminated against because of his disability, denied reasonable accommodations for his disability, and retaliated against for requesting reasonable accommodations for his disability and for requesting and taking medical leave protected by law.

## Legal Claim

110.     The allegations in paragraphs 1-109 are repeated.

111.  The Defendant has intentionally, willfully, and in reckless disregard of state and federal law, discriminated against Leo Pareskevopoulos because of his disabilities, denied him reasonable accommodations for his disabilities, and retaliated and discriminated against him for requesting reasonable accommodations for his disabilities and for filing discrimination complaints with the Maine Human Rights Commission and the Equal Employment Opportunity Commission, under the Maine Human Rights Act, 5 M.R.S.A. §§ 4551-4634, the Americans with Disabilities Act, 42 U.S.C. §§ 12101-12213, and the and Section 504 of the Rehabilitation Act of 1973, as amended, 29 U.S.C.A. § 794, and intentionally and willfully interfered with his rights and retaliated against him for exercising his rights to request and use leave protected by the Family Medical Leave Act, 29 U.S.C. § 2601 et seq., and the Maine Family Medical Leave Requirements law, 26 M.R.S. § 844. Among other things, the Defendant:

    a.  unlawfully did not make reasonable accommodations for Leo
        Paraskevopoulos's disability such as modified work hours,
        medical leave, and engaging in a good faith interactive dialogue
        about potential reasonable accommodations;

b. retaliated against him for requesting reasonable accommodations by threatening to terminate his employment, demanding that he resign his employment, and constructively discharging him from his employment;

c. retaliated against him for taking protected medical leave by using his protected medical leave as a negative factor in later adverse actions;

d. interfered with his rights under the Maine Human Rights Act by refusing to allow him to request reasonable accommodations for his disability;

e. discriminated against him because of his disability by threatening to terminate his employment and demanding that he resign his employment and constructively discharging him from his employment; and

f. retaliated against Dr. Paraskevopoulos for filing complaints of disability discrimination with the Maine Human Rights Commission and the Equal Employment Opportunity Commission.

112. Dr. Leo Paraskevopoulos is pursuing all possible methods of proving this discrimination and retaliation, including but not limited to, circumstantial and direct evidence, pretext evidence, as well as causation

based on a single unlawful motive and mixed motives, including an unlawful motive.

113.    As a direct and proximate result of the defendant's intentional discrimination, interference, and retaliation against the plaintiff, he has suffered and will continue to suffer damages, including, but not limited to, back pay and benefits, emotional pain and distress, suffering, inconvenience, mental anguish, loss of enjoyment of life, injury to reputation, and other pecuniary and non-pecuniary losses.

**WHEREFORE,** plaintiff requests relief against defendant as follows:

(a)    Enter declaratory relief that defendant violated plaintiff's statutory civil rights to be free of disability discrimination and unlawful retaliation;

(b)    Enter injunctive relief ordering defendant to:

(1) reinstate plaintiff;

(2) provide plaintiff with reasonable accommodations for his disabilities;

(3) post in the Residency staff areas a copy of a remedial notice detailing the judgment in this case as well as the order providing injunctive relief and send a letter printed on Defendant's letterhead to all of the Residency's employees advising them of the judgment against

28

it in this case, enclosing a copy of its policies regarding reasonable accommodations and prohibiting disability discrimination and retaliation against individuals requesting reasonable accommodations, and stating that it will not tolerate any such discrimination, denial of reasonable accommodations, or retaliation, and will take appropriate disciplinary action against any employee or agent of Defendant who engages in such retaliation;

(4) provide effective civil rights training for all managerial employees including program directors on the requirements of all applicable laws prohibiting employment discrimination because of disability and unlawful retaliation against employees for requesting reasonable accommodations and that this training must be completed within 60 days of the entry of Judgment for Injunctive Relief;

(5) provide this training for two years after the date judgment is entered to all new management and supervisory employees including program directors within 60 days of their hire or promotion into a position with responsibility for employees; and

(6) maintain attendance sheets identifying each person who attended each training session and forward a copy of the attendance sheets to Plaintiff's counsel within seven days of each training session;

29

(c)    Award plaintiff back pay for lost wages and benefits and

prejudgment interest thereon and reinstatement, or, in lieu thereof, front pay

for future lost wages and benefits, including future lost income he would have

received as an independent physician had he completed the Residency

program.

(d)    Award compensatory damages in amounts to be determined at

trial by the jury and prejudgment interest thereon;

(e)    Award plaintiff his full costs and reasonable attorney's fees; and

(f)    Award such further relief as is deemed appropriate.

Respectfully submitted,

Date: March 7, 2017

David G. Webbert, Bar No. 7334
Max R. Katler, Bar No. 5227
Johnson, Webbert & Young, LLP
160 Capitol Street, P.O. Box 79
Augusta, Maine  04332-0079
Tel:  (207) 623-5110
E-Mail: dwebbert@johnsonwebbert.com;
mkatler@johnsonwebbert.com

*Attorneys for Plaintiff*

30