UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| LEO S. PARASKEVOPOULOS<br><br>   Plaintiff<br><br>v.<br><br>CENTRAL MAINE MEDICAL CENTER<br><br>  Defendant | CIVIL NO. 2:17-cv-00166-JAW |

**DEFENDANT'S PARTIAL MOTION FOR SUMMARY JUDGMENT
WITH INCORPORATED MEMORANDUM OF LAW**

**MOTION**

Defendant Central Maine Medical Center ("CMMC") moves this Court, pursuant to Rule 56 of the Federal Rules of Civil Procedure, for summary judgment on Count I of Plaintiff's Complaint (disability discrimination, failure to accommodate and retaliation under the Maine Human Rights Act, the Americans with Disabilities Act, and Section 504 of the Rehabilitation Act; interference and retaliation under the Family Medical Leave Act and the Maine Family Medical Leave Requirements; and punitive damages). The reason for this motion, as set forth more fully below in the incorporated memorandum of law, as well as in the accompanying statement of material facts, is that there is no genuine issue of material fact and CMMC is entitled to judgment as a matter of law on Count I of the Complaint.

**INCORPORATED MEMORANDUM OF LAW**

**INTRODUCTION**

The undisputed record in this case establishes that Plaintiff Leo Paraskevopoulos, a former resident in the Family Medicine Residency ("FMR") at CMMC, failed to make satisfactory progress in the FMR program and, ultimately, failed to meet the requirements of the FMR program. Plaintiff's performance issues were formally addressed in February 2012 with a letter of warning, and in July 2012 when he was placed on probation. Plaintiff failed to improve, and in December 2012, CMMC decided to terminate him from the FMR program. When

Plaintiff was told he was going to be terminated, he stated that he needed a mental health evaluation.  Rather than proceed with the planned termination, CMMC suspended Plaintiff and gave him the opportunity to take a medical leave of absence.

Plaintiff was diagnosed with bipolar disorder in December 2012.  He returned to work in March 2013, at which time he was provided with transitional accommodations, and was subsequently taken off of probation in July 2013.  Due to problems with his performance between August 2013 and November 2013, Plaintiff was placed back on probation in November 2013.  In January 2014, Plaintiff failed the Neonatal Resuscitation Program exam for the second time, which was unprecedented, and the faculty's ratings of him on multiple competencies were below acceptable levels.  Accordingly, Plaintiff was terminated from the FMR program in January 2014.

Plaintiff has brought claims against CMMC for: disability discrimination, failure to accommodate and retaliation under the Maine Human Rights Act, the Americans with Disabilities Act, and Section 504 of the Rehabilitation Act; interference and retaliation under the Family Medical Leave Act and the Maine Family Medical Leave Requirements; and punitive damages.  As discussed more fully below, there is no record evidence to support these claims. CMMC is therefore entitled to summary judgment on these claims, which comprise Count I of the complaint in this matter.

## FACTS

As set forth in more detail in Defendant's Statement of Material Facts ("SMF"), filed in support of its Motion for Summary Judgment, CMMC's FMR is a three year graduate medical education program.  SMF ¶ 1.  The FMR is designed to provide training in the full spectrum of family medicine, including outpatient continuity care for all ages of patients, inpatient care of adults and children, emergency care and obstetrics, including management of labor and the delivery of newborns, and has a particular focus on training family physicians interested in

providing care in underserved areas throughout Maine and Northern New England. SMF ¶ 2.

The FMR is accredited by the American Council for Graduate Medical Education ("ACGME"),

SMF ¶ 4, and is subject to the American Board of Family Medicine's ("ABFM") training

standards and certification requirements, SMF ¶ 6. Dr. Donald "Raj" Woolever was the FMR

program director at all times relevant to the complaint. SMF ¶ 8.

Plaintiff was not accepted to any medical schools in the United States or Canada,

graduated at the bottom of his medical school class at St. George's University in Grenada, and

was not accepted to any residency programs in the Unites States or Canada as a first match.

SMF ¶¶ 9-12. CMMC had an unexpected opening in its FMR program and Plaintiff enrolled as

a first year resident in July 2011. SMF ¶¶ 13-14.

Plaintiff had a number of performance problems in the FMR program and these problems

were addressed before he raised any concerns about his mental health or requested a medical

leave of absence. SMF ¶¶ 15-24. Leading up to the December 7, 2012 meeting at which

Plaintiff's employment was going to be terminated for failure to meet the requirements of his

probation, Plaintiff had attributed his difficulties in the residency program to his sick grandfather

and upcoming wedding. SMF ¶¶ 26, 30. However, after Plaintiff told Dr. Woolever that he

needed a mental health evaluation, CMMC decided not to terminate Plaintiff's employment.

SMF ¶ 35.

Plaintiff was granted a medical leave of absence through March 2013 and was provided

transitional accommodations upon his return to work. SMF ¶¶ 37, 43-47. Thereafter, in July

2013, he was taken off of probation. SMF ¶ 50. Around that same time, CMMC determined that

Plaintiff would be required to repeat part of his second year in or to satisfy ACGME's continuity

requirement that residents be physically present with the same panel of patients for two

consecutive years. SMF ¶ 52. Similarly, Plaintiff was required to work overnight shifts because

they are an essential component of the FMR program. SMF ¶¶ 58. In addition the fact that he

3

offered to work overnights, SMF ¶ 59, and did not want to be prohibited from working

overnights, SMF ¶ 61, neither Plaintiff nor anyone on his behalf ever made a direct and specific

request that he not work overnight shifts, SMF ¶¶ 81-85, 60-61.

Between August 2013 and November 2013, Dr. Woolever received a number of concerns

about Plaintiff's performance, SMF ¶¶ 69-76, and placed Plaintiff back on probation in

November 2013, SMF ¶ 77-80.  Thereafter, Dr. Woolever continued to receive concerns about

Plaintiff's performance, SMF ¶¶ 86-87, and was concerned when he learned that Plaintiff was

late for, and failed for the second time, the Neonatal Resuscitation Program ("NRP") exam, and

was assessed as below level on multiple competencies evaluated by ACGME, SMF ¶¶ 92-100.

CMMC conferred with Plaintiff's psychologist from the Maine Medical Professional Health

Program ("MPHP"), Dr. Margaret Palmer, and she stated that despite CMMC's efforts to assist

Plaintiff, he had shown little to no growth, which was a statement of his real abilities.  SMF ¶

101.  Accordingly, in January 2014, after considering all of the concerns about Plaintiff's

performance in conjunction with his second NRP exam failure and his poor milestone

evaluations, he was terminated from the FMR program, SMF ¶ 102, but was later allowed to

resign in lieu of the termination, SMF ¶ 106.

## ARGUMENT

### I.    The Summary Judgment Standard

Summary judgment is appropriate when "the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

Civ. P. 56(a).  For summary judgment purposes, "genuine" means that "a reasonable jury could

resolve the point in favor of the nonmoving party," and a "material fact" is one whose "existence

or nonexistence has the potential to change the outcome of the case." *Tropigas de Puerto Rico,

Inc. v. Certain Underwriters at Lloyd's of London,* 637 F.3d 53, 56 (1st Cir.2011) (citations

omitted). Once the moving party has made this preliminary showing, the nonmoving party must

"produce specific facts, in suitable evidentiary form, to establish the presence of a trialworthy issue." *Triangle Trading Co. v. Robroy Indus., Inc.,* 200 F.3d 1, 2 (1st Cir.1999); *see also* Fed. R. Civ. P. 56(e).

Although the Court "view[s] the evidence in the light most favorable to the nonmovant, 'as to any essential factual element of its claim on which the nonmovant would bear the burden of proof at trial, its failure to come forward with sufficient evidence to generate a trialworthy issue warrants summary judgment to the moving party.'" *In re Spigel,* 260 F.3d 27, 31 (1st Cir. 2001) (citation omitted). "Even in employment discrimination cases where elusive concepts such as motive or intent are at issue, summary judgment is appropriate if the non-moving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation." *Benoit v. Technical Mfg. Corp.,* 331 F.3d 166, 173 (1st Cir.2003) (citation omitted).

## II.      Defendant is Entitled to Summary Judgment on Plaintiff's Discrimination, Failure to Accommodate and Retaliation Claims

Plaintiff's complaint alleges parallel claims under the Maine Human Rights Act, 5 M.R.S. §§ 4551-4634, the Americans with Disabilities Act, 42 U.S.C. §§ 12101-12213, and Section 504 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 794, that CMMC: (1) discriminated against him based on his disability, (2) failed to accommodate his disability, and (3) retaliated against him for requesting reasonable accommodations and for filing discrimination complaints with the MHRC and EEOC.

### A.      CMMC Did Not Discriminate Against Plaintiff Because of a Disability

Plaintiff's Second Amended Complaint alleges that CMMC discriminated against him because of his disability by unlawfully terminating his employment.  *See* Second Amendment Complaint ¶ 122(e).  As set forth below, Plaintiff cannot establish a prima facie case of disability discrimination and, even if he could, the evidence shows that his employment was terminated because of his performance deficiencies.

In order to survive summary judgment on a claim of disability discrimination under the MHRA and ADA, Plaintiff must prove that: (1) he was disabled within the meaning of the MHRA and ADA (2) he was able to perform the essential functions of his job with or without a reasonable accommodation, and (3) that he was discharged because of his disability. *Harding*, 436 F. Supp. 2d at 169 (citing *Garcia-Ayala v. Lederle Parenterals, Inc.*, 212 F.3d 638, 646 (1st Cir. 2000). Similarly, in order to survive summary judgment on a claim of disability discrimination under the Rehabilitation Act, Plaintiff must prove that: (1) he was disabled, (2) otherwise qualified to perform the essential functions of the position with or without a reasonable accommodation, and (3) discriminated against *solely* on the basis of his disability. *See Leary v. Dalton*, 58 F.3d 748, 752 (1st Cir. 1995) ("Section 504 alone, however, continues to require a showing that the plaintiff's disability was the *sole* reason for the defendant's adverse action.") (citing 29 U.S.C. § 794(a)).

Plaintiff can present direct evidence of discrimination or indirect evidence using the *McDonnell Douglas* burden-shifting framework. *Ramos–Echevarría v. Pichis, Inc.,* 659 F.3d 182, 186 (1st Cir. 2011). "Direct evidence' refers to 'a smoking gun' showing that the decision-maker *relied upon* a protected characteristic in taking an employment action." *PowerComm, LLC v. Holyoke Gas & Elec. Dep't*, 657 F.3d 31, 35 (1st Cir. 2011), *reh'g denied*, 662 F.3d 41 (1st Cir. 2011) (emphasis in original). *See also Morissette v. Cote Corporation*, 190 F. Supp. 3d 193, 202 (D. Me. 2016) (holding employer's statements, which could plausibly be interpreted either as discriminatory or benign, did not constitute direct evidence of discrimination). Under the *McDonnell Douglas* framework, if the plaintiff establishes a prima facie case of discrimination, then the employer must articulate a legitimate, non-discriminatory reason for its action. *Ramos–Echevarría*, 659 F.3d at 186-87. If the employer offers a non-discriminatory reason, "the burden shifts back to the plaintiff to show that the employer's justification is mere pretext cloaking discriminatory animus." *Id.* at 187.

       i.     *Plaintiff was not disabled under federal law*

First, Plaintiff cannot prove that he was disabled within the meaning of federal law.[1]  Under the ADA, "[t]he term 'disability' means, with respect to an individual-(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; . . . or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2).  To determine whether a plaintiff has a disability under 42 U.S.C. § 12102(2), the court must determine whether: (1) the plaintiff has a physical or mental impairment, (2) the activities allegedly limited by the impairment are major life activities within the meaning of the ADA, and (3) the impairment substantially limits the major life activities.  *Harding*, 436 F. Supp. 2d at171 (citing *Bragdon v. Abbott,* 524 U.S. 624, 631 (1998)).

Plaintiff had been enrolled in the FMR program for approximately 1.5 years before he was diagnosed as bipolar.  SMF ¶¶ 14, 38.  Even though Plaintiff was diagnosed as bipolar in December 2012, SMF ¶ 38, simply being diagnosed with bipolar does not automatically make him disabled under federal law. As the First Circuit explained, this circuit "has recognized depression as a mental impairment that *may constitute*, at least in some circumstances, a disability under federal law." *Calero-Cerezo v. U.S. Dep't of Justice*, 355 F.3d 6, 20 (1st Cir. 2004) (emphasis added).

Accordingly, Plaintiff must present evidence to demonstrate that he was substantially limited in the performance of a major life activity or that he was regarded as being so limited.  *See* 42 U.S.C. § 12102(2); *Harding*, 436 F. Supp. 2d at171 (citing *Bragdon v. Abbott,* 524 U.S. 624, 631 (1998)).[2]  Based on the Second Amended Complaint and the record evidence, it is unclear which major life activity Plaintiff claims he was substantially limited in performing.  To the extent Plaintiff is claiming that he was substantially limited in the major life activity of sleeping, difficulty sleeping is extremely widespread and there is no evidence that Plaintiff's sleep was substantially limited as compared to the rest of the population.  *See, e.g.*, *Pouliot v. Town of Fairfield*, 226 F.

---

[1] CMMC acknowledges that bipolar is considered a mental disability under the MHRA. 5 M.R.S. § 4553-A(1)(B). *Cf. infra*, *Calero-Cerezo v. U.S. Dep't of Justice*, 355 F.3d 6, 20 (1st Cir. 2004).
[2] While a plaintiff can also present evidence that he had a record of being substantially limited in a major life activity, *id.*, Plaintiff's Second Amended Complaint does not allege that he had any such record.

7

Supp. 2d 233, 243 (D. Me. 2002). If Plaintiff is claiming that he was substantially limited in the major life activity of working, he cannot prevail because there is no evidence that he was precluded from more than the performance of a particular job. *See, e.g.*, *Guzman-Rosario v. United Parcel Serv., Inc.*, 397 F.3d 6, 11 (1st Cir. 2005).

Furthermore, there is no evidence that CMMC regarded Plaintiff as substantially limited in one or more major life activity. *See, e.g.*, *Bailey v. Georgia-Pac. Corp.*, 306 F.3d 1162, 1169 (1st Cir. 2002). The undisputed facts show that CMMC did not believe that Plaintiff's bipolar disorder made it harder for him to sleep than the average person, SMF ¶ 119, and that at no time before, during or after Plaintiff's residency, did CMMC regard Plaintiff as disabled or as having a disability, SMF ¶ 120. Indeed, CMMC believed that Plaintiff was capable of working overnight shifts and was tolerating such shifts well. SMF ¶ 121.

### ii.   Plaintiff could not perform the essential functions of his job

Second, even if Plaintiff could prove that he was disabled, he cannot prove that he was able to perform the essential functions of his job without or without a reasonable accommodation. To determine whether Plaintiff could perform the essential functions of his job, the essential functions must first be identified.

The First Circuit has explained that "[a]n essential function is one that is 'fundamental' to a position." *Sepulveda-Vargas v. Caribbean Restaurants, LLC*, 888 F.3d 549, 553 (1st Cir. 2018) (citing *Kvorjak v. Maine*, 259 F.3d 48, 55 (1st Cir. 2001)). "The term does not include 'marginal' tasks, but may encompass 'individual or idiosyncratic characteristics' of the job." *Id.* Courts generally give deference to academic institutions and medical professions when determining essential functions. *See, e.g.*, *Shin v. University of Maryland Medical System,* 369 Fed. Appx. 472 (4th Cir. 2010) (holding medical resident's request for a reduced patient load was in direct conflict with the residency educational goals designed to develop competency and noting reluctance to substitute the court's judgment on the standards for professional and academic achievement in a

medical residency program).  *See also*, *Zukle v. Regents of Univ. of California*, 166 F.3d 1041, 1047–48 (9th Cir. 1999) (agreeing with the First, Second and Fifth Circuits that an educational institution's academic decisions are entitled to deference and stating "we will extend judicial deference to the evaluation made by the institution itself, absent proof that its standards and its application of them serve no purpose other than to deny an education to handicapped persons"). Similarly, in *Laurin v. Providence Hosp.*, 150 F.3d 52 (1st Cir. 1998), the First Circuit held that shift rotation, working approximately one third of scheduled hours during the evening or night shift, was an essential function of the registered nurse's job.  In reaching its holding, the court explained that "[m]edical needs and emergencies ... do not mind the clock, let alone staff-nurse convenience," and "to suggest otherwise would be tantamount to maintaining that night work is not an 'essential function' of a night watchman's job, even though that is the only time the premises are not otherwise occupied."  *Id.* at 59.

At CMMC, overnight shifts are an essential function of the FMR program.  SMF ¶ 54. Overnight shifts are an essential function because when a resident graduates from the FMR, the program has to certify that the resident has the ability to work in environments that require 24-hour functioning.  SMF ¶ 44.  CMMC's FMR requires all residents to work night call (24-hour shift plus 4 hours for transferring patient care) and night floats (14-hour overnight shifts for 5 nights in a row) and has not made exceptions to this requirement.  SMF ¶¶ 57, 58.[3]  Because working overnight shifts was a requirement of all residents, if Plaintiff had not been required to work overnight shifts he would not have had an equivalent experience to his other resident peers. Other essential functions of the FMR program include satisfactory academic performance (as outlined in the ACGME accreditation requirements), satisfactory patient care, and satisfactory communication and interpersonal skills.  SMF ¶ 68.

---

[3] CMMC is not aware of any other family medicine residencies in Maine that have accommodated residents by not requiring them to work overnight shifts.  SMF ¶ 64.  Dr. Boyack does not know if Maine Medical Center's family medicine residency has made accommodations for individuals similarly situated to Plaintiff to not work overnight shifts.  SMF ¶ 65.  A family medicine residency is different than a psychiatry residency.  SMF ¶¶ 66-67.

It is unclear whether Plaintiff is arguing that he was able to work overnight shifts.  On the one hand, Plaintiff offered to do two weeks straight of night float, SMF ¶ 59, and did not want Dr. Boyack to prohibit him from overnight call, SMF ¶61, but on the other hand, alleges that he wanted to exchange his overnight shifts for day shifts, Second Amended Complaint ¶ 74, and that Dr. Boyack had concerns about him working overnight shifts, Second Amended Complaint ¶ 84.  To the extent that Plaintiff is arguing that he was unable to work overnight shifts, he was unable to perform one of the essential functions of the FMR program and was not a qualified individual under federal law.  *See e.g.*, *Sepulveda-Vargas*, 888 F.3d at 554 (holding that rotating shifts were an essential function of the plaintiff's assistant manager position, his employer was not required to provide him a set schedule, and he was not a qualified individual under the ADA).

With respect to the other essential functions of the FMR program, the undisputed record shows that the course of over two and half years, Plaintiff's performance was below expected levels.  Perhaps this should not have been a surprise, given the fact that Plaintiff was not accepted to any medical schools in the United States or Canada, SMF ¶ 9, and that he graduated 305 out of 320 from the medical school he attended in Grenada, SMF ¶ 10.  In any event, Plaintiff was, among other things, repeatedly late for his shifts, SMF ¶¶ 16, 18, behind on required paperwork, SMF ¶ 21, did not attend all required lectures, SMF ¶ 21, demonstrated insufficient medical knowledge, SMF ¶ 21, generated concerning feedback from his peers, SMF ¶¶ 74-75, did not perform well on the Family Medicine Teaching Service ("FMTS"), SMF ¶ 76, was late for, and failed, the Neonatal Resuscitation Program twice, SMF ¶¶ 88-93, and was assessed to be far below expected levels in multiple competencies by himself and by the faculty, SMF ¶¶ 98-100.

As discussed in more detail below, Plaintiff was granted a medical leave, SMF ¶ 37, returned to work on a reduced schedule, which lasted for approximately three months, SMF ¶¶ 44-46, and was given a schedule that enabled him to regularly see Dr. Boyack in Portland, SMF ¶ 47. Notwithstanding these accommodations, plus regular check-ins with faculty, Plaintiff failed to

meet the program's requirements.

Plaintiff cannot prove that if he had not been required to work overnight shifts—which would not have been reasonable for the reasons set forth above—then he would have been able to perform the essential functions of the FMR program. Plaintiff worked few overnight shifts between August 2013 and January 2014, SMF ¶ 63, and there is no evidence that these few overnight shifts had any significant impact on his overall performance problems. Although Plaintiff would like attribute all of his tiredness to overnight shifts, he admitted that in November 2013, he was tired not necessarily from working overnight shifts but because of a "15 hour schedule or studying for the USMLEs or a million other reasons . . . ." SMF ¶ 118. Moreover, while sleep deprivation is one factor that can trigger Plaintiff's bipolar, there were a number of other factors, including his relationship with his wife, his relationships with other women, his financial stress, his gambling problem, and living alone that triggered his bipolar. SMF ¶¶ 112-117.

### iii.   No causal connection between Plaintiff's disability and termination

Third, Plaintiff cannot prove that he was discharged because of his disability, as required by the MHRA and ADA, let alone prove that his disability was the sole reason, as required by the Rehabilitation Act. *See, e.g.*, *Leary v. Dalton*, 58 F.3d 748, 752 (1st Cir. 1995) ("Section 504 alone, however, continues to require a showing that the plaintiff's disability was the *sole* reason for the defendant's adverse action.") (citing 29 U.S.C. § 794(a)); *cf. Palmquist v. Shinseki*, 689 F.3d 66, 72 (1st Cir. 2012). The record shows that there is no causal connection between Plaintiff's bipolar and his termination.

CMMC addressed concerns about Plaintiff's performance several months before it had any indication whatsoever that Plaintiff may have a mental health issue. SMF ¶¶ 15-17. Moreover, in December 2012, CMMC was going to terminate Plaintiff's employment, but upon learning that he wanted a mental health evaluation, decided not to terminate his employment. SMF ¶¶ 25-26, 33-

36.  In July 2013, after Plaintiff had been diagnosed with bipolar disorder, and after he returned from his medical leave of absence, and after he had received transitional accommodations in the form of a graduated schedule for his return to work, CMMC took Plaintiff off of probation.  SMF ¶ 50.  Only after Plaintiff's performance problems continued throughout the fall and into the winter of 2013, did CMMC decide to terminate his employment in January 2014, more than one year after it learned that Plaintiff had bipolar disorder.  SMF ¶ 38, 102.  Moreover, prior to terminating Plaintiff's employment, CMMC conferred with Plaintiff's psychologist from the MPHP, Dr. Margaret Palmer, and she stated that despite CMMC's efforts to assist Plaintiff, he had shown little to no growth, which was a statement of his real abilities.  SMF ¶ 101.  Ultimately, Plaintiff's employment was expressly conditioned upon his meeting the requirements of, and making satisfactory progress in, the educational medical residency program, and Plaintiff failed to meet this condition.

### iv.    Plaintiff was terminated for his performance deficiencies

Even assuming *arguendo* that Plaintiff can make out a prima facie showing of discrimination, the record shows that CMMC had a legitimate, non-discriminatory reason for its employment decisions—Plaintiff's performance after two and a half years in the residency program was substantially below an acceptable level despite the faculty's repeated efforts to correct his performance.  *See, e.g.*, *Harding*, 436 F. Supp. 2d at 179 (citing *McMillan v. Mass. Soc'y for the Prevention of Cruelty to Animals,* 140 F.3d 288, 300 (1st Cir. 1998) (employer's testimony that it terminated the plaintiff due to her poor work performance and acrimonious relationship with her co-workers was sufficient to shift the burden to the plaintiff to show that these reasons were a pretext for retaliation); *Hodgens v. General Dynamics Corp*., 144 F.3d 151, 166 (1st Cir. 1998) ("In order to rebut the presumption that arises upon the establishment of a prima facie case, the employer need only produce enough competent evidence which, if taken as

true, would permit a rational factfinder to conclude that the challenged employment action was taken for a legitimate, nondiscriminatory reason.").

As set forth in more detail above, the record includes numerous examples of Plaintiff's performance deficiencies—between February 2012 and July 2012 he was late for several shifts, SMF ¶¶ 15-18; his medical knowledge and lecture attendance were deficient, and his paperwork was late, as of November 2012, SMF ¶¶ 21-22; nearly one year later in September 2012 Plaintiff's colleagues reported concerns about his medical knowledge, patient care, and communication, SMF ¶¶ 74-75; and in January 2014, he failed an important examination for the second time—and he was late to the exam, and his medical knowledge was far below expectations, SMF ¶¶ 89-100. Moreover, between the late summer and winter of 2013, Dr. Woolever received a number of complaints about Plaintiff's performance.  SMF ¶¶ 71-76, 86-87.  Thus, CMMC has satisfied its burden of producing evidence of a legitimate, non-discriminatory reason for terminating Plaintiff.

Therefore, it is Plaintiff's burden "to show, unassisted by the original inference of discrimination, that the employer's proffered reason is actually a pretext for discrimination of the type alleged," *Mesnick*, 950 F.2d at 823, "the real reason for his termination being based on impermissible animus directed toward him because of his [disability]," *Harding*, 436 F. Supp. 2d. at 179.  Moreover, "[t]he First Circuit has explained that it is 'insufficient for a plaintiff merely to undermine the veracity of the employer's proffered justification; instead, [he] must muster proof that enables a factfinder rationally to conclude that the stated reason behind the adverse employment decision is not only a sham, but a sham intended to cover up the proscribed type of discrimination."  *Harding*, 436 F. Supp. 2d. at 179-80 (quoting *Dichner v. Liberty Travel*, 141 F.3d 24, 30 (1st Cir. 1998)).  The nonmoving plaintiff may demonstrate pretext either indirectly by showing that the employer's stated reasons for its adverse action were not credible, or directly by showing that that action was more likely motivated by a discriminatory reason. *See Burdine,* 450 U.S. at 256, 101 S.Ct. 1089. In addition, close temporal proximity between two

events may give rise to an inference of causal connection. Thus, "protected conduct closely followed by adverse action may justify an inference of retaliatory motive." *Hodgens v. Gen. Dynamics Corp.*, 144 F.3d 151, 168 (1st Cir. 1998).

Plaintiff cannot meet this burden (*i.e.* Plaintiff cannot prove that the real reason for his termination was based on impermissible animus directed toward him because of his bipolar disorder). In this case, where CMMC decided not to terminate Plaintiff in December 2012 after learning about his mental health issues, it is illogical to argue that CMMC terminated his employment because of his mental health issues one year later. The record evidence shows that CMMC was concerned about Plaintiff's performance before he ever raised any issues about his mental health and before he was diagnosed with bipolar disorder. CMMC's concerns about Plaintiff's performance, and his inability to meet the requirements of, and make satisfactory progress in, the FMR is what resulted in his termination—not any discriminatory animus related to his bipolar disorder. Indeed, as noted above, at no point did CMMC consider Plaintiff to be disabled. SMF ¶ 120.

### B. CMMC Did Not Fail to Accommodate Plaintiff's Alleged Disability

Plaintiff's Second Amended Complaint alleges that CMMC "did not make reasonable accommodations for [Plaintiff's] disability such as modified work hours, medical leave, and engaging in a good faith interactive dialogue about potential reasonable accommodations." *See* Second Amendment Complaint ¶ 122(a). As set forth in more detail below, Plaintiff's claim must fail because the record evidence shows that CMMC granted Plaintiff a medical leave, provided him with a reduced schedule when he returned to work after his medical leave, accommodated his schedule to ensure he could regularly see Dr. Boyack in Portland, and communicated with him regularly to make sure he had what he needed to succeeded in the FMR.

"In order to survive a motion for summary judgment on a reasonable accommodation claim, the plaintiff must produce enough evidence for a reasonable jury to find that (1) he is

disabled within the meaning of the ADA, (2) he was able to perform the essential functions of the job with or without a reasonable accommodation, and (3) [the defendant], despite knowing of [the plaintiff]'s disability, did not reasonably accommodate it." *Freadman*, 484 F.3d at 102 (internal quotation marks omitted).  CMMC incorporates its discussion above regarding whether Plaintiff is disabled and whether he was able to perform the essential functions of his job.  Accordingly, this section focuses on whether CMMC reasonably accommodated Plaintiff.

"Ordinarily, the employer's duty to accommodate is triggered by a request from the employee." *Id.* (citing *Reed v. LePage Bakeries, Inc.,* 244 F.3d 254, 261 (1st Cir. 2001)).  This is because "an employee's disability and concomitant need for accommodation are often not known to the employer." *Reed,* 244 F.3d at 261.  Thus, Plaintiff bears the burden of demonstrating that he "sufficiently requested the accommodation in question."  *Id.* at 260.  An employee's request (1) "must be sufficiently direct and specific," and (2) "must explain how the accommodation requested is linked to some disability." *Id.* at 261 (internal quotation marks omitted).  "[T]he plaintiff must also show that the proposed accommodation is reasonable−that it 'would enable [him] to perform the essential functions of [his] job,' and that 'at least on the face of things, it is feasible for the employer under the circumstances.'" *Freadman,* 484 F.3d at 103 (citing *Reed,* 244 F.3d at 259).

The evidence shows that upon learning about Plaintiff's mental health issues, CMMC provided him with reasonable accommodations. First, CMMC decided not to terminate Plaintiff's employment and granted him a medical leave of absence.  SMF ¶¶ 35-37. Second, CMMC provided Plaintiff with transitional accommodations when he returned to work in March 2013 when Dr. Boyack requested that Plaintiff be provided with a gradual return to work for two weeks. SMF ¶¶ 44.  Although Dr. Boyack only requested that he have a reduced schedule for two weeks, CMMC provided him with a reduced scheduled for approximately three months.  SMF ¶ 46.

Plaintiff alleges that he also requested the reasonable accommodation of being excused from working overnight shifts and the reasonable accommodation of being granted another

medical leave of absence.  With respect to overnight shifts, when Plaintiff returned to work in March 2013, Dr. Boyack stated that he could not be scheduled for overnight call the first few weeks back.  SMF ¶ 44.  This prohibition on overnight call did not extend beyond the first weeks back.  SMF ¶ 45.  Plaintiff was not scheduled for overnight shifts between March 2013 and July 2013.  SMF ¶ 44-46.

Any subsequent requests regarding overnight shifts were not sufficiently direct and specific.  While Dr. Boyack discussed Plaintiff's overnight shifts with CMMC thereafter, she never made a request that he not work overnight shifts, nor did she ever prohibit CMMC from having him from working overnight shifts (other than during his return to work in March 2013).  SMF ¶¶ 45, 61.  Moreover, Plaintiff's own testimony states that he requested to work two weeks straight of night float in July 2013, wanted to participate fully in the program, and did not want Dr. Boyack to prohibit him from overnight shifts. SMF ¶¶ 59, 61.

When the issue of Plaintiff's credits for overnight shifts and night floats arose in the summer of 2013, Plaintiff told Kirk Miklavic in human resources that he worked everything out with Dr. Woolever.  SMF ¶ 53.  *See Freadman v. Metro. Prop. & Cas. Ins. Co.*, 484 F.3d 91, 105 (1st Cir. 2007) (rejecting plaintiff's proposition that "employees who make requests have no obligation to further clarify their needs once the employer offers an accommodation the employee believes is insufficient").  In addition, Plaintiff was required to repeat part of his second year in order to satisfy ACGME's continuity requirement that residents be physically present with the same panel of patients for two consecutive years.  SMF ¶ 52.

Finally, at the November 18, 2013 meeting, neither Dr. Woolever, nor Dr. Picker, understood Plaintiff to be asking for an accommodation of any sort.  SMF ¶¶ 83, 85.  At no point did Plaintiff state that the written document represented a request for accommodations.  SMF ¶¶ 82, 84.  Moreover, there is no record evidence that at any point after November 18, 2013, did Plaintiff send the written document by mail, email or other means.  Even if Plaintiff had been

sufficiently direct and specific in a request not to work overnight shifts, removing overnight shifts would have removed an essential function of his position as a FMR resident and would not have been a reasonable accommodation. *See, e.g.*, *Sepulveda-Vargas v. Caribbean Restaurants, LLC*, 888 F.3d 549, 553 (1st Cir. 2018).

In the context of an academic institution, whether the institution met its duty of reasonable accommodation, can be decided as a matter of law.  As the First Circuit has explained:

> If the institution submits undisputed facts demonstrating that the relevant officials within the institution considered alternative means, their feasibility, cost and effect on the academic program, and came to a rationally justifiable conclusion that the available alternatives would result either in lowering academic standards or requiring substantial program alteration, the court could rule as a matter of law that the institution had met its duty of seeking reasonable accommodation. In most cases, we believe that, as in the qualified immunity context, the issue of whether the facts alleged by a university support its claim that it has met its duty of reasonable accommodation will be a 'purely legal one'."

*Wynne v. Tufts Univ. Sch. of Med.*, 932 F.2d 19, 26 (1st Cir. 1991).

As discussed in more detail above, overnight shifts are an essential function because when a resident graduates from the FMR, the FMR program has to certify that the resident has the ability to work in environments that require 24-hour functioning.  SMF ¶ 56.  If CMMC allowed Plaintiff to graduate from the FMR program without ensuring his ability to work overnight shifts, it would have lowered the academic requirements for Plaintiff, substantially altered the program, and been unable to certify that he was capable of making sound decisions in the middle of the night.  Furthermore, Plaintiff has not presented any facts or evidence that overnight shifts are not an essential function of the FMR program.

With respect to the medical leave of absence, the only time Plaintiff requested a medical leave of absence was in December 2012, and the leave was granted. SMF ¶ 37. Prior to that, in July 2012, Plaintiff asked Dr. Taylor for advice about whether he should take a medical leave of absence and she advised him to try counseling, SMF ¶ 29.  At no

time prior to December 2012 did he request a medical leave of absence. SMF ¶ 105. Similarly, at no time after his return to work in March 2013 did he request a medical leave of absence, until after he was told he was being terminated on January 21, 2014.  SMF ¶ 105.  Again, as referenced above, at the November 18, 2013 meeting, neither Dr. Woolever, nor Dr. Picker, understood Plaintiff to be asking for an accommodation.  SMF ¶¶ 83, 85.

### C.  CMMC Did Not Retaliate Against Plaintiff

The Second Amended Complaint alleges that CMMC retaliated against Plaintiff for requesting reasonable accommodations by threatening to terminate his employment, demanding that he resign from his employment, and constructively discharging him from his employment. *See* Second Amendment Complaint ¶ 122(b).  *See* Second Amended Complaint ¶ 122(f)  The record evidence, discussed in more detail below, shows that there is no causal connection between Plaintiff's requests for accommodations and his termination, or between the filing of his complaints and any other alleged adverse action and, therefore, this claim cannot survive.

In order to bring a successful retaliation claim under state and federal law, a plaintiff must prove that he undertook protected conduct, his employer took material adverse action against him, and that a causal nexus exists between the protected conduct and the adverse action.  *See e.g.*, *Medina-Rivera v. MVM, Inc.*, 713 F.3d 132, 139 (1st Cir. 2013); *Connell v. Bank of Boston*, 924 F.2d 1169, 1179 (1st Cir. 1991). Pursuant to the Rehabilitation Act, a plaintiff must also prove that the protected conduct was the but-for cause of the adverse action.  *Pollack v. Regional Sch. Unit 75,* 12 F. Supp. 3d 173, 190 (D. Me. 2014).

As of February 2012 when Plaintiff received his first written warning, and July 2012 when Plaintiff was first placed on probation, there is no record evidence that he had engaged in any protected conduct.  Similarly, the decision to terminate Plaintiff's employment in December 2012 was made before he raised issues regarding his mental health or requested medical leave.  SMF ¶ 25.  The record evidence shows that contrary to retaliating against Plaintiff for taking medical

leave and requesting a gradual return to work schedule, CMMC further accommodated Plaintiff by allowing him to maintain a reduced schedule for three months and scheduled him in a manner that enabled him to regularly see Dr. Boyack.  SMF ¶¶ 46-47.  In addition, after these events, Plaintiff was taken off of probation.  SMF ¶ 50.  CMMC did not terminate Plaintiff for more than one year after learning about his bipolar, during which time CMMC worked closely with MPHP to ensure that Plaintiff's needs were met.  SMF ¶ 41-42.  CMMC's actions were in response to Plaintiff's performance issues and had nothing to do with his medical condition and, therefore, Plaintiff cannot prove a causal nexus, let alone but-for causation.

Finally, Plaintiff's claim for retaliation based on CMMC's letters of recommendation cannot succeed.  The initial letter of recommendation made reference to Plaintiff's difficulties in the FMR program and Plaintiff approved this letter.  SMF ¶ 108.  Upon receiving an inquiry from the University of Kansas about the difficulties referenced in the first letter, CMMC submitted a second letter providing more information to the University of Kansas.   SMF ¶ 109.  Notwithstanding the fact that there is no record evidence to suggest that the letters were anything but good faith efforts to provide positive yet honest information about Plaintiff, Plaintiff released all claims related to the second letter of recommendation.  SMF ¶ 110.

### III.    Defendant is Entitled to Summary Judgment on Plaintiff's Interference and Retaliation Claims under the FMLA and MFML

Plaintiff's Second Amended Complaint alleges parallel claims for interfering with his rights and retaliating against him for exercising his rights to request and use leave under the Family Medical Leave Act, 29 U.S.C. § 2601 et seq. and the Maine Family Medical Leave Requirements, 26 M.R.S. § 844.  Plaintiff alleges that CMMC retaliated against Plaintiff for taking medical leave by using his protected medical leave as a negative factor in later adverse actions.  *See* Second Amended Complaint ¶ 122(c).

"The Court applies the same analysis to the FMLA and the MFMLR claims and does not otherwise differentiate between the two statutes." *Morin v. Hannaford Bros. Co., LLC*, No. 1:17-

CV-50-GZS, 2018 WL 2746570, at *13 (D. Me. June 7, 2018) (citing *Brunelle v. Cytec Plastics, Inc.*, 225 F. Supp. 2d 67, 76 (D. Me. 2002) (treating the "FMLA analysis as dispositive of the merits of the MFMLR claims")).  Plaintiff can prove these claims with direct evidence or indirectly using the *McDonnell Douglas* burden-shifting framework.  *See, e.g.*, *Hodgens v. Gen. Dynamics Corp.*, 144 F.3d 151, 160 (1st Cir. 1998) ("[W]hen there is no direct evidence of discrimination, the *McDonnell Douglas* burden-shifting framework applies to claims that an employee was discriminated against for availing himself of FMLA-protected rights.).  *Cf. Cote*, 168 F. Supp. 3d at 331 ("*Interpretatio logica* concludes that the Maine Supreme Judicial Court would apply *Brady* to a MFMLA claim and discard the *McDonnell Douglas* framework for summary judgment purposes.").

An employer is prohibited from retaliating against employees who exercise their rights under the FMLA. 29 U.S.C. §2615(a). Specifically, an employer may not consider the fact that an employee has taken leave under the FMLA as a negative factor in making employment decisions including hiring, promotions or termination. *Mellen v. Trustees of Boston Univ*., 504 F.3d 21, 26-27 (1st Cir. 2007). In order to survive summary judgment on this retaliation claim, Plaintiff must demonstrate that: (1) he availed himself of a protected right under the FMLA, (2) he was subject to an adverse employment decision, and (3) a causal relationship exists between that protected activity and his employer's adverse employment decision. *Hodgens*, 144 F.3d at 161.  Plaintiff cannot meet this burden because there is no causal relationship.

For summary judgment purposes, CMMC acknowledges that Plaintiff availed himself of a protected right under the FMLA when he took FMLA leave beginning in December 2012.  While an employer is prohibited from retaliating against employees who exercise their rights under the FMLA, an employer is not precluded from terminating an employee for independent reasons simply because he has taken a leave under the FMLA. *Nagle v. Acton-Boxborough Reg'l Sch. Dist.*, 576 F.3d 1, 3 (1st Cir. 2009).  As discussed in more detail above, Plaintiff was terminated

because he failed to meet the requirements of, and failed to make satisfactory progress in, the FMR program.  There is no causal connection between Plaintiff's medical leave in December 2012 and the decision to terminate his employment in January 2014.

Moreover, there is no causal connection between Plaintiff's medical leave in December 2012 and the requirement that he repeat part of his second year.  The FMR's accrediting body, ACGME, requires a resident to be physically present with the same panel of patients for two years.  Dr. Woolever was responsible for conducting the FMR in compliance with ACGME's requirements and, therefore, required Plaintiff to repeat part of his second year to meet the ACGME's continuity requirement.

Even if Plaintiff could make out a prima facie case, CMMC has articulated a legitimate non-discriminatory reason for terminating Plaintiff's employment, and for requiring him to repeat part of his second year.  Finally, Plaintiff cannot generate a trial worthy issue of pretext.  There is not close temporal proximity between Plaintiff's medical leave and his termination (*i.e.* more than one year).  Moreover, Plaintiff's initial termination was rescinded, after which he was granted a medical leave.  Although there is closer temporal proximity between Plaintiff's medical leave and the requirement that he repeat part of his second year (*i.e.* seven months), it was still several months apart, and a result of the ACGME's continuity requirements.  *See e.g., Carrero-Ojeda v. Autoridad de Energia Electrica*, 755 F.3d 711, 720 (1st Cir. 2014) ("But while temporal proximity is one factor from which an employer's bad motive can be inferred, by itself, it is not enough—especially if the surrounding circumstances undermine any claim of causation.").  In addition, there is no evidence of falsity of CMMC's explanations.

In addition, Plaintiff cannot prove his interference claim because he was provided with the employee benefits to which he was entitled per the FMLA.  Plaintiff further admitted that he did not request a second medical leave—to which he was not eligible—until after he learned that he was going to be terminated in January 2014.  *See Morin v. Hannaford Bros. Co., LLC*, No. 1:17-

CV-50-GZS, 2018 WL 2746570, at *16 (D. Me. June 7, 2018) ("the gravamen of an FMLA interference claim is that an employer interfered with the employee's use of leave to which the employee was otherwise entitled under the FMLA.").

### IV.   Defendant is Entitled to Summary Judgment on Plaintiff's Punitive Damages Claim

As an initial matter, Punitive damages may not be awarded in private suits brought under Section 504 of the Rehabilitation Act. *Barnes v. Gorman*, 536 U.S. 181, 189 (2002). Similarly, punitive damages may not be awarded under the FMLA. *Lufkin v. E. Maine Med. Ctr.*, 401 F. Supp. 2d 145, 146 (D. Me. 2005).

To be entitled to punitive damages on his ADA claims, Plaintiff must prove that CMMC acted with malice or reckless indifference to his federally protected rights. *See, e.g.*, *Che v. Massachusetts Bay Transp. Auth.*, 342 F.3d 31, 41 (1st Cir. 2003). Similarly, under the MHRA, punitive damages can only be supported by a showing of malice through clear and convincing evidence. *Batchelder v. Realty Res. Hosp., LLC*, 2007 ME 17, ¶ 22; 5 M.R.S. § 4613(8)(c) (referencing malice or reckless indifference). As discussed above, there is no evidence in the record to support a claim that CMMC acted with malice or reckless indifference in this case. To the contrary, CMMC went to great lengths to help Plaintiff be successful, which included his medical leave, transitional accommodations, academic support, regular faculty check-ins, and considerable feedback from faculty. Plaintiff himself has acknowledged the FMR faculty's significant efforts to help him be successful. SMF ¶ 107.

### V.   Plaintiff's Claims are Time-Barred

Plaintiff's discrimination and retaliation claims are subject to a 300-day time limit. *See Burnett v. Ocean Properties, Ltd.*, No. 2:16-CV-00359-JAW, 2018 WL 2925126, at *24 (D. Me. June 11, 2018) (explaining that employees alleging disability discrimination or retaliation must file the administrative charge within 300 days after the alleged unlawful employment practice occurred); 5 M.R.S. § 4611. "[D]iscrete discriminatory acts are not actionable if time barred, even

when they are related to acts alleged in timely filed charges." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002). Plaintiff filed his administrative complaint with the MHRC/EEOC on November 16, 2014. Therefore, all of the alleged unlawful employment practices that occurred prior to January 20, 2014 are time-barred.

## CONCLUSION

For the reasons discussed above, Defendant Central Maine Medical Center is entitled to summary judgment on Count I of Plaintiff's complaint for disability discrimination, failure to accommodate and retaliation under the Maine Human Rights Act, the Americans with Disabilities Act, and Section 504 of the Rehabilitation Act; interference and retaliation under the Family Medical Leave Act and the Maine Family Medical Leave Requirements; and punitive damages.

Respectfully submitted this 31st day of October, 2018 at Portland, Maine.

/s/ Mark V. Franco
Mark V. Franco, Esq.
*Counsel for Defendant*

/s/ Jeana M. McCormick
Jeana M. McCormick, Esq.
*Counsel for Defendant*

**DRUMMOND WOODSUM**
84 Marginal Way, Suite 600
Portland, ME 04101
Tel: (207) 772-1941

23

## CERTIFICATE OF SERVICE

I, Mark V. Franco, hereby certify that on this 31st day of October, 2018, I filed

Defendant's Partial Motion for Summary Judgment with Incorporated Memorandum of Law

with the Clerk of Court using the CM/ECF system, which will cause electronic service of same

upon the following:

David Webbert, Esq.
Carol Garvan, Esq.
Johnson, Webbert & Young
160 Capitol Street
Augusta, ME 04332
*Attorneys for Plaintiff*

/s/ Mark V. Franco
Mark V. Franco, Esq.
*Attorney for Defendant*

**DRUMMOND WOODSUM**
84 Marginal Way, Suite 600
Portland, ME 04101
Tel: (207) 772-1941
mfranco@dwmlaw.com