United States District Court
District Of Maine

| | | |
|---|---|---|
| Leo S. Paraskevopoulos, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Docket No. 2:17-cv-00166-JAW |
| | ) | |
| Central Maine Medical Center, | ) | |
| | ) | |
| Defendant. | ) | |

## Plaintiff's Opposing Statement of Material Facts

Under Local Rule 56(c), Plaintiff submits this Opposing Statement of Material Facts.

## I.   Plaintiff's Response to Defendant's Statement of Material Facts

### Family Medicine Residency Overview

1.   Central Maine Medical Center's Family Medicine Residency ("FMR") is a three year graduate medical education program.  Declaration of Donald "Raj" Woolever ("Woolever Decl.") ¶ 3.

Response: Admitted.

2.   The FMR is designed to provide training in the full spectrum of family medicine, including outpatient continuity care for all ages of patients, inpatient care of adults and children, emergency care and obstetrics, including management of labor and the delivery of newborns, and has a

particular focus on training family physicians interested in providing care in underserved areas throughout Maine and Northern New England. Woolever Decl. ¶ 3.

Response: Admitted.

3.    The FMR has a total of 21 residents (7 in each year). Woolever Decl. ¶ 3.

Response: Admitted.

4.    The FMR is accredited by the American Council for Graduate Medical Education ("ACGME").  Woolever Decl. ¶ 4.

Response: Admitted.

5.    The FMR program director is responsible for conducting the FMR in compliance with ACGME's requirements.  Woolever Decl. ¶ 4.

Response: Admitted.

6.    The FMR is subject to the American Board of Family Medicine's ("ABFM") training standards and certification requirements and has established training standards that prepare family medicine residents for board certification.  Woolever Decl. ¶ 5.

Response: Admitted.

7.    The ABFM certifies family physicians who qualify for, and who pass, the ABFM's examinations.  Woolever Decl. ¶ 5.

Response: Admitted.

2

8.     Dr. Donald "Raj" Woolever started working as the FMR program director in approximately 2009 and was the program director at all times relevant to the complaint.  Woolever Decl. ¶ 1.

Response: Admitted.

**Plaintiff's Education History**

9.     Plaintiff, Leo Paraskevopoulos, applied to medical schools in the United States and Canada but was not accepted by any of them.  Deposition of Leo S. Paraskevopoulos ("Paraskevopoulos Depo.") 10:8-11; 11:6-8.

Response: Admitted.

10.     Plaintiff attended medical school at St. George's University in Grenada and graduated in 2011 with a class rank of 305 out of 320. Paraskevopoulos Depo. 5:23-6:13; 20:24-21:7; Paraskevopoulos Depo. Exhibit 1.

Response: Admitted.

11.     Plaintiff applied to medical residency programs in Canada but was not accepted by any of them. Paraskevopoulos Depo. 22:8-16.

Response: Admitted.

12.     Plaintiff applied to medical residency programs in the United States but was not accepted by any of them as a first match.  Paraskevopoulos Depo. 22:17-23:11.

Response: Admitted.

13.    After the first match, CMMC had an unexpected opening and offered Plaintiff admission to its FMR program.  Paraskevopoulos Depo. 23:12-17.

Response: Admitted.

14.    In July 2011, Plaintiff started CMMC's FMR program as a first year resident. Paraskevopoulos Depo. 33:23-34:1.

Response: Admitted.

**Plaintiff's Unsatisfactory Performance in the FMR in 2012**

15.    In February 2012, Plaintiff received a letter of written warning regarding unprofessional behavior dated February 2, 2012.  Paraskevopoulos Depo. 34:10-14.

Response: Admitted.

16.    The letter was from Dr. Deborah Taylor, the Associate Program Director, and was written in response to concerns about Plaintiff being late for his work shifts twice within a two week period.  Paraskevopoulos Depo. 34:10-20; Paraskevopoulos Depo. Exhibit 2, page 1; Woolever Decl. ¶¶ 7-8.

Response: Admitted.

17.    In February 2012, Plaintiff was on an individualized learning plan. Paraskevopoulos Depo. 37:2-39:13; Woolever Decl. ¶ 9.

Response: Admitted.

18.   In July 2013, Plaintiff received a memorandum of understanding dated July 13, 2012, placing him on probation for an initial term of six months because he had been late for scheduled work shifts on three separate occasions during one of his Family Medicine Teaching Service (inpatient medicine) rotations, and had been over 90 minutes late for hospital rounds. Paraskevopoulos Depo. 39:23-40:10; Paraskevopoulos Depo. Exhibit 2, pages 17-18; Woolever Decl. ¶ 10.

Response: This statement of fact should be stricken because it alleges a conclusory fact and makes a legal argument regarding causation, using the term "because" to argue that probation was imposed for the legitimate, non-discriminatory reason of prior poor performance and, by direct implication, not for the discriminatory reasons alleged by Plaintiff. Statements of material facts must be limited to "historical facts" and cannot include "legal argument" or "conclusory" facts. *See, e.g., Hearts with Haiti, Inc. v. Kendrick*, 2:13-cv-00039-JAW, 2014 U.S. Dist. LEXIS 128402, at *25 n.18 (D. Me. Aug. 28, 2014). This 'fact' is an argument, not properly presented in a statement of material facts." *Id.* It is for the Court to "consider in due course whether the historical facts, viewed in the light most favorable to the Plaintiff[], demonstrate that" no reasonable jury could find for Plaintiff on the legal issue of causation. *Id.*

Denied. Plaintiff contends that the probation was imposed in retaliation for requesting medical leave and because he was perceived as a person with a disability. Plaintiff's Amended Interrogatories ("Irog Responses") p. 3. In July 2012, toward the beginning of the second year of his residency, Leo met with Dr. Deborah Taylor, a psychologist and the Associate Program Director at the time, and told her he was feeling fatigued, depressed and mentally unwell. Irog Responses p.5; Deposition of Dr. Bethany Picker ("Picker Dep.") 68:10-69:12. Leo asked Dr. Taylor if she thought he should request a medical leave of absence to seek treatment and she told him that he should not request a leave of absence at that time and instead offered him contact information for CMMC's Employee Assistance Program. Irog Responses p. 3. Dr. Taylor sent an email to the faculty including Dr. Woolever and Dr. Youd describing her meeting with Leo. Irog Responses p. 5. Several days later, on July 13, 2012, CMMC put Leo on probation. Irog Responses p. 5; Defendant Produced Bates stamped Documents ("DF") 717-18; Deposition of Donald Woolever ("Woolever Dep.") Exhibit 1, p. 5-6.

19.    The memorandum of understanding served as a final warning to Plaintiff regarding his substandard performance as a resident.  Woolever Decl. ¶ 11.

6

Response: Qualified. The July 13, 2012 memorandum of understanding does not state that it was a "final warning"; instead, the memorandum expressly contemplates that if the probationary terms are not met, disciplinary steps short of dismissal – namely, "suspension" –could be imposed. Exhibit B to Declaration of Donald "Raj" Woolever ("Woolever Decl.") (LP Depo. 0018).

20.  In September 2012, Plaintiff was on a second individualized learning plan. Paraskevopoulos Depo. 47:3-48:5; Woolever Decl. ¶ 12.

Response: Admitted.

21.  On November 18, 2012, Plaintiff's advisor, Dr. Stephanie Youd, sent him an email stating "you have several old notes on your desktop, 27 to be precise, these needed to be completed ASAP.  You are on probation currently and things like this can put you at risk." Paraskevopoulos Depo. 52:22-53:11; Paraskevopoulos Depo. Exhibit 4, page 39.

Response: Admitted.

22.  On November 28, 2012, Dr. Youd informed Plaintiff that there were concerns about his medical knowledge, that he needed to attend at least 70 percent of lectures, and that they were going to have a meeting with Dr. Woolever on December 7, 2012.   Paraskevopoulos Depo. 55:10-13; 56:16-21; Paraskevopoulos Depo. Exhibit 4, page 45; Woolever Decl. ¶ 13.

Response: Qualified. This is a selective quotation from the cited email. Dr. Youd's November 28, 2012 email to Plaintiff also highlighted several positive aspects of his performance, including "I am glad that your ER rotation is going well"; "[y]ou are up to date on your tape reviews which is a good thing"; and "[g]ood job on completing your office visits." Exhibit C to Woolever Decl. (LP Depo 0040). The November 28, 2012 email contemplated CMMC continuing to work with Leo, stating: "I know that you have a lot of stressors in your life right now with your grandfather being ill, but be sure to keep us in the loop so that we can help." Exhibit C to Woolever Decl. (LP Depo 0040).

23.   On December 4, 2012, Dr. Woolever, Dr. Youd and Dr. Kreckel (one of Plaintiff's supervising attending physician in Rumford) met to discuss whether Plaintiff should continue in the FMR.  Woolever Decl. ¶14.

Response: Admitted.

24.   At the meeting on December 4, 2012, they discussed the fact that Plaintiff had been counseled numerous times, both verbally and in writing, regarding his ability to meet the expectations of his role as a resident and noted that he had challenges with: being late for the start of his shifts, face-to-face check ins with his attending physicians, face to face meetings with Dr. Youd, completing all medical records in a timely manner, maintaining 70 percent attendance rates for lectures, making accurate diagnoses and

8

formulating appropriate treatment protocols, and demonstrating an appropriate level of knowledge for a second year resident.  Woolever Decl. ¶ 14.

      Response: Admitted.

25.   On December 4, 2012, Dr. Woolever, along with his colleagues, decided that Plaintiff's residency was going to be terminated. Woolever Decl. ¶ 15.

      Response: Denied. Human resources representative Lisa Burger's notes of the December 4, 2012 meeting do not state that CMMC had made a decision to terminate Leo at that meeting. Exhibit D to Woolever Decl (DF 00805); Deposition of Dr. Kirk Miklavic ("Miklavic Dep.") 20:25-23:1. Instead, the notes close with a "question" that "was called by Dr. Woolever: Is it time to meet with Leo and end his residency here?" Exhibit D to Woolever Decl (DF 00805). Just two weeks before the December 4 meeting, Dr. Youd's email to Leo contemplated CMMC continuing to work with Leo: the email stated, "I am expecting that when we meet next week, you will have a written plan with goals and reasonable ways of measuring these goals when you and I meet next week," and concluded, "I know that you have a lot of stressors in your life right now with your grandfather being ill, but be sure to keep us in the loop so that we can help." Exhibit C to Woolever Decl. (LP Depo 0040).

## December 7, 2012 Meeting

26.   The purpose of the meeting on December 7, 2012 was to terminate Plaintiff from the residency because he had failed to meet the conditions of his probation.  Woolever Decl. ¶ 15.

Response: This statement of fact should be stricken because it alleges a conclusory fact and makes a legal argument regarding causation, using the term "because" to argue that probation was imposed for the legitimate, non-discriminatory reason of prior poor performance and, by direct implication, not for the discriminatory reasons alleged by Plaintiff. Statements of material facts must be limited to "historical facts" and cannot include "legal argument" or "conclusory" facts. *See, e.g., Hearts with Haiti, Inc. v. Kendrick*, 2:13-cv-00039-JAW, 2014 U.S. Dist. LEXIS 128402, at *25 n.18 (Aug. 28, 2014). "This 'fact' is an argument, not properly presented in a statement of material facts." *Id*. It is for the Court to "consider in due course whether the historical facts, viewed in the light most favorable to the Plaintiff[], demonstrate that" no reasonable jury could find for Plaintiff on the legal issue of causation. *Id*.

Denied. CMMC terminated Leo after he repeatedly expressed concerns to Defendant about his mental health, including in his December 6, 2012 email asking for medical leave to seek treatment for an undiagnosed mental health condition. Irog Responses p. 3.

10

On November 28, 2012, Dr. Youd sent an email to Leo that contemplated CMMC continuing to work with Leo: the email stated, "I am expecting that when we meet next week, you will have a written plan with goals and reasonable ways of measuring these goals when you and I meet next week," and concluded, "I know that you have a lot of stressors in your life right now with your grandfather being ill, but be sure to keep us in the loop so that we can help." Exhibit C to Woolever Decl. (LP Depo 0040). On November 30, 2012, Dr. Woolever emailed human resources representative Lisa Burger regarding "some concerns about [Leo's] mental health and/or substance abuse issues," noting that "there has been no overt episode and we have no concrete evidence, but there is an underlying uneasiness" among clinic preceptors and staff. Woolever Dep. Exhibit 1, p. 22-23. Human resources representative Burger responded that she was "in uncharted waters here" and that "If there are substance abuse issues . . . there may be an ADA component that will require us to step more gingerly"; the email did not state that there might be an ADA component if there were mental health issues. Woolever Dep. Exhibit 1, p. 21-22. On December 4, 2012, Woolever, human resources representative Burger, Leo's faculty advisor Dr. Stephanie Youd, and Dr. Dieter Kreckel met regarding Leo; Burger's notes of the meeting do not state that CMMC had made a decision to terminate Leo. Exhibit D to Woolever Decl (DF 00805); Miklavic Dep. 20:25-23:1. Instead,

11

the notes close with a "question" that "was called by Dr. Woolever: Is it time to meet with Leo and end his residency here?" Exhibit D to Woolever Decl (DF 00805).

On the morning December 6th, 2012, Leo sent an email to his faculty advisor Stephanie Youd stating in part:

> "I have complained of feelings of anxiety, depression, getting distracted by environmental triggers and fatigue during the last year and a half, if these things are reducing my functionality at home I would like to make an apt with a physician here as I haven't seen one for over a year now and I have also made an apt with my pcp in Canada for evaluation over the break. I think a medical mental health evaluation would be beneficial because I can certainly say I'm intrinsically motivated and want to improve, I feel frustrated when I'm not improving at the rate expected. I am currently not on any medications other than Ambien PRN for insomnia and perhaps I would benefit from some medical help or therapy to improve my functionality."
> Irog Responses p.3; Woolever Dep. Exhibit 1, p. 74-75.

On Friday, December 7, 2012, Leo was called into a meeting with Dr. Donald "Raj" Woolever, Dr. Kreckel, Dr. Youd, and Lisa Burger. Irog Responses p. 7. In this meeting, Leo renewed his request for medical leave, explaining that he had been experiencing a mental health problem and asking for medical leave so he could seek diagnosis and treatment. Irog Responses p. 7. Leo also explained that he had sent an email to Dr. Youd earlier about his mental health problems and need for time off to seek a medical evaluation.  Irog Responses p. 7. Woolever learned at the

12

December 7, 2012 meeting that Leo had sent an email to Stephanie Youd the day before "expressing that he thought he needed medical leave." Woolever Dep. 29:2-30:4; Woolever Dep. Exhibit 9. After Leo asked for a leave of absence to seek diagnosis and treatment, he was asked to leave the room; about 15 minutes later he was called back into the room and Dr. Woolever told him that he could not have a medical leave and that he had to resign or his employment would be terminated. Irog Responses p. 7. Woolever told Leo that he had until Monday, December 10, 2012 to decide whether he would resign or be terminated. Irog Responses p. 7. Woolever Dep. 29:2-30:4. On the afternoon of December 7, Woolever sent an email to the residency faculty that Leo had been given the option to resign or be terminated and had been given until Monday to decide. Woolever Dep. 43:8-45:11; Woolever Dep. Exhibit 1, p.43.

27.   As of the meeting on December 7, 2012, "the details [of Plaintiff's] medical condition have not been shared or discussed with the faculty due to embarrassment and unawareness . . . ." Paraskevopoulos Depo. 78:3-4; 79:12-21.

Response: Denied. In July 2012, toward the beginning of the second year of his residency, Leo met with Dr. Deborah Taylor, a psychologist and the Associate Program Director at the time, and told her he was feeling fatigued, depressed and mentally unwell. Irog Responses p. 5; Picker Dep.

13

68:10-69:12. Leo asked Dr. Taylor if she thought he should request a medical leave of absence to seek treatment and she told him that he should not request a leave of absence at the time and instead offered him contact information for CMMC's Employee Assistance Program. Irog Responses p. 3. Dr. Taylor sent an email to the faculty including Dr. Woolever and Dr. Youd describing her meeting with Leo; several days later, on July 13, 2012, CMMC put Leo on probation. Irog Responses p. 5; DF 717-18; Woolever Dep. Exhibit 1, p. 5-6.

On November 30, 2012, Woolever emailed human resources representative  Lisa Burger regarding "some concerns about [Leo's] mental health and/or substance abuse issues," noting that "there has been no overt episode and we have no concrete evidence, but there is an underlying uneasiness" among clinic preceptors and staff. Woolever Dep. Exhibit 1, p. 22-23. Human resources representative Burger responded that she was "in uncharted waters here" and that "If there are substance abuse issues . . . there may be an ADA component that will require us to step more gingerly," but her email did not state that there might be an ADA component if there were mental health issues. Woolever Dep. Exhibit 1, p. 21-22.

On the morning December 6th, 2012, Leo sent an email to his faculty advisor Stephanie Youd stating in part:

14

"I have complained of feelings of anxiety, depression, getting distracted by environmental triggers and fatigue during the last year and a half, if these things are reducing my functionality at home I would like to make an apt with a physician here as I haven't seen one for over a year now and I have also made an apt with my pcp in Canada for evaluation over the break. I think a medical mental health evaluation would be beneficial because I can certainly say I'm intrinsically motivated and want to improve, I feel frustrated when I'm not improving at the rate expected. I am currently not on any medications other than Ambien PRN for insomnia and perhaps I would benefit from some medical help or therapy to improve my functionality."
Irog Response p.3; Woolever Dep. Exhibit 1, p 74-75.

On Friday, December 7, 2012, Leo was called into a meeting with Dr. Donald "Raj" Woolever, Dr. Kreckel, Dr. Youd, and Lisa Burger. Irog Responses p. 7. In this meeting, Leo renewed his request for medical leave, explaining that he had been experiencing a mental health problem and asking for medical leave so he could seek diagnosis and treatment. Irog Responses p. 7. Leo also explained that he had sent an email to Dr. Youd earlier about his mental health problems and need for time off to seek a medical evaluation. Irog Responses p. 7. Woolever learned at the December 7, 2012 meeting that Leo had sent an email to Stephanie Youd the day before "expressing that he thought he needed medical leave." Woolever Dep. 29:2-30:4; Woolever Dep. Exhibit 9. After Leo asked for a leave of absence to seek diagnosis and treatment, he was asked to leave the room; about 15 minutes later he was called back into the room and Dr. Woolever told him that he

could not have a medical leave and that he had to resign or his employment would be terminated. Irog Responses p. 7. On the afternoon of December 7, Woolever sent an email to the residency faculty that Leo had been given the option to resign or be terminated and had been given until Monday to decide. Woolever Dep. 43:8-45:11; Woolever Dep. Exhibit 1, p.43.

28.   As of the meeting on December 7, 2012, Plaintiff had not requested a leave of absence, no treating medical professional had advised him to take a leave of absence, and he had not been diagnosed with bipolar. Paraskevopoulos Depo. 65:6-17; 66:15-22.

Response: Denied. In December 2011, Leo was treated for depression by a physician in Rumford. Paraskevopoulos Dep. 43:22-44:14. In July 2012, toward the beginning of the second year of his residency, Leo met with Dr. Deborah Taylor, a psychologist and the Associate Program Director at the time, and told her he was feeling fatigued, depressed and mentally unwell. Irog Responses p.5; Picker Dep. 68:10-69:12. Leo asked Dr. Taylor if she thought he should request a medical leave of absence to seek treatment and she told him that he should not request a leave of absence at the time and instead offered him contact information for CMMC's Employee Assistance Program. Irog Responses p. 3. Dr. Taylor sent an email to the faculty including Dr. Woolever and Dr. Youd describing her meeting with Leo;

16

several days later, on July 13, 2012, CMMC put Leo on probation. Irog Responses p. 5; DF717-18; Woolever Dep. Exhibit 1, p. 5-6.

On the morning December 6th, 2012, Leo sent an email to his faculty advisor Stephanie Youd stating in part:

> "I have complained of feelings of anxiety, depression, getting distracted by environmental triggers and fatigue during the last year and a half, if these things are reducing my functionality at home I would like to make an apt with a physician here as I haven't seen one for over a year now and I have also made an apt with my pcp in Canada for evaluation over the break. I think a medical mental health evaluation would be beneficial because I can certainly say I'm intrinsically motivated and want to improve, I feel frustrated when I'm not improving at the rate expected. I am currently not on any medications other than Ambien PRN for insomnia and perhaps I would benefit from some medical help or therapy to improve my functionality." Irog Response p.3; Woolever Dep. Exhibit 1, p. 74-75.

On Friday, December 7, 2012, Leo was called into a meeting with Dr. Donald "Raj" Woolever, Dr. Kreckel, Dr. Youd, and Lisa Burger. Irog Responses p. 7. In this meeting, Leo renewed his request for medical leave, explaining that he had been experiencing a mental health problem and asking for medical leave so he could seek diagnosis and treatment. Irog Responses p. 7. Leo also explained that he had sent an email to Dr. Youd earlier about his mental health problems and need for time off to seek a medical evaluation. Irog Responses p. 7. Woolever learned at the December 7, 2012 meeting that Leo had sent an email to Stephanie Youd the day before

"expressing that he thought he needed medical leave." Woolever Dep. 29:2-30:4; Woolever Dep. Exhibit 9.

After Leo asked for a leave of absence to seek diagnosis and treatment, he was asked to leave the room; about 15 minutes later he was called back into the room and Dr. Woolever told him that he could not have a medical leave and that he had to resign or his employment would be terminated. Irog Responses p. 7. On the afternoon of December 7, Woolever sent an email to the residency faculty that Leo had been given the option to resign or be terminated and had been given until Monday to decide. Woolever Dep. 43:8-45:11; Woolever Dep. Exhibit 1, p. 43.

29.   In July 2012, Plaintiff asked Dr. Taylor for her advice about whether he should take a medical leave of absence and she advised him to try counseling before taking a leave of absence and he appreciated her advice. Paraskevopoulos Depo. 49:9-25.

Response: Qualified. Leo asked Dr. Taylor if she thought he should request a medical leave of absence to seek treatment and she told him that he should not request a leave of absence at the time and instead offered him contact information for CMMC's Employee Assistance Program. Irog Responses p. 3.

18

30.   Leading up to the meeting on December 7, 2012, Plaintiff attributed his difficulties in the FMR program to his sick grandfather and upcoming wedding. Paraskevopoulos Depo. 59:3-13; 63:24-64:4.

Response: Denied. Leading up to the December 7, 2012 meeting, Plaintiff repeatedly and expressly attributed his difficulties in part to mental health issues, including in July 2012 and again in early December 2012: In July 2012, toward the beginning of the second year of his residency, Leo met with Dr. Deborah Taylor, a psychologist and the Associate Program Director at the time, and told her he was feeling fatigued, depressed and mentally unwell. Irog Responses p. 5; Picker Dep. 68:10-69:12. Leo asked Dr. Taylor if she thought he should request a medical leave of absence to seek treatment and she told him that he should not request a leave of absence at the time and instead offered him contact information for CMMC's Employee Assistance Program. Irog Responses p. 3.

On the morning of December 6th, 2012, Leo sent an email to his faculty advisor Stephanie Youd stating in part:

> "I have complained of feelings of anxiety, depression, getting distracted by environmental triggers and fatigue during the last year and a half, if these things are reducing my functionality at home I would like to make an apt with a physician here as I haven't seen one for over a year now and I have also made an apt with my pcp in Canada for evaluation over the break. I think a medical mental health evaluation would be beneficial because I can certainly say I'm intrinsically motivated and want to improve, I feel frustrated when I'm not improving at the rate expected. I am currently not on any medications other than Ambien

19

PRN for insomnia and perhaps I would benefit from some medical help or therapy to improve my functionality." Irog Response p. 3; Woolever Dep. Exhibit 1, p. 74-75.

On Friday, December 7, 2012, Leo was called into a meeting with Dr. Donald "Raj" Woolever, Dr. Kreckel, Dr. Youd, and Lisa Burger. Irog Responses p. 7. In this meeting, Leo renewed his request for medical leave, explaining that he had been experiencing a mental health problem and asking for medical leave so he could seek diagnosis and treatment. Irog Responses p. 7. Leo also explained that he had sent an email to Dr. Youd earlier about his mental health problems and need for time off to seek a medical evaluation. Irog Responses p. 7. Woolever learned at the December 7, 2012 meeting that Leo had sent an email to Stephanie Youd the day before "expressing that he thought he needed medical leave." Woolever Dep. 29:2-30:4; Woolever Dep. Exhibit 9.

After Leo asked for a leave of absence to seek diagnosis and treatment, he was asked to leave the room; about 15 minutes later he was called back into the room and Dr. Woolever told him that he could not have a medical leave and that he had to resign or his employment would be terminated. Irog Responses p. 7. On the afternoon of December 7, Woolever sent an email to the residency faculty that Leo had been given the option to resign or be terminated and had been given until Monday to decide. Woolever Dep. 43:8-45:11; Woolever Dep. Exhibit 1, p. 43.

20

31.    At the meeting on December 7, 2012, Plaintiff met with Dr.
Woolever, Dr. Youd, Dr. Kreckel, and Lisa Burger (from CMMC's Human
Resources). Paraskevopoulos Depo. 61:21-62:24; Woolever Decl. ¶ 16.

       Response: Admitted.

32.    After discussing Plaintiff's performance deficiencies over the last
several months, and his probationary status, Dr. Woolever told Plaintiff that
they were at the end of the road and he could resign or be terminated.
Paraskevopoulos Depo. 62:6-9; 64:5-10.

       Response: Qualified. Woolever told Leo he could resign or be
terminated only after Leo renewed his request for leave for a mental health
evaluation: On Friday, December 7, 2012, Leo was called into a meeting with
Dr. Donald "Raj" Woolever, Dr. Kreckel, Dr. Youd, and Lisa Burger. Irog
Responses p. 7. In this meeting, Leo renewed his request for medical leave,
explaining that he had been experiencing a mental health problem and
asking for medical leave so he could seek diagnosis and treatment. Irog
Responses p. 7. Leo also explained that he had sent an email to Dr. Youd
earlier about his mental health problems and need for time off to seek a
medical evaluation. Irog Responses p. 7. Woolever learned at the December 7,
2012 meeting that Leo had sent an email to Stephanie Youd the day before
"expressing that he thought he needed medical leave." Woolever Dep. 29:2-
30:4; Woolever Dep. Exhibit 9.

After Leo asked for a leave of absence to seek diagnosis and treatment, he was asked to leave the room; about 15 minutes later he was called back into the room and Dr. Woolever told him that he could not have a medical leave and that he had to resign or his employment would be terminated. Irog Responses p. 7. On the afternoon of December 7, Woolever sent an email to the residency faculty that Leo had been given the option to resign or be terminated and had been given until Monday to decide. Woolever Dep. 43:8-45:11; Woolever Dep. Exhibit 1, p. 43.

33.    After Dr. Woolever told him he could resign or be terminated, Plaintiff raised an email that he sent to Dr. Youd on December 6, 2012, in which he wrote: "I think a medical mental health evaluation would be beneficial because I continually say I'm intrinsically motived and I want to improve." Paraskevopoulos Depo. 69:4-5; 70:1-4; Deposition of Central Maine Medial Center ("CMMC Depo.") 117:12-118:5. *See also* Woolever Decl. ¶ 18.

Response: Qualified. Woolever told Leo he could resign or be terminated only after Leo renewed his request for leave for a mental health evaluation: On Friday, December 7, 2012, Leo was called into a meeting with Dr. Donald "Raj" Woolever, Dr. Kreckel, Dr. Youd, and Lisa Burger. Irog Responses p. 7. In this meeting, Leo renewed his request for medical leave, explaining that he had been experiencing a mental health problem and asking for medical leave so he could seek diagnosis and treatment. Irog

22

Responses p. 7. Leo also explained that he had sent an email to Dr. Youd earlier about his mental health problems and need for time off to seek a medical evaluation. Irog Responses p. 7. Woolever learned at the December 7, 2012 meeting that Leo had sent an email to Stephanie Youd the day before "expressing that he thought he needed medical leave." Woolever Dep. 29:2-30:4; Woolever Dep. Exhibit 9.

After Leo asked for a leave of absence to seek diagnosis and treatment, he was asked to leave the room; about 15 minutes later he was called back into the room and Dr. Woolever told him that he could not have a medical leave and that he had to resign or his employment would be terminated. Irog Responses p. 7. On the afternoon of December 7, Woolever sent an email to the residency faculty that Leo had been given the option to resign or be terminated and had been given until Monday to decide. Woolever Dep. 43:8-45:11; Woolever Dep. Exhibit 1, p. 43.

34.   At the time of the meeting on December 7, 2012, Dr. Woolever was not aware that Plaintiff had emailed Dr. Youd stating that he might need a mental health evaluation.  Woolever Decl. ¶ 17.

Response: Qualified. On Nov 30, 2012, Woolever emailed human resources representative Lisa Burger regarding "some concerns about [Leo's] mental health and/or substance abuse issues," noting that "there has been no overt episode and we have no concrete evidence, but there is an underlying

23

uneasiness" among clinic preceptors and staff. Woolever Dep. Exhibit 1, p. 22-23.

35. Upon learning that Plaintiff may have emailed Dr. Youd about the need for a mental health evaluation, Plaintiff was not terminated. CMMC Depo. 118:6-18; Woolever Decl. ¶ 18.

Response: Qualified. CMMC did not reverse its termination decision as soon as it learned about Plaintiff's need for mental health evaluation, but instead continued to carry out the termination decision after the December 7 meeting and reversed its decision only several days later: During the December 7, 2012 meeting, Leo again requested medical leave, explaining that he had been experiencing a mental health problem and asking for medical leave so he could seek diagnosis and treatment. Irog Responses p. 7. Woolever learned at the December 7, 2012 meeting that Leo had sent email to Stephanie Youd the day before, "expressing that he thought he needed medical leave." Woolever Dep. 29:2-30:4; Woolever Dep. Exhibit 9. On the afternoon of December 7, Woolever sent an email to the residency faculty that Leo had been given the option to resign or be terminated and had been given until Monday to decide. Woolever Dep. 43:8-45:11; Woolever Dep. Exhibit 1, p. 43. The following day, Saturday, December 8, human resources representative Burger prepared a termination notice for Leo. Woolever Dep. Exhibit 1, p. 49.

24

On December 9, 2012, Leo sent an email to the faculty of the residency

Program, yet again requesting medical leave:

> "It has become clear to me that I have not been meeting these
> expectations due to a medical problem that has not been
> addressed properly, officially diagnosed or treated. I did state in a
> previous email to my advisor shortly prior to the news of probably
> dismissal that I felt as though a medical problem was at root
> cause and I would like a medical evaluation. I along with my
> family, believe that with proper medical evaluation and
> treatment I would be able to consistently meet expectations
> within the residency program moving forward. I ask for the
> opportunity to take medical leave/suspension to have a formal
> medical evaluation with hopeful treatment and when medically
> stabilized be granted the opportunity to return to work on
> treatment. . . . I hope this can be discussed." Irog Responses p. 6-
> 7; Woolever Dep. Exhibit 1, p. 72-73; DF 82-83.

Later on December 9, Dr. Picker emailed Woolever: "I agree with you,

Raj, that it seems this card has only been played because the consequences

are so immediate and dire." Woolever Dep. Exhibit 1, p. 66; DF 93. In

response to Leo's requests for reasonable accommodation, on December 10,

2012, Leo was told that the termination had been revoked and that he would

be permitted to take medical leave, but that the medical leave would also be a

disciplinary suspension the length of which was to be determined by the

length of the medical leave. Irog Responses p. 8; Woolever Dep. Exhibit 1, p.

83, 88.

36.   Instead, CMMC suspended Plaintiff for not meeting the requirements of his probation, Paraskevopoulos Depo. 89:11-17; Paraskevopoulos Depo. Exhibit 2, page 31, and gave him the opportunity to apply for a medical leave of absence, Paraskevopoulos Depo. 89:11-17; 90:8-12; 93:20-94:2.

Response: This statement of fact should be stricken because it alleges a conclusory fact and makes a legal argument regarding causation, using the phrase "for not meeting the requirements of his probation" to argue that probation was imposed for the legitimate, non-discriminatory reason of prior poor performance and, by direct implication, not for the discriminatory reasons alleged by Plaintiff. Statements of material facts must be limited to "historical facts" and cannot include "legal argument" or "conclusory" facts. *See, e.g., Hearts with Haiti, Inc. v. Kendrick*, 2:13-cv-00039-JAW, 2014 U.S. Dist. LEXIS 128402, at *25 n.18 (D. Me. Aug. 28, 2014). "This 'fact' is an argument, not properly presented in a statement of material facts." *Id*. It is for the Court to "consider in due course whether the historical facts, viewed in the light most favorable to the Plaintiff[], demonstrate that" no reasonable jury could find for Plaintiff on the legal issue of causation. *Id*.

Denied. CMMC terminated Leo after he repeatedly expressed concerns to Defendant about his mental health, including in his December 6, 2012

26

email asking for medical leave to seek treatment for an undiagnosed mental health condition.

On November 28, 2012, Dr. Youd sent an email to Leo that contemplated CMMC continuing to work with Leo: the email stated, "I am expecting that when we meet next week, you will have a written plan with goals and reasonable ways of measuring these goals when you and I meet next week," and concluded, "I know that you have a lot of stressors in your life right now with your grandfather being ill, but be sure to keep us in the loop so that we can help." Exhibit C to Woolever Decl. (LP Depo 0040). On November 30, 2012, Dr. Woolever emailed human resources representative Lisa Burger regarding "some concerns about [Leo's] mental health and/or substance abuse issues," noting that "there has been no overt episode and we have no concrete evidence, but there is an underlying uneasiness" among clinic preceptors and staff. Woolever Dep. Exhibit 1, p. 22-23. Human resources representative Burger responded that she was "in uncharted waters here" and that "If there are substance abuse issues . . . there may be an ADA component that will require us to step more gingerly"; the email did not state that there might be an ADA component if there were mental health issues. Woolever Dep. Exhibit 1, p. 21-22. On December 4, 2012, Woolever, human resources representative Burger, Leo's faculty advisor Dr. Stephanie Youd, and Dr. Dieter Kreckel met regarding Leo; Burger's notes of the

27

meeting do not state that CMMC had made a decision to terminate Leo.
Exhibit D to Woolever Decl (DF 00805); Miklavic Dep. 20:25-23:1. Instead,
the notes close with a "question" that "was called by Dr. Woolever: Is it time
to meet with Leo and end his residency here?" Exhibit D to Woolever Decl
(DF 00805).

On the morning December 6th, 2012, Leo sent an email to his faculty
advisor Stephanie Youd stating in part:

> "I have complained of feelings of anxiety, depression, getting
> distracted by environmental triggers and fatigue during the last
> year and a half, if these things are reducing my functionality at
> home I would like to make an apt with a physician here as I
> haven't seen one for over a year now and I have also made an apt
> with my pcp in Canada for evaluation over the break. I think a
> medical mental health evaluation would be beneficial because I
> can certainly say I'm intrinsically motivated and want to
> improve, I feel frustrated when I'm not improving at the rate
> expected. I am currently not on any medications other than
> Ambien PRN for insomnia and perhaps I would benefit from
> some medical help or therapy to improve my functionality."
> Irog Responses p.3; Woolever Dep. Exhibit 1, p. 74-75.

On Friday, December 7, 2012, Leo was called into a meeting with Dr.
Donald "Raj" Woolever, Dr. Kreckel, Dr. Youd, and Lisa Burger. Irog
Responses p. 7. In this meeting, Leo renewed his request for medical leave,
explaining that he had been experiencing a mental health problem and
asking for medical leave so he could seek diagnosis and treatment. Irog
Responses p. 7. Leo also explained that he had sent an email to Dr. Youd

earlier about his mental health problems and need for time off to seek a medical evaluation. Irog Responses p. 7. Woolever learned at the December 7, 2012 meeting that Leo had sent an email to Stephanie Youd the day before "expressing that he thought he needed medical leave." Woolever Dep. 29:2-30:4; Woolever Dep. Exhibit 9. After Leo asked for a leave of absence to seek diagnosis and treatment, he was asked to leave the room; about 15 minutes later he was called back into the room and Dr. Woolever told him that he could not have a medical leave and that he had to resign or his employment would be terminated. Irog Responses p. 7. Woolever told Leo that he had until Monday, December 10, 2012 to decide whether he would resign or be terminated. Irog Responses p. 7. Woolever Dep. 29:2-30:4. On the afternoon of December 7, Woolever sent an email to the residency faculty that Leo had been given the option to resign or be terminated and had been given until Monday to decide. Woolever Dep. 43:8-45:11; Woolever Dep. Exhibit 1, p.43.

Then, on December 10, 2012, Leo was told that the termination had been revoked and that he would be permitted to take medical leave, but that the medical leave would also be a disciplinary suspension the length of which was to be determined by the length of the medical leave. Leo Irogs p. 8; Woolever Dep. Exhibit 1, p. 83, 88.

**Dr. Boyack and the Maine Medical Professionals Health Program**

37.    Plaintiff applied for, and was granted, a medical leave of absence, effective December 7, 2012. Paraskevopoulos Depo. 89:11-17; 90:8-12; 93:20-94:2.

Response: Qualified. On December 10, 2012, Leo was told that the termination had been revoked and that he would be permitted to take medical leave, but that the medical leave would also be a disciplinary suspension the length of which was to be determined by the length of the medical leave. Irog Responses p. 8; Woolever Dep. Exhibit 1, p. 83, 88.

38.    Plaintiff started seeing a psychiatrist, Dr. Cindy Boyack, in December 2012, and was diagnosed with bipolar disorder for the first time in his life.  Paraskevopoulos Depo. 44:9-11; 90:4-7; Deposition of Cindy Boyack ("Boyack Depo.") 48:23-49:6.

Response: Qualified. In December 2011, Leo was treated for depression by a physician in Rumford. Paraskevopoulos Dep. 43:22-44:14. In July 2012, toward the beginning of the second year of his residency, Leo met with Dr. Deborah Taylor, a psychologist and the Associate Program Director at the time, and told her he was feeling fatigued, depressed and mentally unwell. Irog Responses p. 5; Picker Dep. 68:10-69:12. Leo asked Dr. Taylor if she thought he should request a medical leave of absence to seek treatment and she told him that he should not request a leave of absence at the time and

30

instead offered him contact information for CMMC's Employee Assistance Program. Irog Responses p. 3.

39.    Plaintiff enrolled in the Maine Medical Professionals Health Program ("MPHP") in December 2012, Paraskevopoulos Depo. 98:7-10, and worked with Dr. Margaret Palmer, Paraskevopoulos Depo. 100:5-24.

Response: Qualified. Woolever *required* Leo to enroll in the Maine Health Professionals Program (MPHP) when he went on out on leave in December 2012. Paraskevopoulos Dep. 99:15-24. MPHP is "very substance abuse oriented." Paraskevopoulos Dep. 98:20-24. Leo met with MPHP representative Maggie Palmer "several times" and communicated with her by phone "briefly just to confirm meetings and things like that"; Palmer was more concerned about substance abuse problems, which Leo has never had, and referred deeper psychological questions to treating psychiatrist Dr. Boyack. Paraskevopoulos Dep. 100:10-101:4.

40.    The MPHP started in 1987 and provides monitoring and advocacy services to medical professionals struggling with addiction, substance abuse or mental health challenges.  Woolever Decl. ¶ 6.

Response: Qualified. MPHP's primary focus is substance abuse, not mental health: MPHP is "very substance abuse oriented." Paraskevopoulos Dep. 99:15-24; 98:20-24. HR Director Miklavic's "dealings with Dr. Palmer were generally where we had an impaired physician or a physician who was

in trouble of some sort, whether it was a DUI, et cetera, and she was quite helpful in those circumstances." Miklavic Dep. 18:5-11. Leo met with MPHP representative Maggie Palmer "several times," and communicated with her by phone "briefly just to confirm meetings and things like that"; Palmer was more concerned about substance abuse problems, which Leo has never had, and referred deeper psychological questions to Dr. Boyack. Paraskevopoulos Dep. 100:10-101:4.

41.    Dr. Palmer was a psychologist at the MPHP and she assisted CMMC with Plaintiff to ensure that his mental health challenges were addressed appropriately.  CMMC Depo. 27:13-28:10.

Response: Qualified.  In addition to her work with the MPHP program, Maggie Palmer also had a role directly with CMMC; she was a paid private consultant for CMMC and was paid in the range of $10,000 per year for this work. Deposition of Defendant ("30(b)(6) Dep.") 27:13-28:22.

MPHP is "very substance abuse oriented." Paraskevopoulos Dep. 99:15-24; 98:20-24. HR Director Miklavic's "dealings with Dr. Palmer were generally where we had an impaired physician or a physician who was in trouble of some sort, whether it was a DUI, et cetera, and she was quite helpful in those circumstances." Miklavic Dep. 18:5-11. Leo met with MPHP representative Maggie Palmer "several times," and communicated with her by phone "briefly just to confirm meetings and things like that"; Palmer was

more concerned about substance abuse problems, which Leo has never had, and referred deeper psychological questions to Dr. Boyack. Paraskevopoulos Dep. 100:10-101:4.

42.   Dr. Bethany Picker is one of the FMR faculty in Lewiston, and she served as Plaintiff's onsite supervisor for the MPHP, and became Plaintiff's academic advisor in March 2013.  Deposition of Bethany Picker ("Picker Depo.") 4:21-5:2; 5:23-25.

Response: Admitted.

**Plaintiff's Return to Work**

43.   Plaintiff returned to work on March 18, 2013, which was an agreed upon date between Plaintiff and Dr. Woolever. Paraskevopoulos Depo. 106:20-25.

Response: Qualified. Leo was cleared to return to work in February, but his return to work was delayed until March 18 at Woolever's request:  By letter dated February 1, 2013, Dr. Boyack advised Dr. Palmer that Leo was on target to return to work the week of February 18, recommended a gradual" return to work, warned that "[h]e should absolutely not take overnight call in these initial weeks back," and asked the residency program to be "a little flexible" with Leo. Plaintiff produced Bates stamped document ("P") 1167; Deposition of Dr. Cindy Boyack ("Boyack Dep.") Exhibit 3. On

February 23, 2012, Leo explained in an email to Woolever that he had "received official notice from Dr. Palmer that I am eligible to return to work on or shortly after Feb 28th . . ." Irog Responses pp.8-9. At Woolever's request, however, Leo's return to work was delayed until March 18, 2013. Irog Responses p. 8-9. As a result of the delay in the return to work date set by Woolever, Leo was out of work for more than three months and his disciplinary suspension was extended. Irog Responses p. 8-9.

44.    Dr. Boyack released Plaintiff to return to work with transitional accommodations, namely, that he have a gradual return to work—limited to 20 hours per week for his first week back, 30 hours per week for his second week, and a full-time schedule thereafter, and that he not be scheduled for overnight call for the first few weeks.  Paraskevopoulos Depo. 108:22-109:10; Boyack Depo. 54:10-55:19, Boyack Depo. Exhibit 3.

Response: Qualified. By letter dated February 1, 2013, Dr. Boyack advised Palmer that Leo was on target to return to work the week of February 18, recommended a "gradual" return to work, warned that "[h]e should absolutely not take overnight call in these initial weeks back," and asked the residency program to be "a little flexible" with Leo. P1167; Boyack Dep. Exhibit 3.

On February 11, 2013, Palmer emailed Woolever that Leo's "psychiatrist is suggesting that he return to work on a half time basis, which

34

may be impossible." Woolever Dep. Exhibit 1, p. 100; DF 121; 30(b)(6) Dep. 62:1-63:19. Woolever forwarded Palmer's email to human resources representative Burger and stated: "Per Maggie's email below, it looks like there may be a request for a return to work on a "half-time" basis. Our residency does not offer any kind of part-time option (some do offer shared positions or other less than full time options, but we have never done that)." Woolever Dep. Exhibit 1, p. 100; DF121; 30(b)(6) Dep. 62:1-63:19.

45.   Dr. Boyack did not impose a long term prohibition against Plaintiff working overnight call or night floats.  Boyack Depo. 55:13-19; Boyack Depo. Exhibit 3.

Response: Denied. Boyack repeatedly requested ongoing accommodations for Leo, including accommodations regarding overnight work:

• **February 2013**: By letter dated February 1, 2013, Dr. Boyack advised Dr. Palmer that Leo was on target to return to work the week of February 18, recommended a gradual" return to work, warned that "[h]e should absolutely not take overnight call in these initial weeks back," and asked the residency program to be "a little flexible" with Leo. P1167; Boyack Dep. Exhibit 3.

• **April 2013:**  By letter dated April 30, 2013, Dr. Boyack informed Palmer that: "lack of sleep is very risky for [Leo] or any one with bipolar disorder, in terms of developing mood symptoms again . . . I continue to have

35

concerns about the deleterious effects of sleep deprivation in Bipolar disorder, and how this may impact Leo in his early recovery form his severe mood episode . . . the timing of his being ready for call remains in flux in my assessment. . . he may well require ongoing accommodations regarding work hours in particular in order to ensure he continues to have a successful recovery . . . ." Boyack Dep. Exhibit 4; DF 1580

- **August 2013:** On Aug 19, 2013, Dr. Boyack spoke with Palmer by phone about Leo; Palmer emailed Woolever and Taylor summarizing her call the previous day with Dr. Boyack:

> "I wanted to update you on my conversation late yesterday afternoon with Dr. B, LP's treating psychiatrist. She appreciates the feedback and listened intently to everything I had to say. I also passed along Christine Gray's observations. Dr. B is increasingly concerned about LP have to take 24 hour call as it stimulates his bipolar. She states that his sleep-wake cycle gets completely thrown off when he has to do the overnight calls. She suggested that CMMC think about having him do as many calls, but having them all occur during day hours, even if they end at midnight. MMC has had more than a dozen residents with that same diagnosis for whom accommodations around 24 hour call had to be made." 30(b)(6) Dep. Exhibit 9; DF 255-256; Boyack Dep. 38-39, 71-72.

As of August 22, 2013, Dr. Boyack's notes of her treatment sessions with Leo reflect a need to "monitor closely, especially regarding sleep deprivation on call and night float"; Dr. Boyack's concern was "based on a history where a previous episode of night float, [Leo] literally did not sleep all week, not one hour of sleep in a week." Boyack Dep. 33:5-17.

36

- **November 2013**: On November 15, 2013, Dr. Boyack spoke by phone with Dr. Picker about Leo; Dr. Boyack's notes summarize her phone call that day with Dr. Picker:

> "Writer discussed the course of treatment so far, the question of how much his current challenges may reflect ongoing hypomania vs baseline character. Also reflected concern re: his taking overnight call, given he gets very little sleep during those periods, which can possibly lead to hypomania. Advised Dr. Picker that the patient has been bringing the issues of his performance to therapy increasingly in recent weeks especially, and that we have been addressing them." Boyack Dep. 24-25; P1048.

In her phone call with Dr. Picker in November 2013, Dr. Boyack was "advocating, actually, for Dr. Paraskevopoulos to not necessarily do overnight call because that is also something that we know, is when people with bipolar disorder do shift work, especially that overnight shift, that tends to be more of an acute trigger of losing sleep than night after night which can then trigger an episode either up or down." Boyack Dep. 29:24-30:8. Dr. Boyack understood from her November 15 call with Dr. Picker that a request to pull Leo from night call "would not be well-received" and "that was not an accommodation they were going to consider essentially." Boyack Dep. 35:11-23.

Following the November 15 call with Dr. Boyack, Picker emailed Woolever and Taylor to summarize the call:

> "Just got off the phone with Cindy Boyack. She is now very concerned about him. She had thought he was doing well. Now she thinks maybe

37

when sleep deprived he becomes hypomanic and it appears as grandiosity. . . . [¶] . . . She is considering pulling him from call and wanted to know how that would be received. I told her that was really a question for Raj, but I don't think received well." Woolever Depo. Exhibit 1, p. 195.

46.   When Plaintiff returned to work he had a reduced schedule for approximately three months. Paraskevopoulos Depo. 111:4-7; 119:5-8.

Response: Admitted.

47.   CMMC accommodated Plaintiff's schedule so he could see Dr. Boyack on a weekly or biweekly basis in Portland.  Woolever Decl. ¶ 20.

Response: Admitted.

48.   Plaintiff called out sick on April 19, 2012, Paraskevopolous Depo. 121:11-18, and he was paid for that sick day.  Paraskevopoulos Depo. 143:15-21.

Response: Qualified. Although CMMC did not withhold pay from Leo, Woolever intimidated and threatened Leo for calling in sick because he was unable to work due to symptoms of bipolar:

• On April 23, 2013, Leo told Dr. Picker in a meeting that the reason he had called out sick for one day the prior week was that he was suffering from depression symptoms of his bipolar disorder. Irog Responses p. 9. About three hours later on April 23, Leo was called into a meeting with Dr. Woolever, who expressed that Dr. Picker had told him that he had been out of work one day due to depression symptoms. Irog Responses p. 9. Woolever told Leo that as a

38

result of his use of one sick day for his bipolar disorder and that Leo had

emailed Kim Elliot suggesting a schedule change, Woolever questioned his

integrity, professionalism and readiness to function as a normal fulltime

resident. Irog Responses p. 9.

- Leo asked Woolever if he would be allowed to use accrued sick leave to

take intermittent leave if he felt symptoms of his medical condition, such as

unusually deep depression; Woolever stated that he was concerned about the

fact that he called out sick one day that week because of depression

symptoms of his bipolar disorder. Irog Responses p. 9; Paraskevopoulos Dep.

Exhibit 4, p. 62. Leo stated that he felt like Woolever  was providing him with

a negative consequence for calling out sick due to symptoms of his disease;

Dr. Woolever stated "are you threatening me", Leo stated "no I am not

threatening you", Dr. Woolever stated "it sounds like you are threatening me,

if you go there things will end up very badly for you", Leo stated "I am not

threatening you, this is new for me, my diagnosis and treatment and

beginning work are new for me, I am just trying to learn what to

appropriately do in all situations. Perhaps if I have depressed symptoms I

should come to morning report and speak to a faculty about them and decide

what to do next." Irog Responses p. 9-10; Paraskevopoulos Dep. Exhibit 4, p.

62. Dr. Woolever said "that seems like a good idea" for Leo to come in to work

for morning report if he was unable to work due to depression symptoms

rather than using accrued sick leave; this was not required for other residents who took sick leave and was not required for sick leave due to illness not related to a disability. Irog Responses p. 10; Paraskevopoulos Dep. Exhibit 4, p. 62. As a result of the April 23 meeting, Woolever intimidated Leo to not call in sick if he was experiencing symptoms of insomnia. Paraskevopoulos Dep. 141:5-142:20.

49.    Thereafter, Plaintiff took approximately three additional sick days and fifteen vacation days thereafter.  Woolever Decl. ¶ 21.

Response: Qualified. Leo took several vacation days in December 2013 in order to study for the U.S. Medical Licensing Step III exam, a full two-day licensing exam. He took this time off primarily to ensure that he was mentally healthy and was able to correct any sleeping problems before this important examination. He took and passed the Step III exam in December 2013. Paraskevopoulos Decl. ¶9.

50.    As of July 1, 2013, Plaintiff was no longer on probation. Paraskevopoulos Depo. 152:7-10.

Response: Admitted.

**Residency Requirements**

51.    In early July 2013, Plaintiff was informed that he would receive some credit for rotations completed in his second year but that he would have to

repeat part of his second year.  Paraskevopoulos Depo. 153:1-8; 77:24-78:3;

174:12-18; Woolever Decl. ¶ 22.

Response: Qualified. On July 2, 2013, CMMC told Leo he would have to

repeat the second year of his residency (PGY-2), including repeating all

overnight call and night float requirements. Woolever Dep. Exhibit 1, p. 142-

43; DF 220-21. As of July 2013, Leo had already done 7 to 8 months' worth of

night calls in his second year of residency. Paraskevopoulos Dep. Exhibit 4,

p. 82; Irog Responses p. 12.

52.   Plaintiff was required to repeat part of his second year to satisfy

ACGME's continuity requirement that residents be physically present with

the same panel of patients for two consecutive years.  Woolever Decl. ¶ 22.

Response: This statement of fact should be stricken because it alleges a

conclusory fact and makes a legal argument regarding causation, using the

phrase "to satisfy ACGME's continuity requirement" to argue that the

requirement to repeat second-year requirements was imposed for legitimate,

non-discriminatory reasons and, by direct implication, not for the

discriminatory reasons alleged by Plaintiff. Statements of material facts must

be limited to "historical facts" and cannot include "legal argument" or

"conclusory" facts. *See, e.g., Hearts with Haiti, Inc. v. Kendrick*, 2:13-cv-

00039-JAW, 2014 U.S. Dist. LEXIS 128402, at *25 n.18 (Aug. 28, 2014). "This

'fact' is an argument, not properly presented in a statement of material facts."

41

*Id.* It is for the Court to "consider in due course whether the historical facts, viewed in the light most favorable to the Plaintiff[], demonstrate that" no reasonable jury could find for Plaintiff on the legal issue of causation. *Id.*

Denied. On February 23, 2012, Leo explained in an email to Dr. Woolever that he had "received official notice from Dr. Palmer that I am eligible to return to work on or shortly after Feb 28th . . ." Irog Responses p. 8-9. At Dr. Woolever's request, however, Leo's return to work was delayed until March 18, 2013. Irog Responses p. 8-9. As a result of the delay in the return to work date set by Dr. Woolever, Leo was out of work for more than three months and his disciplinary suspension was extended. Irog Responses p. 8-9.

As Dr. Woolever was aware and Leo was not, rules of the American Board of Family Medicine (ABFM) generally require second and third year residents who are out of work for more than three months to start their residency over at the beginning of the second year; as a result, Dr. Woolever's delay in his return to work resulted in him having to repeat months of his rotation. Irog Responses, p. 8-9. Although Leo may have been eligible for a waiver of this ABFM rule, he was not informed that he would be required to repeat months of work until months after he returned from medical leave and was not told even then that the reason he was being required to repeat those

42

months was an ABFM "continuity" rule, but only that Dr. Woolever was requiring him to repeat months of work. Irog Responses p. 8-9.

Dr. Picker, Leo's advisor, "honestly do[es]n't know" what reason there would be to require Leo to repeat night calls he had already completed. Picker Dep. 86:15-20.

53.   Plaintiff contacted Kirk Miklavic (from CMMC's Human Resources) about the credits he was receiving and having to repeat part of his second year and later told Mr. Miklavic: "yes, Raj and I have worked things through. I am following instructions and the plan set forward for me. Thanks for checking in." Paraskevopoulos Depo. 181:16-20.

Response: Qualified. Leo stated to Human Resources Director Miklavic that he was "following instructions and the plan set forward for me" only after he had repeatedly asked Woolever that he not be required to repeated second-year requirements, had been told "no" by Woolever, had then appealed to HR, and had been told by HR to "work through these concerns with" Woolever: In early July 2013, Leo asked Dr. Woolever if he could maintain credit for the night call shifts that he had worked over the previous calendar year because he was worried that sleep deprivation is the known worst trigger for bipolar symptoms and he hoped that faculty would accommodate him giving credit for his previous completed night call shifts to reduce the risk of developing symptoms related to his medical condition due to sleep

43

deprivation; Woolever clearly stated "no" to this request and did not discuss Leo's request further or discuss possible alternate reasonable accommodations. Irog Responses p. 12. On July 3, 2013, Leo explained to Woolever that "nights are something that we should pay close attention to due to my condition." Woolever Dep. Exhibit 1, p. 142-43; DF 220-21. Also on July 3, 2013, Leo explained to human resources representative Burger that he had requested credit from Woolever for the night calls he had already completed in PGY-2:

> "I also asked if I would maintain credit for my night calls that I have completed as a PGY 2 in Rumford and my director stated that I would not be credited for these. I did say that I am worried that sleep deprivation is the known worst trigger for bipolar symptoms in hopes that faculty would accommodate giving me credit for my previous completed night calls to reduce the amount of night calls I will need to do over the next year while still meeting the required amount but this was immediately declined without further discussion thus far." Woolever Dep. Exhibit 1, p. 150; DF 333.

Burger responded to Leo, and copied Human Resources Director Miklavic, that she "would encourage [Leo] to work through these concerns with Raj [Woolever] and your precepting physician(s)." Woolever Dep. Exhibit 1, p. 149; DF 332. Woolever was the final decision maker about what accommodations, if any, would be made for Leo because of his bipolar disorder. 30(b)(6) Dep. 54:3-16.

44

54.    The requirement that residents work between midnight and 6:00 am is an essential function of the FMR program.  CMMC Depo. 14:3-11; Woolever Decl. ¶¶ 43-44.

Response: This statement of fact should be stricken because it alleges a conclusory fact and makes a legal argument what is an "essential function" of the job at issue. Statements of material facts must be limited to "historical facts" and cannot include "legal argument" or "conclusory" facts. *See, e.g., Hearts with Haiti, Inc. v. Kendrick*, 2:13-cv-00039-JAW, 2014 U.S. Dist. LEXIS 128402, at *25 n.18 (Aug. 28, 2014). "This 'fact' is an argument, not properly presented in a statement of material facts." *Id.* It is for the Court to "consider in due course whether the historical facts, viewed in the light most favorable to the Plaintiff[], demonstrate that" no reasonable jury could find for Plaintiff on the legal issue of causation. *Id.*

Denied. The requirement that residents work between midnight and 6:00 am is not an "essential function" of the job: Working a twenty-eight hour shift "is not a requirement of [CMMC's] accrediting body"; it is a CMMC program requirement and is not imposed by the accrediting body. Woolever Dep. 133:6-134:25; Picker Dep. 30:13-20. There are practice situations where a physician who cannot work a 28-hour shift could perform well; a physician's license should not be revoked if a primary care provider developed a disability that prevented them from doing twenty-eight hour shift. Woolever

45

Dep. 104:3-16. Not all family medicine physicians are required to handle overnight call as part of their job duties; some family practice doctors work day hours at a clinic and are not required to work overnight, so a health problem with working overnight would theoretically be irrelevant to their ability to perform that job. 30(b)(6) Dep. 21:19-22:24. Some physicians work relatively short hours, for example, ten hours four days a week, after residency. Picker Dep. 79:23-80:4.

In addition, in her August 2013 phone call with Palmer, Dr. Boyack explained that "MMC has had more than a dozen residents with that same diagnosis [as Leo], for whom accommodations around 24 hour call had to be made." 30(b)(6) Dep. Exhibit 19; DF 255-256. At the time Woolever received Palmer's email about her call with Dr. Boyack, he did not know whether the dozen MMC residents mentioned in Palmer's email were in a family medicine residency; CMMC did not do anything to follow up on or research the information from Leo's treating psychiatrist about what MMC was doing in its residency programs. 30(b)(6) Dep. 32:14-35:7. CMMC lacks information to know whether psychiatrists are expected to handle emergencies after midnight as much or more than primary care doctors. 30(b)(6) Dep. 66:1-21.

Woolever has no explanation "whatsoever" for why MMC could make these accommodations in its residency programs when CMMC was saying it could not. 30(b)(6) Dep. 18-22. MMC is an "[e]xcellent institution" and

46

probably has a better reputation than CMMC; it is harder to get in to a residency program at MMC than it is at CMMC. 30(b)(6) Dep. 30:8-22. Woolever did not research whether the three other Maine institutions with family medicine residency programs accommodated residents with bipolar. 30(b)(6) Dep. 43:7-21. Woolever was not curious to see if MMC had some thinking about how CMMC could achieve the same goals and still provide a healthy environment for residents with bipolar. 30(b)(6) Dep. 39:16-20. Woolever has never seriously considered modifying the requirement that residents in his program work between midnight and 6am. 30(b)(6) Dep. 14:3-11. Neither Woolever nor anyone else at CMMC investigated or researched whether it was feasible to make accommodations for family medicine residents having to work overnight because of health issues. 30(b)(6) Dep. 19:1-12.

55.   The FMR residents are required to work after midnight because one of the things that the program has to certify after a resident completes his training is that the resident has the ability to function under fatigue and to make sound decisions at 2:00 in the morning.  CMMC Depo. 47:25-48:10; Picker Depo. 81:9-21.

Response: This statement of fact should be stricken because it alleges a conclusory fact and makes a legal argument what is an "essential function" of the job at issue. Statements of material facts must be limited to "historical

47

facts" and cannot include "legal argument" or "conclusory" facts. *See, e.g.,*
*Hearts with Haiti, Inc. v. Kendrick*, 2:13-cv-00039-JAW, 2014 U.S. Dist.
LEXIS 128402, at *25 n.18 (Aug. 28, 2014). "This 'fact' is an argument, not
properly presented in a statement of material facts." *Id.* It is for the Court to
"consider in due course whether the historical facts, viewed in the light most
favorable to the Plaintiff[], demonstrate that" no reasonable jury could find
for Plaintiff on the legal issue of causation. *Id.*

Denied. The requirement that residents work between midnight and
6:00 am is not an "essential function" of the job: Working a twenty-eight hour
shift "is not a requirement of [CMMC's] accrediting body"; it is a CMMC
program requirement and is not imposed by the accrediting body. Woolever
Dep. 133:6-134:25; Picker Dep. 30:13-20. There are practice situations where
a physician who cannot work a 28-hour shift could perform well; a physician's
license should not be revoked if a primary care provider developed a
disability that prevented them from doing twenty-eight hour shift. Woolever
Dep. 104:3-16. Not all family medicine physicians are required to handle
overnight call as part of their job duties; some family practice doctors work
day hours at a clinic and are not required to work overnight, so a health
problem with working overnight would theoretically be irrelevant to their
ability to perform that job. 30(b)(6) Dep. 21:19-22:24. Some physicians work

relatively short hours, for example, ten hours four days a week, after

residency. Picker Dep. 79:23-80:4.

In addition, in her August 2013 phone call with Palmer, Dr. Boyack

explained that "MMC has had more than a dozen residents with that same

diagnosis [as Leo], for whom accommodations around 24 hour call had to be

made." 30(b)(6) Dep. Exhibit 19; DF 255-256. At the time Woolever received

Palmer's email about her call with Dr. Boyack, he did not know whether the

dozen MMC residents mentioned in Palmer's email were in a family medicine

residency; CMMC did not do anything to follow up on or research the

information from Leo's treating psychiatrist about what MMC was doing in

its residency programs. 30(b)(6) Dep. 32:14-35:7. CMMC lacks information to

know whether psychiatrists are expected to handle emergencies after

midnight as much or more than primary care doctors. 30(b)(6) Dep. 66:1-21.

Woolever has no explanation "whatsoever" for why MMC could make

these accommodations in its residency programs when CMMC was saying it

could not. 30(b)(6) Dep. 18-22. MMC is an "[e]xcellent institution" and

probably has a better reputation than CMMC; it is harder to get in to a

residency program at MMC than it is at CMMC. 30(b)(6) Dep. 30:8-22.

Woolever did not research whether the three other Maine institutions with

family medicine residency programs accommodated residents with bipolar.

30(b)(6) Dep. 43:7-21. Woolever was not curious to see if MMC had some

49

thinking about how CMMC could achieve the same goals and still provide a healthy environment for residents with bipolar. 30(b)(6) Dep. 39:16-20. Woolever has never seriously considered modifying the requirement that residents in his program work between midnight and 6am. 30(b)(6) Dep. 14:3-11. Neither Woolever nor anyone else at CMMC investigated or researched whether it was feasible to make accommodations for family medicine residents having to work overnight because of health issues. 30(b)(6) Dep. 19:1-12.

56.    In other words, when a resident graduates from the FMR, CMMC is certifying that the resident is capable of functioning in a 24 hour environment.  Woolever Decl. ¶ 44.

Response: This statement of fact should be stricken because it alleges a conclusory fact and makes a legal argument what is an "essential function" of the job at issue. Statements of material facts must be limited to "historical facts" and cannot include "legal argument" or "conclusory" facts. *See, e.g., Hearts with Haiti, Inc. v. Kendrick*, 2:13-cv-00039-JAW, 2014 U.S. Dist. LEXIS 128402, at *25 n.18 (Aug. 28, 2014). "This 'fact' is an argument, not properly presented in a statement of material facts." *Id.* It is for the Court to "consider in due course whether the historical facts, viewed in the light most favorable to the Plaintiff[], demonstrate that" no reasonable jury could find for Plaintiff on the legal issue of causation. *Id.*

50

Denied. The requirement that residents work between midnight and 6:00 am is not an "essential function" of the job: Working a twenty-eight hour shift "is not a requirement of [CMMC's] accrediting body"; it is a CMMC program requirement and is not imposed by the accrediting body. Woolever Dep. 133:6-134:25; Picker Dep. 30:13-20. There are practice situations where a physician who cannot work a 28-hour shift could perform well; a physician's license should not be revoked if a primary care provider developed a disability that prevented them from doing twenty-eight hour shift. Woolever Dep. 104:3-16. Not all family medicine physicians are required to handle overnight call as part of their job duties; some family practice doctors work day hours at a clinic and are not required to work overnight, so a health problem with working overnight would theoretically be irrelevant to their ability to perform that job. 30(b)(6) Dep. 21:19-22:24. Some physicians work relatively short hours, for example, ten hours four days a week, after residency. Picker Dep. 79:23-80:4.

In addition, in her August 2013 phone call with Palmer, Dr. Boyack explained that "MMC has had more than a dozen residents with that same diagnosis [as Leo], for whom accommodations around 24 hour call had to be made." 30(b)(6) Dep. Exhibit 19; DF 255-256. At the time Woolever received Palmer's email about her call with Dr. Boyack, he did not know whether the dozen MMC residents mentioned in Palmer's email were in a family medicine

51

residency; CMMC did not do anything to follow up on or research the information from Leo's treating psychiatrist about what MMC was doing in its residency programs. 30(b)(6) Dep. 32:14-35:7. CMMC lacks information to know whether psychiatrists are expected to handle emergencies after midnight as much or more than primary care doctors. 30(b)(6) Dep. 66:1-21.

Woolever has no explanation "whatsoever" for why MMC could make these accommodations in its residency programs when CMMC was saying it could not. 30(b)(6) Dep. 18-22. MMC is an "[e]xcellent institution" and probably has a better reputation than CMMC; it is harder to get in to a residency program at MMC than it is at CMMC. 30(b)(6) Dep. 30:8-22. Woolever did not research whether the three other Maine institutions with family medicine residency programs accommodated residents with bipolar. 30(b)(6) Dep. 43:7-21. Woolever was not curious to see if MMC had some thinking about how CMMC could achieve the same goals and still provide a healthy environment for residents with bipolar. 30(b)(6) Dep. 39:16-20. Woolever has never seriously considered modifying the requirement that residents in his program work between midnight and 6am. 30(b)(6) Dep. 14:3-11. Neither Woolever nor anyone else at CMMC investigated or researched whether it was feasible to make accommodations for family medicine residents having to work overnight because of health issues. 30(b)(6) Dep. 19:1-12.

57.    The FMR requires residents to work call shifts and night floats and has not made exceptions to this requirement.  Woolever Decl. ¶ 44.

Response: Admitted.

58.    Call shifts are 24-hour shifts plus 4 hours for transferring patient care and night floats are 14-hour overnight shifts for 5 nights in a row. CMMC Depo. 128:9-11; 140:15-20.

Response: Admitted.

59.    On July 16, 2013, Plaintiff offered to do two weeks straight of night float. Paraskevopoulos Depo. 179:19-22.

Response: Qualified. Leo said he would be "be willing to give two week blocks of night float a try to accommodate" two-week elective blocks, Paraskevopoulos Dep. 179:19-22, but he made this statement only after he had repeatedly asked Woolever not to be required to repeat second-year requirements, had been told "no" by Woolever, had then appealed to HR, and had been told by HR to "work through these concerns with" Woolever as the final decision maker on accommodations: In early July 2013, Leo asked Dr. Woolever if he could maintain credit for the night call shifts that he had worked over the previous calendar year because he was worried that sleep deprivation is the known worst trigger for bipolar symptoms and he hoped that faculty would accommodate him giving credit for his previous completed night call shifts to reduce the risk of developing symptoms related to his

53

medical condition due to sleep deprivation; Woolever clearly stated "no" to this request and did not discuss Leo's request further or discuss possible alternate reasonable accommodations. Irog Responses p. 12. On July 3, 2013, Leo explained to Woolever that "nights are something that we should pay close attention to due to my condition." Woolever Dep. Exhibit 1, p. 142-43; DF 220-21. Also on July 3, 2013, Leo explained to human resources representative Burger that he had requested credit from Woolever for the night calls he had already completed in PGY-2:

> "I also asked if I would maintain credit for my night calls that I have completed as a PGY 2 in Rumford and my director stated that I would not be credited for these. I did say that I am worried that sleep deprivation is the known worst trigger for bipolar symptoms in hopes that faculty would accommodate giving me credit for my previous completed night calls to reduce the amount of night calls I will need to do over the next year while still meeting the required amount but this was immediately declined without further discussion thus far." Woolever Dep. Exhibit 1, p. 150; DF 333.

Burger responded to Leo, and copied Human Resources Director Miklavic, that she "would encourage [Leo] to work through these concerns with Raj [Woolever] and your precepting physician(s)." Woolever Dep. Exhibit 1, p. 149; DF 332. Dr. Woolever was the final decision maker about what accommodations, if any, would be made for Leo because of his bipolar disorder. 30(b)(6) Dep. 54:3-16.

After CMMC denied Leo's request that he not be required to repeat 7-8 months of night float, Leo Irogs 12, on July 16 Leo asked if they could "attempt to schedule elective blocks in at least two week increments" and said he would "be willing to give two week blocks of night float a try to accommodate this." Paraskevopoulos Dep. 179:19-22.

60.    In August 2013 and November 2013 Dr. Boyack expressed concern about Plaintiff working overnight call because lack of sleep can trigger bipolar symptoms.  Boyack Depo. 30:1-17; 35:1-13.

Response: Admitted.

61.    Plaintiff wanted to participate fully in the residency program and did not want Dr. Boyack to inform the program that he was prohibited from overnight call.  Boyack Depo. 37:1-6.

Response: Qualified. Leo "wished to not [have Dr. Boyack prohibit him from doing night call] unless it was absolutely necessary to do so, because he really wanted to, you know, participate in full in the residency program. So when [Dr. Boyack] spoke to Dr. Picker, it was with the recommendation, certainly, but it was not a requirement." Boyack Dep. 37:1-9.

In her phone call with Picker on November 15, 2013, Dr. Boyack was "advocating, actually, for Dr. Paraskevopoulos to not necessarily do overnight call because that is also something that we know, is when people with bipolar disorder do shift work, especially that overnight shift, that tends to be more

55

of an acute trigger of losing sleep than night after night which can then trigger an episode either up or down." Boyack Dep. 29:24-30:8. Dr. Boyack understood from her November 15 call with Picker that a request to pull Leo from night call "would not be well-received" and "that was not an accommodation they were going to consider essentially." Boyack Dep. 35:11-23.

62.   CMMC did not follow-up with removing overnight shifts from Plaintiff's duties because overnight shifts are an essential component of the FMR curriculum.  CMMC Depo. 33:8-13.

Response: This statement of fact should be stricken because it alleges a conclusory fact and makes a legal argument regarding causation, using the term "because" to argue that the refusal to remove overnight shifts was based on the legitimate reason that overnight shifts are an "essential component" of the FMR curriculum, not for the discriminatory reasons alleged by Plaintiff. Statements of material facts must be limited to "historical facts" and cannot include "legal argument" or "conclusory" facts. *See, e.g., Hearts with Haiti, Inc. v. Kendrick*, 2:13-cv-00039-JAW, 2014 U.S. Dist. LEXIS 128402, at *25 n.18 (Aug. 28, 2014). "This 'fact' is an argument, not properly presented in a statement of material facts." *Id.* It is for the Court to "consider in due course whether the historical facts, viewed in the light most favorable to the

Plaintiff[], demonstrate that" no reasonable jury could find for Plaintiff on the legal issue of causation. *Id.*

Denied. The requirement that residents work between midnight and 6:00 am is not an "essential function" of the job: Working a twenty-eight hour shift "is not a requirement of [CMMC's] accrediting body"; it is a CMMC program requirement and is not imposed by the accrediting body. Woolever Dep. 133:6-134:25; Picker Dep. 30:13-20. There are practice situations where a physician who cannot work a 28-hour shift could perform well; a physician's license should not be revoked if a primary care provider developed a disability that prevented them from doing twenty-eight hour shift. Woolever Dep. 104:3-16. Not all family medicine physicians are required to handle overnight call as part of their job duties; some family practice doctors work day hours at a clinic and are not required to work overnight, so a health problem with working overnight would theoretically be irrelevant to their ability to perform that job. 30(b)(6) Dep. 21:19-22:24. Some physicians work relatively short hours, for example, ten hours four days a week, after residency. Picker Dep. 79:23-80:4.

In addition, in her August 2013 phone call with Palmer, Dr. Boyack explained that "MMC has had more than a dozen residents with that same diagnosis [as Leo], for whom accommodations around 24 hour call had to be made." 30(b)(6) Dep. Exhibit 19; DF 255-256. At the time Woolever received

57

Palmer's email about her call with Dr. Boyack, he did not know whether the dozen MMC residents mentioned in Palmer's email were in a family medicine residency; CMMC did not do anything to follow up on or research the information from Leo's treating psychiatrist about what MMC was doing in its residency programs. 30(b)(6) Dep. 32:14-35:7. CMMC lacks information to know whether psychiatrists are expected to handle emergencies after midnight as much or more than primary care doctors. 30(b)(6) Dep. 66:1-21.

Woolever has no explanation "whatsoever" for why MMC could make these accommodations in its residency programs when CMMC was saying it could not. 30(b)(6) Dep. 18-22. MMC is an "[e]xcellent institution" and probably has a better reputation than CMMC; it is harder to get in to a residency program at MMC than it is at CMMC. 30(b)(6) Dep. 30:8-22. Woolever did not research whether the three other Maine institutions with family medicine residency programs accommodated residents with bipolar. 30(b)(6) Dep. 43:7-21. Woolever was not curious to see if MMC had some thinking about how CMMC could achieve the same goals and still provide a healthy environment for residents with bipolar. 30(b)(6) Dep. 39:16-20. Woolever has never seriously considered modifying the requirement that residents in his program work between midnight and 6am. 30(b)(6) Dep. 14:3-11. Neither Woolever nor anyone else at CMMC investigated or researched whether it was feasible to make accommodations for family medicine

58

residents having to work overnight because of health issues. 30(b)(6) Dep. 19:1-12.

63.    Between August 20, 2013 and January 2014, Plaintiff completed ten or fewer overnight shifts, CMMC Depo. 126:5-12, and his last overnight shift was approximately seven weeks before his termination in January 2014, Woolever Decl. ¶ 45.

Response: Admitted.

64.    CMMC is not aware of any other family medicine residencies in Maine that do not require residents to work overnight shifts due to health reasons. CMMC Depo. 14:17-20.

Response: Qualified. In her August 2013 phone call with Dr. Palmer, Dr. Boyack explained that "MMC has had more than a dozen residents with that same diagnosis [as Leo], for whom accommodations around 24 hour call had to be made." 30(b)(6) Dep. Exhibit 19; DF 255-256. At the time Woolever received Palmer's email about her call with Dr. Boyack, he did not know whether the dozen MMC residents mentioned in Palmer's email were in a family medicine residency; CMMC did not do anything to follow up on or research the information from Leo's treating psychiatrist about what MMC was doing in its residency programs. 30(b)(6) Dep. 32:14-35:7.

Woolever has no explanation "whatsoever" for why MMC could make these accommodations in its residency programs when CMMC was saying it

could not. 30b6 18-22. MMC is an "[e]xcellent institution" and probably has a better reputation than CMMC; it is harder to get in to a residency program at MMC than it is at CMMC. 30(b)(6) Dep. 30:8-22. Woolever did not research whether the three other Maine institutions with family medicine residency programs accommodated residents with bipolar. 30(b)(6) Dep. 43:7-21. Woolever was not curious to see if MMC had some thinking about how CMMC could achieve the same goals and still provide a healthy environment for residents with bipolar. 30(b)(6) Dep. 39:16-20. Woolever has never seriously considered modifying the requirement that residents in his program work between midnight and 6am. 30(b)(6) Dep. 14:3-11. Neither Woolever nor anyone else at CMMC investigated or researched whether it was feasible to make accommodations for family medicine residents having to work overnight because of health issues. 30(b)(6) Dep. 19:1-12. If Leo had requested an accommodation to his schedule of not working after midnight, CMMC would have had an obligation to investigate that. 30(b)(6) Dep. 54:23-55:1.

65.   Dr. Boyack is not aware of whether Maine Medical Center's family medicine residency has made accommodations regarding overnight shifts for individuals similarly-situated to Plaintiff.  Boyack Depo. 75:20-24.

Response: Qualified. Although Dr. Boyack is not aware of whether accommodations have been made for similarly situated residents at MMC in

family medicine residency, she is aware of accommodations given to interns at MMC to not do over 24-hr shifts. Boyack Dep. 75:15-76:1.

66.   A family medicine residency is different than a psychiatry residency. Boyack Depo. 39:17-23.

Response: Qualified. CMMC lacks information to know whether psychiatrists are expected to handle emergencies after midnight as much or more than primary care doctors. 30(b)(6) Dep. 66:1-21.

67.   A family medicine residency is different than any other type of medical residency and has different and distinct curriculum requirements and accrediting requirements, as dictated by the ACGME, than other residency programs.   Woolever Decl. ¶ 46.

Response: Qualified. Working a twenty-eight hour shift "is not a requirement of [CMMC's] accrediting body"; it is a CMMC program requirement and is not imposed by the accrediting body. Woolever Dep 133:6-134:25; Picker Dep. 30:13-20.

Moreover, CMMC lacks information to know whether psychiatrists are expected to handle emergencies after midnight as much or more than primary care doctors. Picker Dep. 66:1-21.

68.   Other essential functions of the FMR program include satisfactory academic performance (as outlined in the ACGME accreditation

61

requirements), satisfactory patient care, and satisfactory communication and interpersonal skills.  Woolever Decl. ¶ 43.

Response: Admitted.

## Plaintiff's Unsatisfactory Performance in the FMR in 2013-2014

69.   In August 2013, Leo remained on an individualized education plan. Woolever Decl. ¶ 23.

Response: Admitted.

70.   Dr. Woolever and the faculty were concerned about Plaintiff's performance in several competencies, including, professionalism, interpersonal and communications skills, medical knowledge, and practice based learning and improvement.  Woolever Decl. ¶ 23.

Response: Qualified. Leo successfully completed 13 rotations in the first year of his residency (PGY1), and successfully completed 18 rotations in the second year of his residency (PGY2). Woolever Dep. 118:18-119:10; Woolever Dep. Exhibit 1, p. 277-79. Leo never failed a rotation during his residency. Woolever Dep. 118:18-119:10. Leo passed his U.S. Medical Licensing Examination, Step III, in December 2013. P00049.

During his residency, Leo received hundreds of Daily Precepting Feedback forms that evaluated his demonstrated abilities in the areas of Medical Knowledge, Understanding, Application to Patient, Professionalism,

62

and System-Based Resources. *See* Exhibit 2, Declaration of Leo Paraskevopoulos ("Paraskevopoulos Decl.") ¶ 1. The vast majority of Leo's Daily Precepting Feedback forms throughout his residency evaluated him positively in each of the listed areas. Paraskevopoulos Decl. ¶ 2. In particular, the vast majority of the Daily Precepting Feedback forms during the last several months of his residency, from late October 2013 through January 21, 2014, rated Leo positively in each of the listed areas. Paraskevopoulos Decl. ¶¶ 3, 4; Paraskevopoulos Decl. Exhibit A.

According to Program Director Woolever's June 2014 signed letter of recommendation, during his residency, Leo "demonstrated a solid medical knowledge base," "performed well on his American Board of Family Medicine In-Training Exams," and "[a]chieved a good score on the USMLE Step 3 exam." Woolever Dep. Exhibit 1, p. 274-75. According to Woolever's June 2014 signed letter of recommendation, Leo "developed trusting relationships with his patients. He took ownership of his patient care responsibilities and was a strong patient advocate. He worked closely with other members of the health care team to ensure that his patients could gain access to the care they needed. 'Dr. Leo' was well-loved and appreciated by his patients." Woolever Dep. Exhibit 1, p. 274-75. Everything in Woolever's June 2014 signed and notarized letter of recommendation for Leo is accurate. Woolever Dep. 118:18-119:10; Woolever Dep. Exhibit 1, p. 274-75.

63

According to CMMC physician Gyorgy Mundruczo, MD, who worked personally with Leo during his residency, Leo was "interested, hard-working, well-liked and respected by his peers," his "knowledge base was commensurate for his level of training," and he "asked appropriate questions," "made a clear effort to make the best of his ICU trainings," "was humble," and "got along well with nurses and therapist." P000597. According to Mercy Express Care-Yarmouth physician Norman Guay, D.O., who supervised Leo directly in clinic, Leo is an "intelligent, compassionate physician," his "knowledge base is certainly adequate and he is in possession of excellent cognitive skills," his "communication style has been noted as one of quiet confidence and was always interpreted as respectful of both patients and staff," and he "has shown a very positive attitude and will to succeed" and "a thirst for medical knowledge." P000598. On May 10, 2013, Leo's faculty advisor Dr. Picker submitted a monthly report to MPHP stating that he was performing satisfactorily in all areas; at this time, Leo was not yet doing night call. Picker Dep. 36:5-37:3; Picker Dep. Exhibit 7; DF 1121.

On June 5, 2013, Picker submitted a monthly report to MPHP stating that Leo was performing satisfactorily in all areas; at this time, Leo was not yet doing night call. Picker Dep. 37:4-18; Picker Dep. Exhibit 7; DF 1117. On July 1, 2013, Plaintiff was taken off of probation. Paraskevopoulos Depo. 152:7-10. On July 2, 2013, CMMC told Leo he would have to repeat the

second year of his residency (PGY-2), including repeating all overnight call and night float requirements. Woolever Dep. Exhibit 1, p. 142-43; DF 220-21. On July 12, 2013, Dr. Picker submitted a monthly report to MPHP about Leo stating that he was performing "unsatisfactorily" in two out of three areas ("thought processes" and "interpersonal relations"); at this time, Leo had started doing night call. Picker Dep. 37:19-22; Picker Dep. Exhibit 7; DF 1116. When Leo returned to doing night call in July 2013, in Picker's view he went from performing satisfactorily in thought processes and interpersonal relations to performing borderline or unsatisfactorily. Picker Dep. 39:5-9.

71.   On August 8, 2013, Dr. Woolever received an email from Dr. Picker stating that a patient had complained "significantly" about Leo.  Woolever Decl. ¶ 24.

       Response: Admitted.

72.   On August 13, 2013, Dr. Woolever received an email from Dr. Picker, forwarding an email from Christine Gray, a licensed psychologist who is affiliated with CMMC and who trains FMR residents, stating that Leo "was exhausting," "it was difficult to get him to consider viewpoints different from his own," and that "he wanted to engage in debate."   Woolever Decl. ¶ 25.

       Response: Admitted.

73.   In September 2013, Dr. Woolever understood from Gary Rivard, a family physician faculty member, that a nurse was concerned about her

65

experience working with Leo because he was unable to remember several conversations she had with him about patient status and the plan of care during the shift they worked together. Woolever Decl. ¶ 26.

     Response: Admitted.

74.   In September 2013, at Plaintiff's request, Dr. Picker requested feedback about him from interns and residents and received three email responses. Picker Depo. 94:4-21.

     Response: Admitted.

75.   The email responses stated, among other things:

    a.  "I did not feel that [Plaintiff] handled admissions as smoothly as the other seniors that I have worked with, to be more specific he did not make an effort to see the [patient] first and triage them appropriately, or place holding orders. I wasn't confident that the patients I was being asked to admit met admission criteria. This made the entire admission process, including the precepting with the attending, uncomfortable for me.";

    b.  "The not so good is communication. During my one experience working with him on a busy service, there were a couple times where I couldn't contact him by phone or page and several times where I felt like his expectations of me were not fair and/or clear.";

    c.  "[O]ne thing that has struck me is that he is not the best listener when we are doing sign-out or whether we are discussing a [patient]."

Picker Depo. Exhibit 1, pages 170-172.

     Response: Qualified. These are selective quotations from the cited emails. In addition, the emails also stated, among other things, that:

a. I felt that he was very approachable and made an effort to check in with me about any potential unstable patients so that I wouldn't feel like I was on my own. He also handled the FMTS calls so that I could focus on the IMTS which was helpful. ... When I fell behind and was staying late into the evening, Leo offered multiple times to complete a dictation for me."

b. "In general, the good is he seems very encouraging of his co-residents (especially the interns) education. Also good is he is direct about advice and feedback (compliments and constructive criticism."

c. "Call – Leo appears to embrace his call shifts ..."

Woolever Dep. Exhibit 1, p. 170-172.

d. In addition, by email dated November 4, 2013, hospitalist Jonathan Bausman provided the following feedback on Leo: I've had a crazy busy day, with one very sick girl that I transferred to PICU in Boston. Leo has been awesome! Helping out, he's been a big help doing notes, putting in orders, doing awesome! Clinically he was right on the money. Everything he brought up and things we talked about was basically exactly what the PICU fellow I was talking with was suggesting, so clinically he was managing the patient really well! Just wanted to let you know that he is doing

67

great, and being a great asset to my team today. Woolever Dep.

Exhibit 1, p. 176; DF 00285.

76.   On October 24, 2013, Dr. Picker emailed Plaintiff stating that there

is concern about his performance on the Family Medicine Teaching Service

("FMTS"), Paraskevopoulos Depo. 183:13-19; Picker Depo. 15:24-25, and that

his communication skills are below level and affecting his working

relationships, Paraskevopoulos Depo. 184:18-20; Picker Depo. Exhibit 1, page

174.

Response: Qualified. This is a selective quotation from the cited email.

Picker's October 24, 2013 email also stated, among other things, that Leo's

peers had "universally expressed that you were engaged in teaching when

you were present and trying to teach, but that sometimes you did not

recognize that they could have used help"; stated "[a] couple of people

acknowledged their role in the miscommunications," and concluded, "I know

you are working on this and I encourage you to continue to do so." Woolever

Dep. Exhibit 1, p. 174; DF 00273.

77.   Plaintiff met with Dr. Woolever on or about November 14 and was

told that he was going to be put back on probation and that they were going

to have a more formal meeting on November 18. Paraskevopoulos Depo.

191:9-18.

Response: Admitted.

68

78.   Plaintiff knew at the meeting on November 18 that he and Dr.

Woolever were going to go over the terms of his probation. Paraskevopoulos

Depo. 191:25-192:3.

Response: Qualified. The cited deposition testimony states that Leo

"knew we had a meeting on the 18th" but does not support indicate that Leo

knew that he and Woolever would be going over the terms of probation at the

meeting.

79.   Plaintiff received a memorandum of understanding, dated November

18, 2013, placing him on probation for continued difficulties in the

competencies of professionalism, interpersonal communication and problem

based learning, for an initial term of three months.  Paraskevopoulos Depo.

Exhibit 2, pages 34-36; Woolever Decl. ¶ 27.

Response: This statement of fact should be stricken because it alleges a

conclusory fact and makes a legal argument regarding causation, using the

phrase "placing him on probation for continued difficulties..." to argue that

the probation was based on the legitimate reason of prior poor performance,

not for the discriminatory reasons alleged by Plaintiff. Statements of

material facts must be limited to "historical facts" and cannot include "legal

argument" or "conclusory" facts. *See, e.g., Hearts with Haiti, Inc. v. Kendrick*,

2:13-cv-00039-JAW, 2014 U.S. Dist. LEXIS 128402, at *25 n.18 (Aug. 28,

2014). "This 'fact' is an argument, not properly presented in a statement of

69

material facts." *Id.* It is for the Court to "consider in due course whether the historical facts, viewed in the light most favorable to the Plaintiff[], demonstrate that" no reasonable jury could find for Plaintiff on the legal issue of causation. *Id.*

Denied. Plaintiff contends that the refusal of his reasonable accommodation requests and the terms of the probation agreement were a denial of reasonable accommodations and failure to engage in good-faith dialogue that continued until the end of his employment, and the probation was retaliation and discrimination. Irog Responses p. 4.

On November 15, 2013, Dr. Boyack spoke by phone about Leo with Dr. Picker; Dr. Boyack's notes summarize her phone call that day with Dr. Picker:

> "Writer discussed the course of treatment so far, the question of how much his current challenges may reflect ongoing hypomania vs baseline character. Also reflected concern re: his taking overnight call, given he gets very little sleep during those periods, which can possibly lead to hypomania. Advised Dr. Picker that the patient has been bringing the issues of his performance to therapy increasingly in recent weeks especially, and that we have been addressing them." Boyack Dep. 24-25; P1048.

In her phone call with Dr. Picker on November 15, 2013, Dr. Boyack was "advocating, actually, for Dr. Paraskevopoulos to not necessarily do overnight call because that is also something that we know, is when people with bipolar disorder do shift work, especially that overnight shift, that tends

70

to be more of an acute trigger of losing sleep than night after night which can then trigger an episode either up or down." Boyack Dep. 29:24-30:8. Leo "wished to not [have Dr. Boyack prohibit him from doing night call] unless it was absolutely necessary to do so, because he really wanted to, you know, participate in full in the residency program. So when [Dr. Boyack] spoke to Dr. Picker, it was with the recommendation, certainly, but it was not a requirement." Boyack Dep. 37:1-9. As of November 2013, Dr. Boyack's sense "was that there was untreated hypomania, and I was educating her [Picker] as to the difference" between symptoms of a mood disorder versus baseline character. Boyack Dep. 25:3-27:2. Boyack seriously considered that Leo's behaviors referenced by Picker in the November phone call were "residual hypomanic symptoms and not necessarily his base behavior, implying that if they were treated, his base behavior would be different and hopefully better." Boyack Dep. 78:14-79:7. Dr. Boyack understood from her November 15 call with Picker that a request to pull Leo from night call "would not be well-received" and "that was not an accommodation they were going to consider essentially." Boyack Dep 35:11-23.

Picker's own notes of that same November 15 phone call with Dr. Boyack state: "She [Dr. Boyack] again discussed his sleep and call issues. She really feels that this is big part of what provokes another backslide. She wanted to just 'put it out there' that she may be requesting a change to his

schedule. I did tell her that in the past, the program had not been open to a

change but that I did not know what the response would be if it came from

Maggie Palmer and the Physician Health Program." Woolever Dep. Exhibit 8;

Woolever Dep. 109-10. Following the November 15 call with Dr. Boyack,

Picker emailed Woolever and Dr. Taylor to summarize the call:

> "Just got off the phone with Cindy Boyack. She is now very
> concerned about him. She had thought he was doing well. Now
> she thinks maybe when sleep deprived he becomes hypomanic
> and it appears as grandiosity. . . . [¶] . . . She is considering
> pulling him from call and wanted to know how that would be
> received. I told her that was really a question for Raj, but I don't
> think received well." Woolever Dep. Exhibit 1, p.195.

On November 18, 2013, Woolever and Picker scheduled a meeting with

Leo; Leo asked for HR to be present at the meeting, but Woolever said no.

Paraskevopoulos Dep. 191:22-24. During the November 18 meeting, the

following exchange occurred:

> Leo:   I know, I told you this before and you said that I didn't, but
> I have a disability.
> [Long silence for more than six seconds]
> Leo:   I printed off something that I'd like to give you explicitly
> explaining problems I've had with my disability.
> Woolever:   I'm not going to take that piece of paper from you.
> Leo:        Well here it is.
> Woolever:   I'm not taking it. You can keep it with you; I am not
> taking it.
> Leo:        Can I read it?
> Woolever:   No you may not read that, that you may not read.
> You are in a program. That program is monitoring your status.
> According to your psychiatrist and the psychologist that
> monitored that program, you are fine to be at work. If you were

not cleared for work you would not have returned to the
residency. I am not interested in that piece of paper.
*See* Exhibit 1, Declaration of Patricia Creeden Bryant ("Bryant
Decl."), Exhibit A p. 12.

Woolever admitted that it would be a failure to engage in dialogue

about reasonable accommodations if the following occurred: "If the employee

said "I printed off something that I would like to give you explicitly

explaining problems I have had with my disability," and if the employer

responded, "I am not going to take that piece of paper from you" and if the

employee said, "Well, here it is," and placed the piece of paper on the table in

front of the employer and the employer responded, "I am not taking it," and

you can keep it -- "you can keep  it with you, I am not taking it," and if the

employee then asked "can I read it", and if the employer then said "no, you

may not read that, that you may not read."' Woolever Dep. 73:7-22.

The written letter that Leo tried to give to Dr. Woolever stated, in part:

"I am just learning how to control, reduce, and live with
symptoms of Bipolar disease. Perhaps a discussion could be had
about the benefits of some reasonable accommodations that for
example may include:
        • Reducing work hours.
        • Exchanging overnight shifts for day shifts.
        • Taking another short medical leave of absence to provide
        the opportunity to focus on improving my treatment plan
        and well being.
        • Daily check-in's to assure expectations are objectively
        being met." Woolever Dep. Exhibit 1, p. 213; P000130; Irog
        Responses p.15.

At the November 18 meeting, Dr. Woolever "glanced at" the letter from Leo, and told Leo he did not need to see it. Woolever Dep. 60:10-12. After Woolever refused to accept Leo's written letter, Leo tried to explain his bipolar symptoms orally:

> Leo: Bethany? Can I at least explain some problems with my personality.
> Raj: I am not going to listen to that.
> Leo: Why?
> Raj: That is for you to deal with your providers. I am not your medical provider.
> Leo: But you misunderstand some symptoms.
> Raj: If there is a misunderstanding then your medical provider should be in touch with us to clarify that. That's why you are in that program.
> Bethany: You can't have it both ways Leo, you can't have 'I want to be treated like a normal resident, treat me like a normal resident' and then when it hits the fan, you pull it up. And that's how it feels it's been happening. You have repeatedly told me, 'I have been mentally healthy, I have been mentally healthy.'
> Leo: That's how I felt.
> Bethany: So when I'm bringing up the feedback, the same feedback over and over and it's not getting incorporated, it's not changing. Either you can't do it or you're not mentally healthy, but you can't have it both ways."
> Bryant Decl., Exhibit A p. 13-14.

If an employer refuses to allow an employee to submit a written request for accommodation and refuses to let the employee state the request out loud, it can be very hard to know what they were requesting. Woolever Dep. 64:20-65:3. If Leo had asked during the November 18 meeting for an accommodation related to night work or other modifications to the job, the employer would have been required to talk about those with Leo at that

point. Woolever Dep. 66:7-21. An employer cannot legally refuse to allow an employee to submit written request for reasonable accommodation. Miklavic Dep. 86:12-87:4.

On November 18, CMMC put Leo on probation; the probation agreement stated that "ANY violation of the above terms will result in dismissal" from the CMMC residency," and stated the following terms: "No solicitations of staff or fellow residents to defend, support or speak on your behalf"; "No unreasonable requests"; "While on probation, no schedule change requests will be granted." Woolever Dep. Exhibit 1, p. 202-04; DF 871-873.

80.   Plaintiff met with Dr. Woolever and Dr. Picker on November 18, 2013, and discussed the memorandum of understanding.  Paraskevopoulos Depo. 200:5-201:2.

Response: Admitted.

81.   Plaintiff then told Dr. Woolever and Dr. Picker that he printed something off that he would like to give to them explaining the problems he had with his disability, Paraskevopoulos Depo. 206:10-15, and that he wanted the faculty to bring identified symptoms to his attention, Paraskevopoulos Depo. 213:11-16.

Response: Qualified. During the November 18 meeting, the following exchange occurred:

Leo:   I know, I told you this before and you said that I didn't, but I
have a disability.
[Long silence for more than six seconds]
Leo:   I printed off something that I'd like to give you explicitly
explaining problems I've had with my disability.
Woolever:   I'm not going to take that piece of paper from you.
Leo:            Well here it is.
Woolever:   I'm not taking it. You can keep it with you; I am not taking
it.
Leo:            Can I read it?
Woolever:   No you may not read that, that you may not read. You are
in a program. That program is monitoring your status. According to
your psychiatrist and the psychologist that monitored that program,
you are fine to be at work. If you were not cleared for work you would
not have returned to the residency. I am not interested in that piece of
paper. Bryant Decl., Exhibit A p. 12.

Woolever admitted that it would be a failure to engage in dialogue

about reasonable accommodations if the following occurred: "If the employee

said "I printed off something that I would like to give you explicitly

explaining problems I have had with my disability," and if the employer

responded, "I am not going to take that piece of paper from you" and if the

employee said, "Well, here it is," and placed the piece of paper on the table in

front of the employer and the employer responded, "I am not taking it," and

you can keep it -- "you can keep  it with you, I am not taking it," and if the

employee then asked "can I read it", and if the employer then said "no, you

may not read that, that you may not read.'" Woolever Dep. 73:7-22.

The written letter that Leo tried to give to Dr. Woolever stated, in part:

"I am just learning how to control, reduce, and live with
symptoms of Bipolar disease. Perhaps a discussion could be had

76

about the benefits of some reasonable accommodations that for
example may include:
        • Reducing work hours.
        • Exchanging overnight shifts for day shifts.
        • Taking another short medical leave of absence to provide
the opportunity to focus on improving my treatment plan
and wellbeing.
        • Daily check-in's to assure expectations are objectively
being met." Woolever Dep. Exhibit 1, p. 213; P000130; Irog
Responses p.15.

At the November 18 meeting, Dr. Woolever "glanced at" the letter from

Leo, and told Leo he did not need to see it. Woolever Dep. 60:10-12. After

Woolever refused to accept Leo's written letter, Leo tried to explain his

bipolar symptoms orally:

Leo: Bethany? Can I at least explain some problems with my
personality.
Raj: I am not to listen to that.
Leo: Why?
Raj: That is for you to deal with your providers. I am not your
medical provider.
Leo: But you misunderstand some symptoms.
Raj: If there is a misunderstanding then your medical provider
should be in touch with us to clarify that. That's why you are in
that program.
Bethany: You can't have it both ways Leo, you can't have 'I want
to be treated like a normal resident, treat me like a normal
resident' and then when it hits the fan, you pull it up. And that's
how it feels it's been happening. You have repeatedly told me, 'I
have been mentally healthy, I have been mentally healthy.'
Leo: That's how I felt.
Bethany: So when I'm bringing up the feedback, the same
feedback over and over and it's not getting incorporated, it's not
changing. Either you can't do it or  you're not mentally healthy,
but you can't have it both ways."
Bryant Decl. Exhibit A, p. 13-14.

If an employer refuses to allow an employee to submit a written request for accommodation and refuses to let the employee state the request out loud, it can be very hard to know what they were requesting. Woolever Dep. 64:20-65:3. If Leo had asked during the November 18 meeting for accommodation related to night work or other modifications to the job, the employer would have been required to talk about those with Leo at that point. Woolever Dep. 66:7-21. An employer cannot legally refuse to allow an employee to submit written request for reasonable accommodation. Miklavic Dep. 86:12-87:4.

82.    Plaintiff did not say anything to Dr. Woolever or Dr. Picker about accommodations or medical leave during this meeting. Paraskevopoulos Depo. 218:3-7.

Response: Denied. During the November 18 meeting, the following exchange occurred:

> Leo:  I know, I told you this before and you said that I didn't, but I have a disability.
> [Long silence for more than six seconds]
> Leo:  I printed off something that I'd like to give you explicitly explaining problems I've had with my disability.
> Woolever:   I'm not going to take that piece of paper from you.
> Leo:        Well here it is.
> Woolever:   I'm not taking it. You can keep it with you; I am not taking it.
> Leo:        Can I read it?
> Woolever:   No you may not read that, that you may not read. You are in a program. That program is monitoring your status. According to your psychiatrist and the psychologist that monitored that program, you are fine to be at work. If you were not cleared for work you would not have returned to the

residency. I am not interested in that piece of paper. Bryant Decl., Exhibit A p. 12.

Woolever admitted that it would be a failure to engage in dialogue about reasonable accommodations if the following occurred: "If the employee said "I printed off something that I would like to give you explicitly explaining problems I have had with my disability," and if the employer responded, "I am not going to take that piece of paper from you" and if the employee said, "Well, here it is," and placed the piece of paper on the table in front of the employer and the employer responded, "I am not taking it," and you can keep it -- "you can keep  it with you, I am not taking it," and if the employee then asked "can I read it", and if the employer then said "no, you may not read that, that you may not read."' Woolever Dep. 73:7-22.

The written letter that Leo tried to give to Dr. Woolever stated, in part:

"I am just learning how to control, reduce, and live with symptoms of Bipolar disease. Perhaps a discussion could be had about the benefits of some reasonable accommodations that for example may include:
- Reducing work hours.
- Exchanging overnight shifts for day shifts.
- Taking another short medical leave of absence to provide the opportunity to focus on improving my treatment plan and wellbeing.
- Daily check-in's to assure expectations are objectively being met." Woolever Dep. Exhibit 1, p. 213; P000130; Irog Responses p.15.

At the November 18 meeting, Dr. Woolever "glanced at" the letter from Leo, and told Leo he did not need to see it. Woolever Dep. 60:10-12. After

Woolever refused to accept Leo's written letter, Leo tried to explain his

bipolar symptoms orally:

> Leo: Bethany? Can I at least explain some problems with my personality.
> Raj: I am not going to listen to that.
> Leo: Why?
> Raj: That is for you to deal with your providers. I am not your medical provider.
> Leo: But you misunderstand some symptoms.
> Raj: If there is a misunderstanding then your medical provider should be in touch with us to clarify that. That's why you are in that program.
> Bethany: You can't have it both ways Leo, you can't have 'I want to be treated like a normal resident, treat me like a normal resident' and then when it hits the fan, you pull it up. And that's how it feels it's been happening. You have repeatedly told me, 'I have been mentally healthy, I have been mentally healthy.'
> Leo: That's how I felt.
> Bethany: So when I'm bringing up the feedback, the same feedback over and over and it's not getting incorporated, it's not changing. Either you can't do it or  you're not mentally healthy, but you can't have it both ways."
> Bryant Decl., Exhibit A p. 13-14.

If an employer refuses to allow an employee to submit a written request

for accommodation and refuses to let the employee state the request out loud,

it can be very hard to know what they were requesting. Woolever Dep. 64:20-

65:3. If Leo had asked during the November 18 meeting for an

accommodation related to night work or other modifications to the job, the

employer would have been required to talk about those with Leo at that

point. Woolever Dep. 66:7-21. An employer cannot legally refuse to allow an

employee to submit written request for reasonable accommodation. Miklavic
86:12-87:4.

83.   Dr. Picker did not understand Plaintiff to be asking for

accommodations. Picker Depo. 105:22-24.

Response: Denied. During the November 18 meeting, the following

exchange occurred:

> Leo:   I know, I told you this before and you said that I didn't, but
> I have a disability.
> [Long silence for more than six seconds]
> Leo:   I printed off something that I'd like to give you explicitly
> explaining problems I've had with my disability.
> Woolever:   I'm not going to take that piece of paper from you.
> Leo:           Well here it is.
> Woolever:   I'm not taking it. You can keep it with you, I am not
> taking it.
> Leo:           Can I read it?
> Woolever:   No you may not read that, that you may not read.
> You are in a program. That program is monitoring your status.
> According to your psychiatrist and the psychologist that
> monitored that program, you are fine to be at work. If you were
> not cleared for work you would not have returned to the
> residency. I am not interested in that piece of paper.
> Bryant Decl., Exhibit A p. 12.

Woolever admitted that it would be a failure to engage in dialogue

about reasonable accommodations if the following occurred: "If the employee

said "I printed off something that I would like to give you explicitly

explaining problems I have had with my disability," and if the employer

responded, "I am not going to take that piece of paper from you" and if the

employee said, "Well, here it is," and placed the piece of paper on the table in

front of the employer and the employer responded, "I am not taking it," and you can keep it -- "you can keep it with you, I am not taking it," and if the employee then asked "can I read it", and if the employer then said "no, you may not read that, that you may not read."' Woolever Dep. 73:7-22.

The written letter that Leo tried to give to Dr. Woolever stated, in part:

> "I am just learning how to control, reduce, and live with symptoms of Bipolar disease. Perhaps a discussion could be had about the benefits of some reasonable accommodations that for example may include:
> · Reducing work hours.
> · Exchanging overnight shifts for day shifts.
> · Taking another short medical leave of absence to provide the opportunity to focus on improving my treatment plan and wellbeing.
> · Daily check-in's to assure expectations are objectively being met." Woolever Dep. Exhibit 1, p. 213; P000130; Irog Responses p.15.

At the November 18 meeting, Dr. Woolever "glanced at" the letter from Leo, and told Leo he did not need to see it. Woolever Dep. 60:10-12. After Woolever refused to accept Leo's written letter, Leo tried to explain his bipolar symptoms orally:

> Leo: Bethany? Can I at least explain some problems with my personality.
> Raj: I am not going to listen to that.
> Leo: Why?
> Raj: That is for you to deal with your providers. I am not your medical provider.
> Leo: But you misunderstand some symptoms.
> Raj: If there is a misunderstanding then your medical provider should be in touch with us to clarify that. That's why you are in that program.

> Bethany: You can't have it both ways Leo, you can't have 'I want
> to be treated like a normal resident, treat me like a normal
> resident' and then when it hits the fan, you pull it up. And that's
> how it feels it's been happening. You have repeatedly told me, 'I
> have been mentally healthy, I have been mentally healthy.'
> Leo: That's how I felt.
> Bethany: So when I'm bringing up the feedback, the same
> feedback over and over and it's not getting incorporated, it's not
> changing. Either you can't do it or  you're not mentally healthy,
> but you can't have it both ways."
> Bryant Decl., Exhibit A p. 13-14.

If an employer refuses to allow an employee to submit a written request

for accommodation and refuses to let the employee state the request out loud,

it can be very hard to know what they were requesting. Woolever Dep. 64:20-

65:3. If Leo had asked during the November 18 meeting for an

accommodation related to night work or other modifications to the job, the

employer would have been required to talk about those with Leo at that

point. Woolever Dep. 66:7-21. An employer cannot legally refuse to allow an

employee to submit written request for reasonable accommodation. Miklavic

Dep. 86:12-87:4.

84.    The document was not expressed to be a written request for

accommodation, it was expressed to be more information about bipolar

disease or bipolar disorder.  Picker Depo. 107:5-8.

Response: Qualified. During the November 18 meeting, the following

exchange occurred:

Leo:   I know, I told you this before and you said that I didn't, but I have a disability.
[Long silence for more than six seconds]
Leo:   I printed off something that I'd like to give you explicitly explaining problems I've had with my disability.
Woolever:   I'm not going to take that piece of paper from you.
Leo:            Well here it is.
Woolever:   I'm not taking it. You can keep it with you; I am not taking it.
Leo:            Can I read it?
Woolever:   No you may not read that, that you may not read. You are in a program. That program is monitoring your status. According to your psychiatrist and the psychologist that monitored that program, you are fine to be at work. If you were not cleared for work you would not have returned to the residency. I am not interested in that piece of paper.
Bryant Decl., Exhibit A p. 12.

Woolever admitted that it would be a failure to engage in dialogue about reasonable accommodations if the following occurred: "If the employee said "I printed off something that I would like to give you explicitly explaining problems I have had with my disability," and if the employer responded, "I am not going to take that piece of paper from you" and if the employee said, "Well, here it is," and placed the piece of paper on the table in front of the employer and the employer responded, "I am not taking it," and you can keep it -- "you can keep it with you, I am not taking it," and if the employee then asked "can I read it", and if the employer then said "no, you may not read that, that you may not read."' Woolever Dep. 73:7-22.

The written letter that Leo tried to give to Dr. Woolever stated, in part:

"I am just learning how to control, reduce, and live with symptoms of Bipolar disease. Perhaps a discussion could be had about the benefits of some reasonable accommodations that for example may include:
> • Reducing work hours.
> • Exchanging overnight shifts for day shifts.
> • Taking another short medical leave of absence to provide the opportunity to focus on improving my treatment plan and wellbeing.
> • Daily check-in's to assure expectations are objectively being met." Woolever Dep. Exhibit 1, p. 213 (P000130); Irog Responses p.15.

At the November 18 meeting, Dr. Woolever "glanced at" the letter from Leo, and told Leo he did not need to see it. Woolever Dep. 60:10-12. After Woolever refused to accept Leo's written letter, Leo tried to explain his bipolar symptoms orally:

> Leo: Bethany? Can I at least explain some problems with my personality.
> Raj: I am not going to listen to that.
> Leo: Why?
> Raj: That is for you to deal with your providers. I am not your medical provider.
> Leo: But you misunderstand some symptoms.
> Raj: If there is a misunderstanding then your medical provider should be in touch with us to clarify that. That's why you are in that program.
> Bethany: You can't have it both ways Leo, you can't have 'I want to be treated like a normal resident, treat me like a normal resident.' And then when it hits the fan, you pull it up. And that's how it feels it's been happening. You have repeatedly told me, 'I have been mentally healthy, I have been mentally healthy.'
> Leo: That's how I felt.
> Bethany: So when I'm bringing up the feedback, the same feedback over and over and it's not getting incorporated, it's not changing. Either you can't do it or  you're not mentally healthy, but you can't have it both ways."
> Bryant Decl., Exhibit A p. 13-14.

If an employer refuses to allow an employee to submit a written request for accommodation and refuses to let the employee state the request out loud, it can be very hard to know what they were requesting. Woolever Dep. 64:20-65:3. If Leo had asked during the November 18 meeting for an accommodation related to night work or other modifications to the job, the employer would have been required to talk about those with Leo at that point. Woolever Dep. 66:7-21. An employer cannot legally refuse to allow an employee to submit written request for reasonable accommodation. Miklavic Dep. 86:12-87:4.

85.    Dr. Woolever did not have any idea that the printed document had anything to do with accommodations.  Woolever Decl. ¶ 28.

Response: Denied. During the November 18 meeting, the following exchange occurred:

> Leo:  I know, I told you this before and you said that I didn't, but I have a disability.
> [Long silence for more than six seconds]
> Leo:  I printed off something that I'd like to give you explicitly explaining problems I've had with my disability.
> Woolever:    I'm not going to take that piece of paper from you.
> Leo:          Well here it is.
> Woolever:    I'm not taking it. You can keep it with you, I am not taking it.
> Leo:          Can I read it?
> Woolever:    No you may not read that, that you may not read. You are in a program. That program is monitoring your status. According  to  your  psychiatrist  and  the  psychologist  that monitored that program, you are fine to be at work. If you were

not cleared for work you would not have returned to the
residency. I am not interested in that piece of paper.
Bryant Decl., Exhibit A p. 12.

Woolever admitted that it would be a failure to engage in dialogue

about reasonable accommodations if the following occurred: "If the employee

said "I printed off something that I would like to give you explicitly

explaining problems I have had with my disability," and if the employer

responded, "I am not going to take that piece of paper from you" and if the

employee said, "Well, here it is," and placed the piece of paper on the table in

front of the employer and the employer responded, "I am not taking it," and

you can keep it -- "you can keep it with you, I am not taking it," and if the

employee then asked "can I read it", and if the employer then said "no, you

may not read that, that you may not read.'" Woolever Dep. 73:7-22.

The written letter that Leo tried to give to Dr. Woolever stated, in part:

"I am just learning how to control, reduce, and live with symptoms of
Bipolar disease. Perhaps a discussion could be had about the benefits of
some reasonable accommodations that for example may include:
• Reducing work hours.
• Exchanging overnight shifts for day shifts.
• Taking another short medical leave of absence to provide the
opportunity to focus on improving my treatment plan and
wellbeing.
• Daily check-in's to assure expectations are objectively being
met." Woolever Dep. Exhibit 1, p. 213; P000130; Irog Responses
p.15.

At the November 18 meeting, Dr. Woolever "glanced at" the letter from

Leo, and told Leo he did not need to see it. Woolever Dep. 60:10-12. After

Woolever refused to accept Leo's written letter, Leo tried to explain his

bipolar symptoms orally:

> Leo: Bethany? Can I at least explain some problems with my
> personality.
> Raj: I am not going to listen to that.
> Leo: Why?
> Raj: That is for you to deal with your providers. I am not your
> medical provider.
> Leo: But you misunderstand some symptoms.
> Raj: If there is a misunderstanding then your medical provider
> should be in touch with us to clarify that, that's why you are in
> that program.
> Bethany: You can't have it both ways Leo, you can't have 'I want
> to be treated like a normal resident, treat me like a normal
> resident' and then when it hits the fan, you pull it up. And that's
> how it feels it's been happening. You have repeatedly told me, 'I
> have been mentally healthy, I have been mentally healthy.'
> Leo: That's how I felt.
> Bethany: So when I'm bringing up the feedback, the same
> feedback over and over and it's not getting incorporated, it's not
> changing. Either you can't do it or  you're not mentally healthy,
> but you can't have it both ways."
> Bryant Decl., Exhibit A p. 13-14.

If an employer refuses to allow an employee to submit a written request

for accommodation and refuses to let the employee state the request out loud,

it can be very hard to know what they were requesting. Woolever Dep. 64:20-

65:3. If Leo had asked during the November 18 meeting for an

accommodation related to night work or other modifications to the job, the

employer would have been required to talk about those with Leo at that

point. Woolever Dep. 66:7-21. An employer cannot legally refuse to allow an

employee to submit written request for reasonable accommodation. Miklavic Dep. 86:12-87:4.

86.   On November 22, 2013, I received an email from Dr. Taylor, forwarding an email from Lisa McAllister, a doctor at CMMC, stating that Leo "was an hour behind and on two complicated patients had not read the prior notes and therefore didn't present them well to me nor did he have a complete, appropriate plan." Woolever Decl. ¶ 29.

Response: Admitted.

87.   On November 22, 2013 I received an email from Dr. Taylor, forwarding an email from Dana Little, a doctor at CMMC, about Leo stating "I feel his knowledge base is shallow" and "[h]e really concerns me." Woolever Decl. ¶ 30.

Response: Admitted.

88.   On January 10, 2014, Plaintiff emailed Dr. Woolever, Dr. Picker and Dr. Taylor and said he was quite concerned about his poor performance during his Neonatal Resuscitation Program ("NRP") the previous day. Paraskevopoulos Depo. 222:10-24.

Response: Admitted.

89.   Plaintiff had failed to successfully take the NRP exam in 2013 and was retaking it in January 2014. Paraskevopoulos Depo. 223:20-23.

Response: Admitted.

90.    Plaintiff was approximately 18 minutes late for the NRP exam in January 2014. Paraskevopoulos Depo. 223:24-224:3.

Response: Admitted.

91.    Plaintiff stated "I am incredibly disappointed in myself as I have a long-standing pattern of unprofessionalism, which I am trying to put behind me with change" and "I don't want to catastrophize my NRP poor performance, but in the context of my probation I do think it can be a very big deal and I deeply wish that I had not put myself in this position." Paraskevopoulos Depo. 225:10-20.

Response: Admitted.

92.    Dr. Woolever and Dr. Picker were concerned about Plaintiff's performance in the NRP class because he did not complete all of the required modules, did not read the email detailing where to go and when to be there, was late for the course, and after failing the course in June and being on probation did not take appropriate steps to ensure his success. Paraskevopoulos Depo. 225:21-226:13; Woolever Decl. ¶ 31.

Response: Admitted.

93.    In Dr. Woolever's experience, it was unprecedented for a resident to fail the NRP exam twice.  Woolever Decl. ¶ 31.

Response: Admitted.

90

94.   Plaintiff had been assessed to be far below expected levels in multiple competencies, and in January 2014, Dr. Picker asked the faculty to complete the milestone evaluations on three competencies that the faculty had not yet assessed.  Paraskevopoulos Depo. 227:2-13.

> Response: Qualified. This is a selective quotation from the cited email.
>
> By email dated January 10, 2014, Dr. Picker informed Leo:
>
> "We are concerned about your overall performance, although most of your behavior detailed in your probation letter has improved aside from the NRP performance.  You have been assessed to be far below expected level in multiple competencies. I will be asking the faculty to complete the mile stones on the three competencies we have not yet assessed.  I know you have already self-assessed on those.  After I receive information from the faculty, I will summarize and review with you.  We need to develop a plan to improve your performance." Paraskevopoulos Dep. 227; Paraskevopoulos Dep. Exhibit 4, p. 106.

95.   The milestone evaluations are a product of the ACGME and the ABFM.  Woolever Decl. ¶ 34.

> Response: Admitted.

96.   Milestone evaluation levels should generally correlate with a resident's level of training and Plaintiff had completed approximately 2.5 years of training at the time these evaluations were completed.  Woolever Decl. ¶ 32.

> Response: Admitted.

97.   The three competencies that the faculty assessed Plaintiff on in January 2014 were: Practice-Based Learning and Improvement; Professionalism and Communication.  Woolever Decl. ¶ 34.

Response: Admitted.

98.   For the Practice-Based Learning and Improvement Competency, Plaintiff was scored as follows, with possible scores ranging from "Has not achieved Level 1" to "Level 5":

> d.  Locates, appraises and assimilates evidence from scientific studies related to the patients' health problems: Faculty scored Plaintiff at Level 1.5 and Plaintiff scored himself at Level 2;
> e.  Demonstrates self-directed learning: Faculty and Plaintiff scored him at "Has not achieved Level 1"; and
> f.  Improves systems in which the physician provides care: Faculty and Plaintiff scored him at Level 1.

Woolever Decl. ¶ 35; Paraskevopoulos Depo. Depo. Exhibit 5.

Response: Qualified. When Plaintiff filled out the self-assessment, he was not very familiar with it; Dr. Woolever asked him to complete the self-assessment and said that his faculty would complete one and then if there were any gaps between the one that Leo completed and the one that he had completed those gaps would need to be addressed. Paraskevopoulos Dep. 229:3-15. Leo rated himself low in the competency areas because he thought that was what Woolever wanted him to do. Paraskevopoulos Dep. 231:7-11.

During his residency, Leo received hundreds of Daily Precepting Feedback forms that evaluated his demonstrated abilities in the areas of

92

Medical Knowledge, Understanding, Application to Patient, Professionalism, and System-Based Resources. Paraskevopoulos Decl. ¶ 1. The vast majority of Leo's Daily Precepting Feedback forms throughout his residency evaluated him positively in each of the listed areas. Paraskevopoulos Decl. ¶ 2. In addition, the vast majority of the Daily Precepting Feedback forms during the last several months of his residency, from late October 2013 through January 21, 2014, rated Leo positively in each of the listed areas. Paraskevopoulos Decl. ¶ 3, 4; Paraskevopoulos Decl., Exhibit A.

99.    For the Professionalism Competency, Plaintiff was scored as follows, with possible scores ranging from "Has not achieved Level 1" to "Level 5":

> g.  Completes a process of professionalization: Faculty and Plaintiff scored him at "Has not achieved Level 1";
> h.  Demonstrates professional conduct and accountability: Faculty scored Plaintiff at "Has not achieved Level 1" and Plaintiff scored himself at Level 1;
> i.  Demonstrates humanism and cultural proficiency: Faculty scored Plaintiff at "Has not achieved Level 1" and Plaintiff scored himself at Level 3; and
> j.  Maintains emotional, physical, and mental health and pursues continual personal and professional growth: Faculty scored Plaintiff at "Has not achieved Level 1" and Plaintiff scored himself at Level 1.

Woolever Decl. ¶ 36; Paraskevopoulos Depo. Exhibit 5.

Response: Qualified. When Plaintiff filled out the self-assessment, he was not very familiar with it; Dr. Woolever asked him to complete the self-assessment and said that his faculty would complete one and then if there

93

were any gaps between the one that Leo completed and the one that he had completed those gaps would need to be addressed. Paraskevopoulos Dep. 229:3-15. Leo rated himself low in the competency areas because he thought that was what Woolever wanted him to do. Paraskevopoulos Dep. 231:7-11.

During his residency, Leo received hundreds of Daily Precepting Feedback forms that evaluated his demonstrated abilities in the areas of Medical Knowledge, Understanding, Application to Patient, Professionalism, and System-Based Resources. Paraskevopoulos Decl. ¶ 1.  The vast majority of Leo's Daily Precepting Feedback forms throughout his residency evaluated him positively in each of the listed areas. Paraskevopoulos Decl. ¶ 2. In addition, the vast majority of the Daily Precepting Feedback forms during the last several months of his residency, from late October 2013 through January 21, 2014, rated Leo positively in each of the listed areas. Paraskevopoulos Decl. ¶ 3, 4; Paraskevopoulos Decl., Exhibit A.

100.  For the Communication Competency, Plaintiff was scored as follows, with possible scores ranging from "Has not achieved Level 1" to "Level 5":

> k.  Develops meaningful, therapeutic relationships with patients and families: Faculty scored Plaintiff at Level 1.5 and Plaintiff scored himself at Level 3;
> l.  Communicates effectively with patients, families and the public: Faculty and Plaintiff scored him at Level 1.5;
> m.  Develops relationships and effectively communicates with physicians, other health professionals, and health care teams: Faculty and Plaintiff scored him at "Has not achieved Level 1"; and

94

n. Utilizes technology to optimize communication: Faculty scored Plaintiff at Level 1.5 and Plaintiff scored himself at Level 2.5.

Woolever Decl. ¶ 37; Paraskevopoulos Depo. Exhibit 5.

Response: Qualified. When Plaintiff filled out the self-assessment, he was not very familiar with it; Dr. Woolever asked him to complete the self-assessment and said that his faculty would complete one and then if there were any gaps between the one that Leo completed and the one that he had completed those gaps would need to be addressed. Paraskevopoulos Dep. 229:3-15. Leo rated himself low in the competency areas because he thought that was what Woolever wanted him to do. Paraskevopoulos Dep. 231:7-11.

During his residency, Leo received hundreds of Daily Precepting Feedback forms that evaluated his demonstrated abilities in the areas of Medical Knowledge, Understanding, Application to Patient, Professionalism, and System-Based Resources. Paraskevopoulos Decl. ¶ 1.  The vast majority of Leo's Daily Precepting Feedback forms throughout his residency evaluated him positively in each of the listed areas. Paraskevopoulos Decl. ¶ 2. In addition, the vast majority of the Daily Precepting Feedback forms during the last several months of his residency, from late October 2013 through January 21, 2014, rated Leo positively in each of the listed areas. Paraskevopoulos Decl. ¶ 3, 4; Paraskevopoulos Decl., Exhibit A.

101.  On January 15, 2014, Dr. Woolever received an email from Dr.

Picker, forwarding an email from Dr. Palmer, stating that the results of Dr.

Boyack's work with Leo are not being applied appropriately and that Leo:

> [I]s not material expected of a 2nd year resident.  Most concerning
> is his low ranking clinical acumen.  Having Leo become an
> individual practitioner in another year and possibly working on
> his own seeing patients feels very risky from this perspective . . .
> you are all doing way more work with Leo than Leo is doing with
> Leo.  It may be time to stop dedicating your energies to someone
> who either cannot or will not adapt to your requirements . . . He
> has certainly had an overwhelming amount of personal coaching.
> To see little to no growth is disappointing, but is also a statement
> of his real abilities.

Woolever Decl. ¶ 38.

Response: Qualified. This is a selective quotation from the cited email.

The cited paragraphs of the email from Dr. Palmer, the psychologist at

MPHP who was responsible for assisting CMMC with Plaintiff to ensure that

his mental health challenges were addressed appropriately 30(b)(6) Dep.

27:13-28:10), state:

> Regarding Leo, I am as frustrated as you, but not nearly as
> patient as all of you have been. There have been many
> conversations with Dr. Boyack who swears that she is bringing
> him along. Problem is, the results of her work are not being
> applied appropriately. Leo is good at playing victim. His sense of
> entitlement is what worries me the most. I am unable to
> determine if be is manipulating or simply cannot understand, In
> either case, he is not the material expected of a 2nd year resident.
> Most concerning is his low ranking in clinical acumen. Having
> Leo become an individual practitioner in another year and
> possibly working on his own seeing patients feels very risky from
> this perspective. You should certainly talk with Dr. Boyack one

96

more time, but I think you have all rightly reached your limit. As said to Raj, you are all doing way more work with Leo than Leo is doing with Leo. It may be time to stop dedicating your energies to someone who either cannot or will not adapt to your requirements. It is past due time to insist that his goals are reached, and that he stand on his own. In retrospect, it seems as though he has had excuse after excuse about why he cannot perform in the manner expected of residents. He has certainly had an overwhelming amount of personal coaching. To see little to no growth is disappointing, but also is a statement of his real abilities. All along he has targeted for correction those things pointed out to him, but has never really grasped the big picture."

## Termination January 21, 2014

102.  After assessing Plaintiff's overall performance in conjunction with his second NRP exam failure and his poor milestone evaluations, he was terminated from the FMR program for failure to meet the requirements of, and to make satisfactory progress in, the FMR program.  Woolever Decl. ¶ 39.

Response: This statement of fact should be stricken because it alleges a conclusory fact and makes a legal argument regarding causation, using the term "because" to argue that CMMC terminated Plaintiff's employment for the legitimate, non-discriminatory reason of prior poor performance and, by direct implication, not for the discriminatory reasons alleged by Plaintiff. Statements of material facts must be limited to "historical facts" and cannot include "legal argument" or "conclusory" facts. *See, e.g., Hearts with Haiti, Inc. v. Kendrick*, 2:13-cv-00039-JAW, 2014 U.S. Dist. LEXIS 128402, at *25 n.18 (Aug. 28, 2014). "This 'fact' is an argument, not properly presented in a

statement of material facts." *Id.* It is for the Court to "consider in due course whether the historical facts, viewed in the light most favorable to the Plaintiff[], demonstrate that" no reasonable jury could find for Plaintiff on the legal issue of causation. *Id.*

Denied. Leo contends his employment was terminated because of his disability and in retaliation for his recent requests for accommodation, and not based on unsatisfactory performance.

On November 15, 2013, Dr. Boyack spoke by phone with Dr. Picker about Leo; Dr. Boyack's notes summarize her phone call that day with Dr. Picker:

> "Writer discussed the course of treatment so far, the question of how much his current challenges may reflect ongoing hypomania vs baseline character. Also reflected concern re: his taking overnight call, given he gets very little sleep during those periods, which can possibly lead to hypomania. Advised Dr. Picker that the patient has been bringing the issues of his performance to therapy increasingly in recent weeks especially, and that we have been addressing them." Boyack Dep. 24-25; P1048.

In her phone call with Dr. Picker in November 2013, Dr. Boyack was "advocating, actually, for Dr. Paraskevopoulos to not necessarily do overnight call because that is also something that we know, is when people with bipolar disorder do shift work, especially that overnight shift, that tends to be more of an acute trigger of losing sleep than night after night which can then trigger an episode either up or down." Boyack Dep. 29:24-30:8. Dr. Boyack

understood from her November 15 call with Dr. Picker that a request to pull Leo from night call "would not be well-received" and "that was not an accommodation they were going to consider essentially." Boyack Dep. 35:11-23.

Three days after Dr. Boyack's call to Dr. Picker, on November 18, CMMC placed Leo back on probation; the probation agreement stated that "ANY violation of the above terms will result in dismissal" from the CMMC residency, and stated the following terms: "No solicitations of staff or fellow residents to defend, support or speak on your behalf"; "No unreasonable requests"; "While on probation, no schedule change requests will be granted." Woolever Dep. Exhibit 1, p. 202-04; DF 871-873. Two months later, on January 21, 2014, CMMC terminated Leo's employment. Irog Responses p. 17.

Leo successfully completed 13 rotations in the first year of his residency (PGY1), and successfully completed 18 rotations in the second year of his residency (PGY2). Woolever Dep. 118:18-119:10; Woolever Dep. Exhibit 1, p. 277-79. Leo never failed a rotation during his residency. Woolever Dep. 118:18-119:10. Leo passed his U.S. Medical Licensing Examination, Step III, in December 2013. P00049.

During his residency, Leo received hundreds of Daily Precepting Feedback forms that evaluated his demonstrated abilities in the areas of

99

Medical Knowledge, Understanding, Application to Patient, Professionalism, and System-Based Resources. Paraskevopoulos Decl. ¶ 1.  The vast majority of Leo's Daily Precepting Feedback forms throughout his residency evaluated him positively in each of the listed areas. Paraskevopoulos Decl. ¶ 2. In particular, the vast majority of the Daily Precepting Feedback forms during the last several months of his residency, from late October 2013 through January 21, 2014, rated Leo positively in each of the listed areas. Paraskevopoulos Decl. ¶ 3, 4; Paraskevopoulos Exhibit A.

According to Program Director Woolever's June 2014 signed letter of recommendation, during his residency, Leo "demonstrated a solid medical knowledge base," "performed well on his American Board of Family Medicine In-Training Exams," and "[a]chieved a good score on the USMLE Step 3 exam." Woolever Dep. Exhibit 1, p. 274-75. According to Woolever's June 2014 signed letter of recommendation, Leo "developed trusting relationships with his patients. He took ownership of his patient care responsibilities and was a strong patient advocate. He worked closely with other members of the health care team to ensure that his patients could gain access to the care they needed. 'Dr. Leo' was well-loved and appreciated by his patients." Woolever Dep. Exhibit 1, p. 274-75. Everything in Woolever's June 2014 signed and notarized letter of recommendation for Leo is accurate. Woolever Dep. 118:18-119:10; Woolever Dep. Exhibit 1, p. 274-75.

100

According to CMMC physician Gyorgy Mundruczo, MD, who worked personally with Leo during his residency, Leo was "interested, hard-working, well-liked and respected by his peers," his "knowledge base was commensurate for his level of training," and he "asked appropriate questions," "made a clear effort to make the best of his ICU trainings," "was humble," and "got along well with nurses and therapist." P000597. According to Mercy Express Care-Yarmouth physician Norman Guay, D.O., who supervised Leo directly in clinic, Leo is an "intelligent, compassionate physician," his "knowledge base is certainly adequate and he is in possession of excellent cognitive skills," his "communication style has been noted as one of quiet confidence and was always interpreted as respectful of both patients and staff," and he "has shown a very positive attitude and will to succeed" and "a thirst for medical knowledge." P000598.

On May 10, 2013, Leo's faculty advisor Dr. Picker submitted a monthly report to MPHP stating that he was performing satisfactorily in all areas; at this time, Leo was not yet doing night call. Picker Dep. 36:5-37:3; Woolever Dep. Exhibit 7; DF 1121. On June 5, 2013, Picker submitted a monthly report to MPHP stating that Leo was performing satisfactorily in all areas; at this time, Leo was not yet doing night call. Picker Dep. 37:4-18; Woolever Dep. Exhibit 7; DF 1117. On July 1, 2013, Plaintiff was taken off of probation. Paraskevopoulos Dep. 152:7-10. On July 2, 2013, CMMC told Leo he would

have to repeat the second year of his residency (PGY-2), including repeating all overnight call and night float requirements. Woolever Dep. Exhibit 1, p. 142-43; DF 220-21. On July 12, 2013, Dr. Picker submitted a monthly report to MPHP about Leo stating that he was performing "unsatisfactorily" in two out of three areas ("thought processes" and "interpersonal relations"); at this time, Leo had started doing night call. Picker Dep. 37:19-22; Woolever Dep. Exhibit 7; DF 1116. When Leo returned to doing night call in July 2013, in Picker's view he went from performing satisfactorily in thought processes and interpersonal relations to performing borderline or unsatisfactorily. Picker Dep. 39:5-9.

103.  On January 21, 2014, Plaintiff met with Dr. Woolever, Dr. Picker and Kirk Miklavic. Paraskevopoulos Depo. 240:19-25.

    Response: Admitted.

104.  After Dr. Woolever told him that he was being terminated from the program, Plaintiff asked if he could take a leave of absence. Paraskevopoulos Depo. 243:5-9.

    Response: Admitted.

105.  At no time between July 2012 and December 2012, or November 18, 2013 and January 21, 2014, did Plaintiff, or any of his medical providers on his behalf, request a leave of absence. Paraskevopoulos Depo. 218:14-219:2; 219:23-220:22; CMMC Depo. 114:18-115:3.

Response: Denied. Plaintiff attempted to request a "short medical leave of absence" on November 18, 2013, but Woolever and Picker refused to take his written accommodation request, refused to let him state his request out loud, and then imposed probation that prohibited any requests for schedule changes:

> During the November 18 meeting, the following exchange occurred:
>
> Leo:  I know, I told you this before and you said that I didn't, but I have a disability.
> [Long silence for more than six seconds]
> Leo:  I printed off something that I'd like to give you explicitly explaining problems I've had with my disability.
> Woolever:   I'm not going to take that piece of paper from you.
> Leo:          Well here it is.
> Woolever:   I'm not taking it. You can keep it with you; I am not taking it.
> Leo:          Can I read it?
> Woolever:   No you may not read that, that you may not read. You are in a program. That program is monitoring your status. According to your psychiatrist and the psychologist that monitored that program, you are fine to be at work. If you were not cleared for work you would not have returned to the residency. I am not interested in that piece of paper.
> Bryant Decl., Exhibit A p. 12.

Woolever admitted that it would be a failure to engage in dialogue about reasonable accommodations if the following occurred: "If the employee said "I printed off something that I would like to give you explicitly explaining problems I have had with my disability," and if the employer responded, "I am not going to take that piece of paper from you" and if the employee said, "Well, here it is," and placed the piece of paper on the table in

front of the employer and the employer responded, "I am not taking it," and

you can keep it -- "you can keep  it with you, I am not taking it," and if the

employee then asked "can I read it", and if the employer then said "no, you

may not read that, that you may not read.'" Woolever Dep. 73:7-22.

The written letter that Leo tried to give to Woolever stated, in part:

"I am just learning how to control, reduce, and live with
symptoms of Bipolar disease. Perhaps a discussion could be had
about the benefits of some reasonable accommodations that for
example may include:
    • Reducing work hours.
    • Exchanging overnight shifts for day shifts.
    • Taking another short medical leave of absence to provide
    the opportunity to focus on improving my treatment plan
    and wellbeing.
    • Daily check-in's to assure expectations are objectively
    being met." Woolever Dep. Exhibit 1, p. 213; P000130; Irog
    Responses p.15.

At the November 18 meeting, Dr. Woolever "glanced at" the letter from

Leo, and told Leo he did not need to see it. Woolever Dep. 60:10-12. After

Woolever refused to accept Leo's written letter, Leo tried to explain his

bipolar symptoms orally:

Leo: Bethany? Can I at least explain some problems with my
personality.
Raj: I am not going to listen to that.
Leo: Why?
Raj: That is for you to deal with your providers. I am not your
medical provider.
Leo: But you misunderstand some symptoms.
Raj: If there is a misunderstanding then your medical provider
should be in touch with us to clarify that. That's why you are in
that program.

> Bethany: You can't have it both ways Leo, you can't have 'I want to be treated like a normal resident, treat me like a normal resident' and then when it hits the fan, you pull it up. And that's how it feels it's been happening. You have repeatedly told me, 'I have been mentally healthy, I have been mentally healthy.'
> Leo: That's how I felt.
> Bethany: So when I'm bringing up the feedback, the same feedback over and over and it's not getting incorporated, it's not changing. Either you can't do it or you're not mentally healthy, but you can't have it both ways."
> Bryant Decl., Exhibit A p. 13-14

If an employer refuses to allow an employee to submit a written request for accommodation and refuses to let the employee state the request out loud, it can be very hard to know what they were requesting. Woolever Dep. 64:20-65:3. If Leo had asked during the November 18 meeting for an accommodation related to night work or other modifications to the job, the employer would have been required to talk about those with Leo at that point. Woolever Dep. 66:7-21. An employer cannot legally refuse to allow an employee to submit written request for reasonable accommodation. Miklavic 86:12-87:4.

On November 18, CMMC put Leo on probation; the probation agreement stated that "ANY violation of the above terms will result in dismissal" from the CMMC residency" and stated the following terms: "No solicitations of staff or fellow residents to defend, support or speak on your behalf"; "No unreasonable requests"; "While on probation, no schedule change requests will be granted." Woolever Dep. Exhibit 1, p. 202-04; DF 871-873.

After he was put back on probation on November 18, Leo did not email CMMC asking for a schedule change or leave of absence, because he had been forced to sign a probation agreement that said no schedule accommodations were permitted. Paraskevopoulos Dep. 221-22. Woolever was the final decision maker for Leo's residency, and it would be reasonable for Leo to follow the instructions in his November 18 probation agreement. Miklavic Dep. 105:4-11.

In addition, in the January 21, 2014 termination meeting, Leo asked for scheduling accommodations or a leave of absence, but Woolever told him that was not an option. Paraskevopoulos Dep. 24:23-242:4; Miklavic Dep. 113:15-21.

106.  Plaintiff was not permitted to take a leave of absence but was told that he could resign in lieu of termination. Paraskevopoulos Depo. 243:10-16.

Response: Qualified. Woolever initially said that Leo would not be given the option to resign instead of termination because he had been offered that option before in December 2012 and hadn't taken it, referencing the occasion when after telling Leo that he had to resign or be terminated, CMMC ultimately granted Leo protected medical leave. Later, Miklavic told Leo he had the option to resign or he would be terminated. Because his only other option was to be terminated, he resigned his position. Irog Responses p. 17.

107.  Plaintiff, by his own admission, acknowledged the significant efforts of the FMR faculty to help him be successful.  Paraskevopoulos Depo. 150:5-16; 243:23.

Response: Qualified. The cited testimony supports only that by email dated July 1, 2013, Leo wrote to the FMR faculty: "However, since returning [from leave] I've certainly noticed how faculty has clearly made a lot of effort to help me succeed within our residency program. I cannot express in words how grateful I am for faculties efforts and kindness that have helped me return on a path that truly at times feels life saving." Paraskevopoulos Dep. 150:5-16.

## Letter of Reference

108.  After Plaintiff resigned from the FMR in January 2014, Dr. Woolever provided him with a letter of reference that made references to difficulties Plaintiff experienced in the program.  Plaintiff indicated that the letter was satisfactory.  Woolever Decl. ¶ 41.

Response: Admitted.

109.  When Plaintiff applied to another residency program at the University of Kansas, it inquired about the details of the difficulties Plaintiff experienced at CMMC.  Woolever Decl. ¶ 42.

Response: Admitted.

110.  Before CMMC provided such details in a subsequent letter, Plaintiff agreed to a Release and Waiver, pursuant to which he agreed not to use the contents of the subsequent letter in this proceeding and to release any claim against CMMC based on that letter.  Woolever Decl. ¶ 42.

Response: Qualified. The Release and Waiver releases claims "arising out of or based on "the contents of that [reference] letter and attachment"; by its plain terms the Release and Waiver does not extend to claims based on *other* statements made by CMMC in connection with a reference request for Leo. Woolever Decl. Ex. N.

## Plaintiff's Bipolar

111.  Dr. Boyack encouraged Plaintiff to think about whether he should be doing overnight call because she wanted to remove one of the triggers that they had control over.  Boyack Depo. 85:24-86:2.

Response: Admitted.

112.  Sleep deprivation is one factor that can trigger Plaintiff's symptoms. Boyack Depo. 85:20-24.

Response: Admitted.

113.  Relationship issues are another factor than can trigger Plaintiff's symptoms and Plaintiff's relationship with his wife was one of the primary triggers for his bipolar.  Boyack Depo. 43:5-7.

Response: Denied. Dr. Boyack testified that relationship issues with his wife was a "primary *other* stressor" for Leo, apart than the "very common" trigger with bipolar of "lack of sleep." Boyack Dep. 42:10-43:7.

114. In March 2013, Plaintiff told Dr. Boyack that he considered girls to be his biggest trigger.  Boyack Depo. 57:2-4.

Response: Qualified. When Leo said girls were his biggest trigger, "it was primarily pertaining to his wife who was there that week." Boyack Dep. 57:2-7.

115. While married, Plaintiff had close personal relationships with other women and exhibited significant symptoms following the breakups of those relationships.  Boyack Depo. 44:10-18.

Response: Admitted.

116. Financial stress is another factor that can trigger Plaintiff's symptoms and Plaintiff talked with Dr. Boyack about his financial stresses, which included a significant gambling problem.  Boyack Depo. 46:12-47:10.

Response: Admitted.

117. Another trigger is seclusion and/or loneliness, and Plaintiff had been living alone.  Boyack Depo. 64:14-19.

Response: Admitted.

118. In November 2013, Plaintiff was sleep deprived and exhausted, not necessarily because he was working nights but because of his "15 hour

schedule or studying for the USMLEs or a million other reasons . . . ."
Paraskevopoulos Depo. 185:13-15; 187:3-24.

Response: Qualified. The cited testimony states that as of November
11, 2013, "if it had been three weeks since the last time [he] had taken a
night call," it was "because of sleep deprivation," "[o]r a symptom of my
medical condition"; "[o]r night flow or a 15 hour schedule or studying for the
USMLEs or a million other reasons to be sleep deprived and overly
exhausted." Paraskevopoulos Dep. 185:13-21.

119.  CMMC did not believe that Plaintiff's bipolar disorder made it harder
for him to sleep than the average person.  CMMC Depo. 148:4-13.

Response: Denied. Both Leo and Dr. Boyack repeatedly informed
CMMC about the extremely dangerous and destructive effects lack of sleep
had on his bipolar:

By letter dated February 1, 2013, Dr. Boyack advised Palmer that Leo
was on target to return to work the week of February 18, recommended a
gradual" return to work, warned that "[h]e should absolutely not take
overnight call in these initial weeks back," and asked the residency program
to be "a little flexible" with Leo. P1167; Boyack Dep. Exhibit 3. By letter
dated April 30, 2013, Dr. Boyack informed Dr. Palmer that: "lack of sleep is
very risky for [Leo] or any one with bipolar disorder, in terms of developing
mood symptoms again . . . I continue to have concerns about the deleterious

110

effects of sleep deprivation in Bipolar disorder, and how this may impact Leo in his early recovery form his severe mood episode . . . the timing of his being ready for call remains in flux in my assessment. . . he may well require ongoing accommodations regarding work hours in particular in order to ensure he continues to have a successful recovery . . . ." Boyack Dep. Exhibit 4; DF 1580.

In July 2013, Leo asked Woolever if he could maintain credit for the night call shifts that he had worked over the previous calendar year because he was worried that sleep deprivation is the known worst trigger for bipolar symptoms and he hoped that faculty would accommodate giving him credit for his previous completed night call shifts to reduce the risk of developing symptoms related to his medical condition due to sleep deprivation. Irog Responses p. 12. On July 3, 2013, Leo explained to Woolever that "nights are something that we should pay close attention to due to my condition." Woolever Dep. Exhibit 1, p. 142-43; DF 220-21. On July 5, 2013, Leo expressed concern to Picker "about overnight calls and his mental health"; Picker suggested to Leo that any request regarding overnight work should come from Dr. Boyack (and not Leo directly), but told him that she "did not know if that would change any requirements of the program." Picker Dep. 87:14-88:13; Woolever Dep. Exhibit 1, p.148; DF 223.

On August 19, 2013, Dr. Boyack spoke with Palmer by phone about

Leo, and Palmer emailed Woolever and Taylor summarizing her call the

previous day with Dr. Boyack:

> "I wanted to update you on my conversation late yesterday
> afternoon with Dr. B, LP's treating psychiatrist. She appreciates
> the feedback and listened intently to everything I had to say. I
> also passed along Christine Gray's observations. Dr. B is
> increasingly concerned about LP have to take 24 hour call as it
> stimulates his bipolar. She states that his sleep-wake cycle gets
> completely thrown off when he has to do the overnight calls. She
> suggested that CMMC think about having him do as many calls,
> but having them all occur during day hours, even if they end at
> midnight. MMC has had more than a dozen residents with that
> same diagnosis for whom accommodations around 24 hour call
> had to be made." 30(b)(6) Dep. Exhibit 19; DF 255-256; Boyack
> Dep. 38-39,71-72.

And on November 15, 2013, Dr. Boyack spoke by phone with Picker

about Leo, and summarized her phone call that day as follows:

> "Writer discussed the course of treatment so far, the question of
> how much his current challenges may reflect ongoing hypomania
> vs baseline character. Also reflected concern re: his taking
> overnight call, given he gets very little sleep during those periods,
> which can possibly lead to hypomania. Advised Picker that the
> patient has been bringing the issues of his performance to
> therapy increasingly in recent weeks especially, and that we have
> been addressing them." Boyack Dep. 24-25; P1048.

"Undergoing forced sleep deprivation, [Leo's] symptoms last[ed] a very

long time, almost the entire time [he] worked at CMMC if you compare [Leo]

to [himself] in a healthy state." Paraskevopoulos Dep. 160:11-161:22. Sleep

deprivation triggered symptoms for Leo including insomnia, deep pain,

112

depression, and an inability to eat. Paraskevopoulos Dep. 161:10-22. Leo's
bipolar disorder diagnosis was "an evolving diagnosis for Dr. P. that the lack
of sleep is – is considered a serious warning sign that you could be then
getting into a worse state. So it's often a harbinger of bad things to come";
lack of sleep triggered "other hypomanic symptoms." Boyack Dep. 28:22-
29:14.

120.  At no time, before, during or after Plaintiff's residency, did CMMC
regard Plaintiff as disabled or as having a disability.  CMMC Depo. 124:13-
16.

    Response: This statement of fact should be stricken because it alleges a
conclusory fact and makes a legal argument regarding whether Plaintiff was
"regarded" as disabled, a legal element of his disability discrimination claim.
Statements of material facts must be limited to "historical facts" and cannot
include "legal argument" or "conclusory" facts. *See, e.g., Hearts with Haiti,
Inc. v. Kendrick*, 2:13-cv-00039-JAW, 2014 U.S. Dist. LEXIS 128402, at *25
n.18 (Aug. 28, 2014). "This 'fact' is an argument, not properly presented in a
statement of material facts." *Id.* It is for the Court to "consider in due course
whether the historical facts, viewed in the light most favorable to the
Plaintiff[], demonstrate that" no reasonable jury could find for Plaintiff on the
legal issue of causation. *Id.*

113

Denied. On Nov 30, 2012, Woolever emailed human resources

representative  Lisa Burger regarding "some concerns about [Leo's] mental

health and/or substance abuse issues," noting that "there has been no overt

episode and we have no concrete evidence, but there is an underlying

uneasiness" among clinic preceptors and staff. Woolever Dep. Exhibit 1, p. 22-

23.

On the morning December 6th, 2012, Leo sent an email to his faculty

advisor Stephanie Youd stating in part:

> "I have complained of feelings of anxiety, depression, getting
> distracted by environmental triggers and fatigue during the last
> year and a half, if these things are reducing my functionality at
> home I would like to make an apt with a physician here as I
> haven't seen one for over a year now and I have also made an apt
> with my pcp in Canada for evaluation over the break. I think a
> medical mental health evaluation would be beneficial because I
> can certainly say I'm intrinsically motivated and want to
> improve, I feel frustrated when I'm not improving at the rate
> expected. I am currently not on any medications other than
> Ambien PRN for insomnia and perhaps I would benefit from
> some medical help or therapy to improve my functionality." Irog
> Responses p.3; Woolever Dep. Exhibit 1, p 74-75.

On December 7, 2012, Leo renewed his request for medical leave,

explaining that he had been experiencing a mental health problem and

asking for medical leave so he could seek diagnosis and treatment. Irog

Responses p. 7. In response to Leo's requests for reasonable accommodation,

on December 10, 2012, Leo was told that the termination had been revoked

and that he would be permitted to take medical leave, but that the medical

114

leave would also be a disciplinary suspension the length of which was to be determined by the length of the medical leave. Irog Responses p. 8; Woolever Dep. Exhibit 1, p. 83, 88. Woolever required Leo to enroll in the Maine Health Professionals Program (MPHP) when went on out on leave in December 2012. Paraskevopoulos Dep. 99:15-24; 98:20-24.

On December 14, 2012, Leo began treatment with Dr. Cindy Boyack, a psychiatrist at Maine Medical Center, who diagnosed him with Bipolar Disorder. P1155, 1572. "So sleep deprivation absolutely can trigger and contribute to symptoms of bipolar disorder, both hypomania and depression. People can have hypomania and depression together, which Dr. Paraskevopoulos did at times. …. It is also true that it's not a bimodal condition where you're either hypomanic or you're not. There are grades; there are degrees; there are levels of improvement. They are bouncing up and down in terms of, okay I'm doing better this week, I'm not so good that week. That is also reflected in this record, that the -- that symptoms came and went and came and went, all through as we were trying to – trying to get more towards what his baseline was." Boyack Dep. 85:4-86:2. "Undergoing forced sleep deprivation, [Leo's] symptoms last[ed] a very long time, almost the entire time [he] worked at CMMC if you compare [Leo] to [himself] in a healthy state." Paraskevopoulos Dep. 160:11-161:22. Sleep deprivation triggered symptoms for Leo including insomnia, deep pain, depression, and

115

an inability to eat. Paraskevopoulos Dep. 161:10-22. Leo's bipolar disorder
diagnosis was "an evolving diagnosis for Dr. P. that the lack of sleep is – is
considered a serious warning sign that you could be then getting into a worse
state. So it's often a harbinger of bad things to come"; lack of sleep triggered
"other hypomanic symptoms." Boyack Dep. 28:22-29:14.

A "distorted view of how you are perceived by others" and of your
performance can be a symptom of bipolar. Picker Dep. 57:7-15. It is possible
that bipolar symptoms, for example hypomania, can cause an employee to be
disliked by coworkers. Woolever Dep. 82:15-18.  Leo "was having hypomanic
symptoms the entire time" Boyack treated him (Dec 2012-Jan 2014); "there
were symptoms of hypomania and, more importantly, also depression that
were flaring up and easing off all the time during this timeframe." Boyack
Dep. 41:14-42:2.

CMMC understood that it takes a while for somebody diagnosed for
bipolar to get the full benefit of treatment; sometimes medications need to be
adjusted, and it takes a while to learn how to cope with a disease you just
found out about; CMMC understood that as of 2013, Leo might get more
successful at managing his bipolar disorder in the future. 30(b)(6) Dep. 57:19-
58:11.

By letter dated April 30, 2013, Dr. Boyack informed Dr. Palmer that:
"lack of sleep is very risky for [Leo] or any one with bipolar disorder, in terms

116

of developing mood symptoms again . . . I continue to have concerns about the
deleterious effects of sleep deprivation in Bipolar disorder, and how this may
impact Leo in his early recovery form his severe mood episode . . . the timing
of his being ready for call remains in flux in my assessment. . . he may well
require ongoing accommodations regarding work hours in particular in order
to ensure he continues to have a successful recovery . . . ." Boyack Dep. Ex.4;
DF 1580.

On November 15, 2013, Dr. Boyack spoke by phone about Leo with Dr.
Picker; Dr. Boyack's notes summarize her phone call that day with Dr.
Picker:

> "Writer discussed the course of treatment so far, the question of
> how much his current challenges may reflect ongoing hypomania
> vs baseline character. Also reflected concern re: his taking
> overnight call, given he gets very little sleep during those periods,
> which can possibly lead to hypomania. Advised Dr. Picker that
> the patient has been bringing the issues of his performance in
> therapy increasingly in recent weeks especially, and that we have
> been addressing them." Boyack Dep. 24-25; P1048.

In her phone call with Dr. Picker on November 15, 2013, Dr. Boyack
was "advocating, actually, for Dr. Paraskevopoulos to not necessarily do
overnight call because that is also something that we know, is when people
with bipolar disorder do shift work, especially that overnight shift, that tends
to be more of an acute trigger of losing sleep than night after night which can
then trigger an episode either up or down." Boyack Dep. 29:24-30:8. As of

117

November 2013, Dr. Boyack's sense "was that there was untreated hypomania, and I was educating her [Dr, Picker] as to the difference" between symptoms of a mood disorder versus baseline character. Boyack Dep. 25:3-27:2.

121.  Dr. Woolever's observation was that Plaintiff was tolerating overnight shifts well in the FMR program.  CMMC Depo. 132:6-14.

Response: Qualified. On August 20, 2013, Woolever received the email from Leo's treating psychiatrist explaining that she thought those overnight calls were very dangerous for Leo. 30(b)(6) Dep. 128:16-19. Boyack knows bipolar better than Woolever, and she was in a much better position to understand and know about bipolar disorder and its effects on Leo than Woolever. 30(b)(6) Dep. 128:21-130:18.

## II.  Plaintiff's Statement of Additional Facts

**CMMC adopted and followed a facially unlawful disability policy and acted without any knowledge or training on reasonable accommodation.**

122.   CMMC's Resident Employment Agreement, which Program Director Donald Woolever signed, states that when a resident with a disability has exhausted their available FMLA leave, this "shall be grounds for termination":

"Disability. In the event that the Resident is unable to perform the duties set forth in this Agreement, due to the Resident's illness, injury, or disability, The Resident shall be eligible to

receive paid sick leave, to the extent provided under the benefit summary. To the extent that the Resident is not eligible for paid leave, or has exhausted eligibility for paid sick leave, The Resident may be entitled to the balance of eligible time as unpaid leave, pursuant to the federal and state Family and Medical Leave laws. If the Resident is not eligible for leave, or has exhausted available leave, it shall be grounds for termination of this Agreement." Resident Employment Agreement, para 7, 30(b)(6) Dep. Exhibit 11; P0613.

123.   This provision reads that if a resident has exhausted available leave, it shall be grounds for termination, meaning a complete end of the employment relationship, and that would be because of a disability. 30(b)(6) Dep. 10:10-11:7.

124.   This provision reflects CMMC's policies regarding how it treats a disability in a resident employee, and Woolever has followed that policy throughout his nine-year tenure as Program Director for the Family Medicine Residency Program; the policy is still in effect today. 30(b)(6) Dep. 9:6-10:9.

125.   Consistent with CMMC's "Disability" policy in its employment agreement, in September 2015, CMMC denied a family medicine resident's request for an extension of her medical leave of absence for depression and terminated her employment. DF2325; 30(b)(6) Dep. 67:18-68:17; 94:25-95:24. (In his Errata sheet, Woolever made substantive changes to a portion of the cited testimony and provided only the conclusory reason "Clarification." When a witness makes changes to his testimony, the original answer remains a part of the record and may be used in summary judgment and trial

119

proceedings. *Combined Energies v CCI, Inc.*, 628 F.Supp.2d 226, 232 n.4 (D. Me. 2009); *CSC Holdings, Inc. v. Alberto*, 379 F.Supp.2d 490, 493 n.1 (S.D.N.Y. 2005).)

126.   This CMMC "Disability" policy was the same policy CMMC followed with respect to Leo. 30(b)(6) Dep. 94:25-95:24.

127.   Consistent with CMMC's "Disability" policy in its employment agreement, in October 2017, CMMC told a family medicine resident that his leave time had expired so he had to return to work from his leave for depression or be terminated. DF5306 & 5325-5327; 30(b)(6) Dep. 98:8-25 & 100:7-24. (In his Errata sheet, Woolever made substantive changes to a portion of the cited testimony and provided only the conclusory reason "Clarification." As noted above, when a witness makes changes to his testimony, the original answer remains a part of the record and may be used in summary judgment and trial proceedings.)

128.   Human Resources Director Kirk Miklavic has "some knowledge" of the ADA, but CMMC's Employee Health department is "the expert." Miklavic Dep. 4:1-5:22.

129.   However, if residents in the CMMC family medicine residency request a reasonable accommodation, they are not referred to Employee Health; instead, they are referred to the residency's Program Director, Woolever. Miklavic Dep. 126:10-23.

130.   It was CMMC policy to allow Woolever to unilaterally make decisions about reasonable accommodation requests in his residency program. Miklavic Dep. 77:16-19.

131.   Woolever was the final decision maker on family medicine residents; Human Resources had less authority over Woolever than over other department heads at CMMC. Miklavic Dep. 59:3-8.

132.   Woolever "do[es] not have knowledge of the law around" the criteria an employer must meet to deny an accommodation. Woolever Dep. 89:20-24.

133.   Dr. Bethany Picker, the person tasked with advising Leo and serving as his Maine Professionals Health Program (MPHP) on-site supervisor after he returned from medical leave, had no training regarding ADA reasonable accommodation requirements. Picker Dep. 5:12-25, 24:7-12.

**Objective measures show Leo's successful performance as a physician in training.**

134.   Leo passed his U.S. Medical Licensing Examination, Step I, in 2009, and passed his U.S. Medical Licensing Examination, Step II (Clinical Knowledge and Clinical Skills components), in 2010. P000046-48.

135.   Leo graduated from St. George's University School of Medicine in June 2011. P000053.

136.   Leo began his three-year post-graduate residency at CMMC in July 2011, and successfully completed his first year of residency, Post-Graduate Year 1 ("PGY1"), in June 2012. 30(b)(6) Dep. 75:1-15.

137.   Leo successfully completed 13 rotations in the first year of his residency (PGY1), and successfully completed 18 rotations in the second year of his residency (PGY2). Woolever Dep. 118:18-119:10; Woolever Dep. Exhibit 1, p. 277-79.

138.   Leo never failed a rotation during his residency. Woolever Dep. 118:18-119:10.

139.   During his residency, Leo received hundreds of Daily Precepting Feedback forms that evaluated his demonstrated abilities in the areas of Medical Knowledge, Understanding, Application to Patient, Professionalism, and System-Based Resources. *See* Exhibit 2, Declaration of Leo Paraskevopoulos ("Paraskevopoulos Decl.") ¶ 1.

140.   The vast majority of Leo's Daily Precepting Feedback forms throughout his residency evaluated him positively in each of the listed areas. Paraskevopoulos Decl. ¶ 2.

141.   The vast majority of the Daily Precepting Feedback forms from November 15, 2013 through January 21, 2014, rated Leo positively in each of the listed areas. Paraskevopoulos Decl. ¶ 3, 4; Paraskevopoulos Decl., Exhibit A.

142.   Leo passed his U.S. Medical Licensing Examination, Step III, in December 2013. P00049; Paraskevopoulos Decl. ¶ 9.

143.   According to Program Director Woolever's June 2014 signed letter of recommendation, during his residency, Leo "demonstrated a solid medical knowledge base," "performed well on his American Board of Family Medicine In-Training Exams," and "[a]chieved a good score on the USMLE Step 3 exam." Woolever Dep. Exhibit 1, p. 274-75.

144.   According to Woolever's June 2014 signed letter of recommendation, Leo "developed trusting relationships with his patients. He took ownership of his patient care responsibilities and was a strong patient advocate.  He worked closely with other members of the health care team to ensure that his patients could gain access to the care they needed. 'Dr. Leo' was well-loved and appreciated by his patients." Woolever Dep. Exhibit 1, p. 274-75.

145.   Everything in Woolever's June 2014 signed and notarized letter of recommendation for Leo is accurate. Woolever Dep. 118:18-119:10; Woolever Dep. Exhibit 1, p. 274-75.

146.   During the last seven weeks of Leo's employment at CMMC, he spent a majority of his time working in the Mercy Express Care urgent care facility. During December 2013 and January 2014, he worked about 200 hours at the urgent care facility. He worked directly with supervisor Dr.

Norman Guay on virtually every shift at the facility. Paraskevopoulos Decl. ¶5.

147.   According to Dr. Guay, Leo is an "intelligent, compassionate physician," his "knowledge base is certainly adequate and he is in possession of excellent cognitive skills," his "communication style has been noted as one of quiet confidence and was always interpreted as respectful of both patients and staff," and he "has shown a very positive attitude and will to succeed" and "a thirst for medical knowledge." Paraskevopoulos Decl., Exhibit B; P000598.

148.   During Leo's residency, he worked personally with Gyorgy Mundruczo, M.D., a supervising physician in the CMMC Intensive Critical Care Unit. Leo worked with Dr. Mundruczo and his colleagues in the ICU for a full month of Leo's second year of residency, and Leo also worked closely with Dr. Mundruczo and his colleagues whenever there was an emergency with one of his patients admitted to the hospital overnight. Paraskevopoulos Decl. ¶7.

149.   According to Dr. Mundruczo, Leo was "interested, hard-working, well-liked and respected by his peers," his "knowledge base was commensurate for his level of training," and he "asked appropriate questions," "made a clear effort to make the best of his ICU trainings," "was

humble," and "got along well with nurses and therapist." Paraskevopoulos

Decl., Exhibit C; P000597.

**CMMC fires Leo in 2012, one day after he requested a leave of absence for his mental health condition, but then rescinds the termination.**

150.   In December 2011, Leo was treated for depression by a physician

in Rumford. Paraskevopoulos Dep. 43:22-44:14.

151.   In July 2012, toward the beginning of the second year of his

residency, Leo met with Dr. Deborah Taylor, a psychologist and the Associate

Program Director at the time, and told her he was feeling fatigued, depressed

and mentally unwell. Irog Responses p.5; Picker Dep. 68:10-69:12.

152.   Leo asked Dr. Taylor if she thought he should request a medical

leave of absence to seek treatment and she told him that he should not

request a leave of absence at the time and instead offered him contact

information for CMMC's Employee Assistance Program. Irog Responses p. 3.

153.   Dr. Taylor sent an email to the faculty, including Woolever and

Leo's faculty advisor, Dr. Stephanie Youd, describing her meeting with Leo.

Several days later, on July 13, 2012, CMMC put Leo on probation. Irog

Responses p. 5; DF717-18; Woolever Dep. Exhibit 1, p. 5-6.

154.   On November 28, 2012, Dr. Youd sent an email to Leo that

contemplated CMMC continuing to work with Leo, stating, "I am expecting

that when we meet next week, you will have a written plan with goals and

reasonable ways of measuring these goals when you and I meet next week," and concluded, "I know that you have a lot of stressors in your life right now with your grandfather being ill, but be sure to keep us in the loop so that we can help." Woolever Decl. Ex C (LP Depo 0040).

155.   Dr. Youd's November 28, 2012 email to Plaintiff also highlighted several positive aspects of Leo's performance, including "I am glad that your ER rotation is going well"; "[y]ou are up to date on your tape reviews which is a good thing"; and "[g]ood job on completing your office visits." Woolever Decl. Exhibit C (LP Depo 0040).

156.   On November 30, 2012, Woolever emailed human resources representative  Lisa Burger regarding "some concerns about [Leo's] mental health and/or substance abuse issues," noting that "there has been no overt episode and we have no concrete evidence, but there is an underlying uneasiness" among clinic preceptors and staff. Woolever Dep. Exhibit 1, p. 22-23.

157.   HR representative Burger responded that she was "in uncharted waters here" and that, "[i]f there are substance abuse issues . . . there may be an ADA component that will require us to step more gingerly"; her email did not state that there might be an ADA component if there were mental health issues. Woolever Dep. Exhibit 1, p. 21-22.

158.   On December 4, 2012, Woolever, human resources representative Burger, Leo's faculty advisor Dr. Stephanie Youd, and Dr. Dieter Kreckel met regarding Leo; Burger's notes of the meeting do not state that CMMC had made a decision to terminate Leo.  Woolever Decl, Exhibit D (DF 00805); Miklavic Dep. 20:25-23:1.

159.   Instead, the notes close with a "question" that "was called by Woolever: Is it time to meet with Leo and end his residency here?" Woolever Decl, Exhibit D (DF 00805).

160.   On the morning December 6th, 2012, Leo sent an email to Dr. Youd stating in part:

> "I have complained of feelings of anxiety, depression, getting distracted by environmental triggers and fatigue during the last year and a half, if these things are reducing my functionality at home I would like to make an apt with a physician here as I haven't seen one for over a year now and I have also made an apt with my pcp in Canada for evaluation over the break. I think a medical mental health evaluation would be beneficial because I can certainly say I'm intrinsically motivated and want to improve, I feel frustrated when I'm not improving at the rate expected. I am currently not on any medications other than Ambien PRN for insomnia and perhaps I would benefit from some medical help or therapy to improve my functionality." Irog Response p.3; Woolever Dep. Exhibit 1, p. 74-75.

161.   On Friday, December 7, 2012, Leo was called into a meeting with Woolever, Kreckel, Youd, and Burger. Irog Responses p. 7.

162.   In this meeting, Leo renewed his request for medical leave, explaining that he had been experiencing a mental health problem and

asking for medical leave so he could seek diagnosis and treatment. Irog Response p. 7.

163.   Leo also explained that he had sent an email to Youd earlier about his mental health problems and need for time off to seek a medical evaluation.  Irog Responses p. 7.

164.   Woolever learned at the December 7, 2012 meeting that Leo had sent an email to Youd the day before "expressing that he thought he needed medical leave." Woolever Dep. 29:2-30:4.

165.   After Leo asked for a leave of absence to seek diagnosis and treatment, he was asked to leave the room; about 15 minutes later he was called back into the room and Woolever told him that he could not have take medical leave and that he had to resign or his employment would be terminated. Irog Responses p. 7.

166.   Woolever told Leo that he had until Monday, December 10, 2012 to decide whether he would resign or be terminated. Irog Responses p. 7. Woolever Dep. 29:2-30:4.

167.   On the afternoon of December 7, Woolever sent an email to the residency faculty that Leo had been given the option to resign or be terminated and had been given until Monday to decide. Woolever Dep. 43:8-45:11; Woolever Dep. Exhibit 1, p.43.

168. The following day, Saturday, December 8, human resources representative Burger prepared a termination notice for Leo. Woolever Dep. Exhibit 1, p.49.

169. On December 9, 2012, Leo sent an email to the faculty of the residency Program, yet again requesting medical leave:

> "It has become clear to me that I have not been meeting these expectations due to a medical problem that has not been addressed properly, officially diagnosed or treated. I did state in a previous email to my advisor shortly prior to the news of probably dismissal that I felt as though a medical problem was at root cause and I would like a medical evaluation. I along with my family, believe that with proper medical evaluation and treatment I would be able to consistently meet expectations within the residency program moving forward. I ask for the opportunity to take medical leave/suspension to have a formal medical evaluation with hopeful treatment and when medically stabilized be granted the opportunity to return to work on treatment. . . . I hope this can be discussed." Irog Responses p. 6-7; Woolever Dep. Exhibit 1, p. 72-73; DF 82-83.

170. Later on December 9, Picker emailed Woolever: "I agree with you, Raj, that it seems this card has only been played because the consequences are so immediate and dire." Woolever Dep. Exhibit 1, p. 66; DF 93.

171. In response to Leo's requests for reasonable accommodation, on December 10, 2012, Leo was told that the termination had been revoked and that he would be permitted to take medical leave, but that the medical leave would also be a disciplinary suspension, the length of which was to be

determined by the length of the medical leave. Irog Responses p. 8; Woolever
Dep. Exhibit 1, p. 83, 88.

172.   Woolever required Leo to enroll in the Maine Professionals
Health Program (MPHP) when Leo went on out on leave in December 2012;
MPHP is "very substance abuse oriented." Paraskevopoulos Dep. 99:15-24;
98:20-24.

173.   Leo met with MPHP representative Maggie Palmer "several
times" and communicated with her by phone "briefly just to confirm meetings
and things like that"; Palmer was more concerned about substance abuse
problems, which Leo has never had, and referred deeper psychological
questions to treating psychiatrist Dr. Boyack. Paraskevopoulos Dep. 100:10-
101:4.

174.   Human Resources Director Miklavic's "dealings with Dr. Palmer
were generally where we had an impaired physician or a physician who was
in trouble of some sort, whether it was a DUI, et cetera, and she was quite
helpful in those circumstances." Miklavic Dep. 18:5-11.

175.   In addition to her work with the MPHP program, Palmer also
had a role directly with CMMC; she was a paid private consultant for CMMC
and was paid in the range of $10,000 per year for this work. 30(b)(6) Dep.
27:13-28:22.

**Leo is diagnosed with bipolar disorder, which has severe symptoms commonly triggered by sleep deprivation.**

176.   On December 14, 2012, Leo began treatment with Dr. Cindy Boyack, a psychiatrist at Maine Medical Center, who diagnosed him with Bipolar Disorder. P1155, 1572.

177.   If left untreated, bipolar disorder is associated with a much higher rate of suicide than in the average population, and involves a very severe depression compared to the average person's experience of contextual or circumstantial depression. 30(b)(6) Dep. 71:16-72:5.

178.   A "trigger, a very common one with bipolar, is . . . lack of sleep." Boyack Dep. 42:7-15.

179.   CMMC's Family Medicine Residency program required its residents to do "night float," which required working shifts from 5 p.m.-6 a.m. for 5 nights in a row for 2 weeks, with a two day break in between. Woolever Dep. 89:4-11.

180.   CMMC's Family Medicine Residency program required its residents to do "call shifts" on the weekends, which required working a 28-hour shift, providing 24-hour call coverage in the hospital and then an additional four hours of work for transfer of care. Woolever Dep. 102:11-21.

181.   "So sleep deprivation absolutely can trigger and contribute to symptoms of bipolar disorder, both hypomania and depression. People can

have hypomania and depression together, which Dr. Paraskevopoulos did at times. .... It is also true that it's not a bimodal condition where you're either hypomanic or you're not. There are grades; there are degrees; there are levels of improvement. They are bouncing up and down in terms of, okay I'm doing better this week, I'm not so good that week. That is also reflected in this record, that the -- that symptoms came and went and came and went, all through as we were trying to – trying to get more towards what his baseline was." Boyack Dep. 85:4-86:2.

182.   Sleep deprivation is one trigger for bipolar, although there are others; "In [Dr. Boyack's] recommendations, in encouraging [Leo] to think about call and whether he should be doing overnight call, [Dr. Boyack] simply wanted to remove one of the triggers [they] had control over." Boyack Dep. 85:20-86:2.

183.   "Undergoing forced sleep deprivation, [Leo's] symptoms last[ed] a very long time, almost the entire time [he] worked at CMMC if you compare [Leo] to [himself] in a healthy state." Paraskevopoulos Dep. 160:11-161:22.

184.   Sleep deprivation triggered symptoms for Leo including insomnia, deep pain, depression, and an inability to eat. Paraskevopoulos Dep. 161:10-22.

185.   Leo's bipolar disorder diagnosis was "an evolving diagnosis for [Leo] that the lack of sleep is – is considered a serious warning sign that you

could be then getting into a worse state. So it's often a harbinger of bad things to come"; lack of sleep triggered "other hypomanic symptoms." Boyack Dep. 28:22-29:14.

186.    CMMC understood it takes a while for somebody diagnosed for bipolar to get the full benefit of treatment; sometimes medications need to be adjusted, and it takes a while to learn how to cope with a disease you just found out about; CMMC understood that as of 2013, Leo might get more successful at managing his bipolar disorder in the future. 30(b)(6) Dep. 57:19-58:11.

187.    A "distorted view of how you are perceived by others" and of your performance can be a symptom of bipolar. Picker Dep. 57:7-15.

188.    It is possible that bipolar symptoms, for example hypomania, can cause an employee to be disliked by coworkers. Woolever Dep. 82:15-18.

189.    Leo "was having hypomanic symptoms the entire time" Dr. Boyack treated him (Dec 2012 – Jan 2014); "there were symptoms of hypomania and, more importantly, also depression that were flaring up and easing off all the time during this timeframe." Boyack Dep. 41:14-42:2.

**CMMC refuses to consider ongoing work on a part-time basis and delays Leo's return-to-work date**

190.   By letter dated February 1, 2013, Dr. Boyack advised Palmer that Leo was on target to return to work the week of February 18, recommended a gradual" return to work, warned that "[h]e should absolutely not take overnight call in these initial weeks back," and asked the residency program to be "a little flexible" with Leo. P1167; Boyack Dep. Exhibit 3.

191.   On February 11, 2013, Palmer emailed Woolever that Leo's "psychiatrist is suggesting that he return to work on a half time basis, which may be impossible." Woolever Dep. Exhibit 1, p. 100; DF 121; 30(b)(6) Dep. 62:1-63:19.

192.   Woolever forwarded Palmer's email to human resources representative Burger and stated: "Per Maggie's email below, it looks like there may be a request for a return to work on a 'half-time' basis. Our residency does not offer any kind of part-time option (some do offer shared positions or other less than full time options, but we have never done that)." Woolever Dep. Exhibit 1, p. 100; DF 121; 30(b)(6) Dep. 62:1-63:19.

193.   CMMC was aware that other residency programs did offer work on a part-time basis; however, CMMC did not research how those institutions managed to offer part-time accommodations. 30(b)(6) Dep. 63:19-65:18.

194.   On February 23, 2013, Leo explained in an email to Woolever that he had "received official notice from Dr. Palmer that I am eligible to return to work on or shortly after Feb 28th . . ." Irog Responses p.8-9.

195.   At Woolever's request, however, Leo's return to work was delayed until March 18, 2013. Irog Responses p. 8-9.

196.   As a result of the delay in the return to work date set by Woolever, Leo was out of work for more than three months and his disciplinary suspension was extended. Irog Responses p. 8-9.

197.   As Woolever was aware and Leo was not, rules of the American Board of Family Medicine (ABFM) generally require second and third year residents who are out of work for more than three months to start their residency over at the beginning of the second year; as a result, Woolever's delay in his return to work resulted in him having to repeat months of his rotation. Irog Responses p. 8-9.

198.   Although Leo may have been eligible for a waiver of this ABFM rule, he was not informed that he would be required to repeat months of work until months after he returned from medical leave and was not told even then that the reason he was being required to repeat those months was an ABFM "continuity" rule, but only that Woolever was requiring him to repeat months of work. Irog Response p. 8-9.

199.   On April 13, 2013, Palmer sent an email to Leo stating that "MPHP does not support" Dr. Boyack prescribing him Ambien for his insomnia symptoms because "[i]t can be an addictive drug and we do not allow you to be taking that while participating in our program and while you are working"; she further stated that she and Woolever "will make a decision about your continuing in our program."  P000199.

## CMMC penalizes Leo for taking one day off for symptoms of bipolar

200.   On April 23, 2013, Leo told Picker in a meeting that the reason he had called out sick for one day the prior week was that he was suffering from depression symptoms of his bipolar disorder. Irog Responses p. 9.

201.   About three hours later on April 23, Leo was called into a meeting with Woolever, who expressed that Picker had told him that he had been out of work one day due to depression symptoms. Irog Responses p. 9.

202.   Woolever told Leo that as a result of his use of one sick day for his bipolar disorder and that Leo had emailed Kim Elliot suggesting a schedule change, Woolever questioned his integrity, professionalism and readiness to function as a normal fulltime resident. Irog Responses p.9.

203.   Leo asked Woolever if he would be allowed to use accrued sick leave to take intermittent leave if he felt symptoms of his medical condition, such as unusually deep depression; Woolever stated that he was concerned

about the fact that he called out sick one day that week because of depression symptoms of his bipolar disorder. Irog Responses p.9; Paraskevopoulos Dep. Exhibit 4, p. 62.

204.   Leo stated that he felt like Woolever  was providing him with a negative consequence for calling out sick due to symptoms of his disease; Woolever stated "are you threatening me," Leo stated "no I am not threatening you", Woolever stated "it sounds like you are threatening me, if you go there things will end up very badly for you," and Leo stated "I am not threatening you, this is new for me, my diagnosis and treatment and beginning work are new for me, I am just trying to learn what to appropriately do in all situations. Perhaps if I have depressed symptoms I should come to morning report and speak to a faculty about them and decide what to do next." Irogs p.9-10; Paraskevopoulos Dep. Exhibit 4, p. 62.

205.   Woolever said "that seems like a good idea" for Leo to come in to work for morning report if he was unable to work due to depression symptoms rather than using accrued sick leave; this was not required for other residents who took sick leave and was not required for sick leave due to illness not related to a disability. Irog Responses p. 10; Paraskevopoulos Dep. Exhibit 4, p. 62.

206.   As a result April 23 meeting, Woolever intimidated Leo to not call in sick if he was experiencing symptoms of insomnia. Paraskevopoulos Dep. 141:5-142:20.

## CMMC requires Leo to return to a full-time schedule including night shifts, despite Leo's and treating psychiatrist Dr. Boyack's concerns

207.   In a meeting on April 26, 2013, Picker informed Leo that the residency planned to increase his work schedule to a full resident schedule including night call shifts of up to 28 hours.  Irog Responses p. 10.

208.   At the April 26 meeting, Picker stated that the consensus was that if he could not handle the trial of a full resident schedule, that faculty had 20 other residents to focus their time on and would consider dismissing him from the residency.  Irog Responses p. 10.

209.   At the April 26 meeting, Leo "mentioned the ADA and how it is on the front of the resident handbook" and "mentioned that he feels that if his hours get pushed and he does not succeed then the answer should be to reduce hours and not end his residency here." Woolever Dep. Exhibit 1, p.129; DF 191; Picker Dep. 14:20-22.

210.   During the April 26 meeting, Picker told Leo they would not be contacting Dr. Boyack directly, but instead would be working through Dr. Palmer and human resources. Woolever Dep. Exhibit 1, p.129; DF 191; Picker Dep. 14:20-22.

211.   As of April 26, Picker understood Leo to be worried that working hours of a "full capacity resident physician," including 28 hour shifts, might exacerbate his bipolar. Picker Dep. 20:4-22:3.

212.   By letter dated April 30, 2013, Dr. Boyack informed Dr. Palmer that: "lack of sleep is very risky for [Leo] or any one with bipolar disorder, in terms of developing mood symptoms again . . . I continue to have concerns about the deleterious effects of sleep deprivation in Bipolar disorder, and how this may impact Leo in his early recovery form his severe mood episode . . . the timing of his being ready for call remains in flux in my assessment. . . he may well require ongoing accommodations regarding work hours in particular in order to ensure he continues to have a successful recovery . . . ." Boyack Dep. Exhibit 4; DF 1580.

213.   On May 10, 2013, Picker submitted a monthly report to MPHP stating that he was performing satisfactorily in all areas; at this time, Leo was not yet doing night call. Picker Dep. 36:5-37:3; Woolever Dep. Ex 7; DF 1121.

214.   On June 5, 2013, Picker submitted a monthly report to MPHP stating that Leo was performing satisfactorily in all areas; at this time, Leo was not yet doing night call. Picker Dep. 37:4-18; Woolever Dep. Exhibit 7; DF 1117.

215.   On June 30, 2013, Dr. Deborah Taylor, a psychologist and the Associate Program Director at the time, told Picker and Woolever that the CMMC faculty needed to contact Dr. Boyack to let her know their concerns with Leo and have Dr. Boyack be more engaged with the faculty; to Picker's knowledge no one contacted Dr. Boyack at that time. Picker Dep. 68:10-69:12; Woolever Dep. Exhibit 1, p. 138; DF 206.

216.   On July 1, 2013, Plaintiff was taken off of probation. Paraskevopoulos Dep. 152:7-10.

217.   On July 2, 2013, CMMC told Leo he would have to repeat the second year of his residency (PGY-2), including repeating all overnight call and night float requirements. Woolever Dep. Exhibit 1, p. 142-43; DF 220-21.

218.   As of July 2013, Leo had already done 7 to 8 months worth of night calls in his second year of residency. Paraskevopoulos Dep. Exhibit 4, p.82; Irog Responses p. 12.

219.   Leo asked Woolever if he could maintain credit for the night call shifts that he had worked over the previous calendar year because he was worried that sleep deprivation is the known worst trigger for bipolar symptoms and he hoped that faculty would accommodate him giving credit for his previous completed night call shifts to reduce the risk of developing symptoms related to his medical condition due to sleep deprivation. Irog Responses p. 12.

220.   Woolever clearly stated "no" to Leo's request and did not discuss Leo's request further or discuss possible alternate reasonable accommodations. Irog Responses p. 12.

221.   On July 3, 2013, Leo explained to Woolever that "nights are something that we should pay close attention to due to my condition." Woolever Dep. Exhibit 1, p. 142-43; DF 220-21.

222.   July 3, 2013, Leo explained to human resources representative Burger that he had requested credit from Woolever for the night calls he had already completed in PGY-2: "I also asked if I would maintain credit for my night calls that I have completed as a PGY 2 in Rumford and my director stated that I would not be credited for these. I did say that I am worried that sleep deprivation is the known worst trigger for bipolar symptoms in hopes that faculty would accommodate giving me credit for my previous completed night calls to reduce the amount of night calls I will need to do over the next year while still meeting the required amount but this was immediately declined without further discussion thus far." Miklavic Dep. 48:1-49:2 Woolever Dep. Exhibit 1, p. 150; DF 333.

223.   Burger responded to Leo, and copied Human Resources Director Miklavic, that she "would encourage [Leo] to work through these concerns with Raj [Woolever] and your precepting physician(s)." Woolever Dep. Exhibit 1, p. 149; DF 332.

224.   Human Resources Director Miklavic would understand the language in Leo's July 3 email as a request for accommodation and that it was important to follow up on that; if this exchange occurred, Miklavic would have concerns that a reasonable accommodation had been requested and that required further interaction which had not occurred. Miklavic Dep. 57:1-58:11.

225.   Picker "honestly do[es]n't know" what reason there would be to require Leo to repeat night calls he had already completed. Picker Dep. 86:15-20.

226.   On July 5, 2013, Leo expressed concern to Picker "about overnight calls and his mental health"; Picker suggested to Leo that any request regarding overnight work should come from Dr. Boyack (and not Leo directly), but told him that she "did not know if that would change any requirements of the program." Picker Dep. 87:14-88:13; Woolever Dep. Exhibit 1, p.148; DF 223.

227.   On July 12, 2013, Picker submitted a monthly report to MPHP about Leo stating that he was performing "unsatisfactorily" in two out of three areas ("thought processes" and "interpersonal relations"); at this time, Leo had started doing night call. Picker Dep. 37:19-22; Woolever Dep. Exhibit Ex. 7; DF 1116.

228.   When Leo returned to doing night call in July 2013, he went from performing satisfactorily in thought processes and interpersonal relations to performing borderline or unsatisfactorily in Picker's view. Picker Dep. 39:5-9.

229.   In August 2013, Dr. Deborah Taylor asked Leo for permission so she could talk directly with Dr. Boyack, and Leo agreed and explained "it would be great for you and Dr. Boyack to talk with each other." Woolever Dep. Exhibit 1, p. 156; DF 240-241.

## CMMC refuses treating psychiatrist Dr. Boyack's August 2013 request for accommodations regarding overnight call

230.   On August 19, 2013, Dr. Boyack spoke with Palmer by phone about Leo, and Palmer emailed Woolever and Taylor summarizing her call the previous day with Dr. Boyack:

> "I wanted to update you on my conversation late yesterday afternoon with Dr. B, LP's treating psychiatrist. She appreciates the feedback and listened intently to everything I had to say. I also passed along Christine Gray's observations. Dr. B is increasingly concerned about LP have to take 24 hour call as it stimulates his bipolar. She states that his sleep-wake cycle gets completely thrown off when he has to do the overnight calls. She suggested that CMMC think about having him do as many calls, but having them all occur during day hours, even if they end at midnight. MMC has had more than a dozen residents with that same diagnosis for whom accommodations around 24 hour call had to be made."
> 30(b)(6) Dep. Exhibit 19; DF 255-256; Boyack Dep. 38-39,71-72.

231.   On August 20, Woolever responded to Palmer and Taylor: "I do have some concerns about her call recommendations. . . . If he is not doing 24

hour call or Night Float that does not seem like an equivalent experience to his other resident peers. I don't see many other alternatives for our program, so I am still feeling reluctant to make that accommodation at this point." 30(b)(6) Dep. Exhibit 19; DF 256-57.

232.   Woolever was the final decision maker about what accommodations, if any, would be made for Leo because of his bipolar disorder. 30(b)(6) Dep. 54:3-16.

233.   At the time Woolever received Palmer's email, he did not know whether the dozen MMC residents mentioned in Palmer's email were in a family medicine residency; CMMC did not do anything to follow up on or research the information from Leo's treating psychiatrist about what MMC was doing in its residency programs. 30(b)(6) Dep. 32:14-35:7.

234.   Woolever has no explanation "whatsoever" for why MMC could make these accommodations in its residency programs when CMMC was saying it could not. 30(b)(6) Dep. 18-22.

235.   Maine Medical Center is an "[e]xcellent institution" and probably has a better reputation than CMMC; it is harder to get in to a residency program at MMC than it is at CMMC. 30(b)(6) Dep. 30:8-22.

236.   Woolever was not curious to see if MMC had some thinking about how CMMC could achieve the same goals and still provide a healthy environment for residents with bipolar. 30(b)(6) Dep. 39:16-20.

237.   Woolever did not research whether the three other Maine institutions with family medicine residency programs accommodated residents with bipolar. 30(b)(6) Dep. 43:7-21.

238.   If Leo had requested an accommodation to his schedule of not working after midnight, CMMC would have had an obligation to investigate that. 30(b)(6) Dep. 54:23-55:1.

239.   CMMC lacks information to know whether psychiatrists are expected to handle emergencies after midnight as much or more than primary care doctors. 30(b)(6) Dep. 66:1-21.

240.   Woolever has never seriously considered modifying the requirement that residents in his program work between midnight and 6am. 30(b)(6) Dep.14:3-11.

241.   Neither Woolever nor anyone else at CMMC investigated or researched whether it was feasible to make accommodations for family medicine residents having to work overnight because of health issues. 30(b)(6) Dep. 19:1-12.

242.   As of August 22, 2013, Dr. Boyack's notes of her treatment sessions with Leo reflect a need to "monitor closely, especially regarding sleep deprivation on call and night float"; Dr. Boyack's concern was "based on a history where a previous episode of night float, [Leo] literally did not sleep all week, not one hour of sleep in a week." Boyack Dep. 33:5-17.

145

243.   Dr. Boyack is not aware whether accommodations have been made for similarly situated residents in the MMC family medicine residency, but she is aware of accommodations given to interns at MMC to not do over 24-hr shifts. Boyack Dep. 75:15-76:1.

244.   In September 2013, at Plaintiff's request, Picker requested feedback about him from interns and residents and received three email responses.  Picker Dep. 94:4-21. Among other things, the emails stated:

> a.     "I felt that he was very approachable and made an effort to check in with me about any potential unstable patients so that I wouldn't feel like I was on my own. He also handled the FMTS calls so that I could focus on the IMTS which was helpful. ... When I fell behind and was staying late into the evening, Leo offered multiple times to complete a dictation for me."
> b.     "In general, the good is he seems very encouraging of his co-residents (especially the interns) education. Also good is he is direct about advice and feedback (compliments and constructive criticism."
> c.     "Call – Leo appears to embrace his call shifts ... It is tricky as Intern to assess any senior because i[t] doesn't feel quite right to do so..."
> Woolever Dep. Exhibit 1, p. 170-172.

245.   By email dated November 4, 2013, hospitalist Jonathan Bausman provided the following feedback on Leo: "I've had a crazy busy day, with one very sick girl that I transferred to PICU in boston. Leo has been awesome! Helping out, he's been a big help doing notes, putting in orders, doing awesome! Clinically he was right on the money. Everything be brought up and things we talked about was basically exactly what the PICU fellow I was

146

talking with was suggesting, so clinically he was managing the patient really well! Just wanted to let you know that he is doing great, and being a great asset to my team today." Woolever Dep. Exhibit 1, p. 176 (DF 00285).

## CMMC refuses to engage with Boyack's and Leo's November 2013 requests for accommodation regarding overnight work

246.   On November 15, 2013, Dr. Boyack spoke by phone about Leo with Picker, and summarized her phone call that day as follows:

> "Writer discussed the course of treatment so far, the question of how much his current challenges may reflect ongoing hypomania vs baseline character. Also reflected concern re: his taking overnight call, given he gets very little sleep during those periods, which can possibly lead to hypomania. Advised Picker that the patient has been bringing the issues of his performance to therapy increasingly in recent weeks especially, and that we have been addressing them."
> Boyack Dep. 24-25; P1048.

247.   In her phone call with Picker on November 15, 2013, Dr. Boyack was "advocating, actually, for Dr. Paraskevopoulos to not necessarily do overnight call because that is also something that we know, is when people with bipolar disorder do shift work, especially that overnight shift, that tends to be more of an acute trigger of losing sleep than night after night which can then trigger an episode either up or down." Boyack Dep. 29:24-30:8.

248.   Leo "wished to not [have Dr. Boyack prohibit him from doing night call] unless it was absolutely necessary to do so, because he really wanted to, you know, participate in full in the residency program. So when

147

[Dr. Boyack] spoke to Picker, it was with the recommendation, certainly, but it was not a requirement." Boyack Dep. 37:1-9.

249.   As of November 2013, Dr. Boyack's sense "was that there was untreated hypomania, and I was educating her [Dr, Picker] as to the difference" between symptoms of a mood disorder versus baseline character. Boyack Dep. 25:3-27:2.

250.   Dr. Boyack seriously considered that Leo's behaviors referenced by Picker in the November phone call were "residual hypomanic symptoms and not necessarily his base behavior, implying that if they were treated, his base behavior would be different and hopefully better." Boyack Dep. 78:14-79:7.

251.   Dr. Boyack understood from her November 15 call with Picker that a request to pull Leo from night call "would not be well-received" and "that was not an accommodation they were going to consider essentially." Boyack Dep. 35:11-23.

252.   Picker's own notes of that same November 15 phone call with Dr. Boyack state: "[Dr. Boyack] again discussed his sleep and call issues. She really feels that this is big part of what provokes another backslide. She wanted to just 'put it out there' that she may be requesting a change to his schedule. I did tell her that in the past, the program had not been open to a change but that I did not know what the response would be if it came from

Maggie Palmer and the Physician Health Program." Woolever Dep. Exhibit 8;

Woolever Dep. 109-10.

253.   Following the November 15 call with Dr. Boyack, Picker emailed

Woolever and Taylor to summarize the call:

> "Just got off the phone with Cindy Boyack. She is now very concerned about him. She had thought he was doing well. Now she thinks maybe when sleep deprived he becomes hypomanic and it appears as grandiosity. . . . [¶] . . . She is considering pulling him from call and wanted to know how that would be received. I told her that was really a question for Raj, but I don't think received well." Woolever Dep. Exhibit 1, p.195.

254.   On November 18, 2013, Woolever and Picker scheduled a meeting

with Leo; Leo asked for HR to be present at the meeting, but Woolever said

no. Woolever Dep. Exhibit 1, 191:22-24.

255.   During the November 18 meeting, the following exchange

occurred:

> Leo:   I know, I told you this before and you said that I didn't, but I have a disability.
> [Long silence for more than six seconds]
> Leo:   I printed off something that I'd like to give you explicitly explaining problems I've had with my disability.
> Woolever:   I'm not going to take that piece of paper from you.
> Leo:   Well here it is.
> Woolever:   I'm not taking it. You can keep it with you, I am not taking it.
> Leo:       Can I read it?
> Woolever:   No you may not read that, that you may not read. You are in a program. That program is monitoring your status. According to your psychiatrist and the psychologist that monitored that program, you are fine to be at work. If you were

not cleared for work you would not have returned to the residency. I am not interested in that piece of paper.
Bryant Decl., Exhibit A p. 12.

256.   Woolever admitted that it would be a failure to engage in dialogue about reasonable accommodations if the following occurred: "If the employee said "I printed off something that I would like to give you explicitly explaining problems I have had with my disability," and if the employer responded, "I am not going to take that piece of paper from you" and if the employee said, "Well, here it is," and placed the piece of paper on the table in front of the employer and the employer responded, "I am not taking it," and you can keep it -- "you can keep  it with you, I am not taking it," and if the employee then asked "can I read it", and if the employer then said "no, you may not read that, that you may not read."' Woolever Dep. 73:7-22.

257.   The written request that Leo tried to give to Woolever stated, in part:

> "I am just learning how to control, reduce, and live with symptoms of Bipolar disease. Perhaps a discussion could be had about the benefits of some reasonable accommodations that for example may include:
> • Reducing work hours.
> • Exchanging overnight shifts for day shifts.
> • Taking another short medical leave of absence to provide the opportunity to focus on improving my treatment plan and wellbeing.
> • Daily check-in's to assure expectations are objectively being met."
> Woolever Dep. Exhibit 1, p. 213; P000130; Irog Responses p.15.

258.   At the November 18 meeting, Woolever "glanced at" the letter from Leo, and told Leo he did not need to see it. Woolever Dep. 60:10-12. After Woolever refused to accept Leo's written letter, Leo tried to explain his bipolar symptoms orally:

> Leo: Bethany? Can I at least explain some problems with my personality.
> Raj: I am not going to listen to that.
> Leo: Why?
> Raj: That is for you to deal with your providers. I am not your medical provider.
> Leo: But you misunderstand some symptoms.
> Raj: If there is a misunderstanding then your medical provider should be in touch with us to clarify that. That's why you are in that program.
> Bethany: You can't have it both ways Leo, you can't have 'I want to be treated like a normal resident, treat me like a normal resident' and then when it hits the fan, you pull it up. And that's how it feels it's been happening. You have repeatedly told me, 'I have been mentally healthy, I have been mentally healthy.'
> Leo: That's how I felt.
> Bethany: So when I'm bringing up the feedback, the same feedback over and over and it's not getting incorporated, it's not changing. Either you can't do it or  you're not mentally healthy, but you can't have it both ways."
> Bryant Decl., Exhibit A p. 13-14

259.   If an employer refuses to allow an employee to submit a written request for accommodation and refuses to let the employee state the request out loud, it can be very hard to know what they were requesting. Woolever Dep. 64:20-65:3.

260.   If Leo had asked during the November 18 meeting for accommodations related to night work or other modifications to the job, the employer would have been required to talk about those with Leo at that point. Woolever  Dep. 66:7-21

261.   An employer cannot legally refuse to allow an employee to submit written request for reasonable accommodation. Miklavic Dep. 86:12-87:4.

**CMMC puts Leo back on probation and prohibits schedule changes.**

262.   On November 18, CMMC put Leo on probation; the probation agreement stated that "ANY violation of the above terms will result in dismissal" from the CMMC residency, and stated the following terms:  "No solicitations of staff or fellow residents to defend, support or speak on your behalf"; "No unreasonable requests"; "While on probation, no schedule change requests will be granted." Woolever Dep. Exhibit 1, p. 202-04; DF 871-873.

263.   After he was put back on probation on November 18, Leo did not email CMMC asking for a schedule change or leave of absence, because he had been forced to sign a probation agreement that said no schedule accommodations were permitted. Paraskevopoulos Dep. 221-22.

264.   Woolever was the final decision maker for Leo's residency, and it would be reasonable for Leo to follow the instructions in his November 18 probation agreement. Miklavic Dep. 105:4-11.

265.   Leo took several vacation days in December 2013 in order to study for the U.S. Medical Licensing Step III exam, a full two-day licensing exam. Leo Decl. ¶9. He took this time off primarily to ensure that he was mentally healthy and was able to correct any sleeping problems before this important examination. Leo Decl. ¶9. He took and passed the Step III exam in December 2013. Leo Decl. ¶9.

**CMMC easily could have accommodated Leo's scheduling requests.**

266.   "It wouldn't have been a particular hardship to the residency" to not require Leo to continue having night float shifts in 2013; Leo completed some night floats in his second year before his leave, and there was no requirement as part of extending his residency that he also be required to repeat those night floats – in fact, the residency took night float away from other second-year residents and assigned them to Leo. Woolever Dep. 91:4-92:5.

267.   Picker was not aware of any hardship that would be imposed if Leo were not required to do 28-hour calls. Picker Dep. 33:5-8.

268.   If Woolever had considered the accommodations listed in Leo's Nov 18, 2013 letter, some or all of them would have been possible. Woolever Dep. 101:17-102:10; Woolever Dep. Exhibit 1, p. 213.

269.   There are practice situations where a physician who cannot work a 28-hour shift could perform well; a physician's license should not be revoked if a primary care provider developed a disability that prevented them from doing 28-hour shift. Woolever Dep. 104:3-16.

270.   Not all family medicine physicians are required to handle overnight call as part of their job duties; some family practice doctors work day hours at a clinic and are not required to work overnight, so a health problem with working overnight would theoretically be irrelevant to their ability to perform that job. 30(b)(6) Dep. 21:19-22:24.

271.   Some physicians work relatively short hours, for example, ten hours four days a week, after residency. Picker Dep. 79:23-80:4.

272.   In Woolever's view, even if a resident has a medical condition that can be triggered by fatigue and the consequences can be life threatening, that resident should still be required to perform 28-hour shifts, under supervision. Woolever Dep. 107:13-20.

273.   Working a twenty-eight hour shift "is not a requirement of [CMMC's] accrediting body"; it is a CMMC program requirement and is not imposed by the accrediting body. Woolever Dep. 133:6-134:25; Picker Dep. 30: 13-20.

**If CMMC had accommodated Leo, he might have been able to graduate from the residency program.**

274.   If Leo "had been granted an accommodation in November of 2013 of reduced hours or leave or not working nights and his performance improved," it is possible he would have been able to graduate from program. Woolever Dep. 110:24-111:6.

**CMMC terminates Leo's employment in January 2014**

275.   By email dated January 10, 2014, Picker informed Leo:

> "We are concerned about your overall performance, although most of your behavior detailed in your probation letter has improved aside from the NRP performance.  You have been assessed to be far below expected level in multiple competencies. I will be asking the faculty to complete the mile stones on the three competencies we have not yet assessed.  I know you have already self-assessed on those.  After I receive information from the faculty, I will summarize and review with you.  We need to develop a plan to improve your performance."
> Paraskevopoulos Dep. Exhibit 4, p. 106.

276.   When Leo filled out the milestone self-assessment, he was not very familiar with it; Woolever asked him to complete the self-assessment and said that his faculty would complete one and then if there were any gaps between the one that Leo completed and the one that faculty had completed, those gaps would need to be addressed. Paraskevopoulos Dep.  229:3-15.

277.   Leo rated himself low in the competency areas because he thought that was what Woolever wanted him to do. Paraskevopoulos Dep. 231:7-11.

278.   On January 21, 2014, Leo was called unexpectedly into a meeting with Picker, Human Resources Director Miklavic, and Woolever and was told he was being terminated from the program. Irog Responses p. 17.

279.   In the January 21 meeting, Leo asked for scheduling accommodations or a leave of absence, but Woolever told him that was not an option. Paraskevopoulos Dep. 241:23-243:4; Miklavic Dep. 113:15-21.

280.   Woolever initially said that Leo would not be given the option to resign instead of termination because he had been offered that option before in December 2012 and had not taken it, referencing the occasion when after telling Leo that he had to resign or be terminated, CMMC ultimately granted Leo protected medical leave. Irog Responses p. 17.

281.   Later, Miklavic told Leo he had the option to resign or he be terminated, and because his only other option was to be terminated, he resigned his position. Irog Responses p. 17.

**CMMC further retaliates by giving Leo a bad reference**

282.   In February 2016, after Leo filed his complaint with the Maine Human Rights Commission and Equal Employment Opportunity

Commission, the program director of another residency program (Kansas University) who was considering hiring Leo called to speak to Woolever as an employment reference. Irog Responses p. 17-18, Paraskevopoulos Dep. 246-7. Woolever refused to speak to her as he normally spoke to potential employers of former residents. Irog Responses p. 17-18.

283.   Instead, CMMC told the Kansas University residency program director that could they not release any more info than what was in the written reference letter and that the residency should call CMMC's lawyers for more information. Paraskevopoulos Dep. 246-7. Irog Responses p. 17-18.

284.   It "[d]oes not help [resident's] candidacy" to have a reference say they can't provide information for legal reasons. Woolever Dep. 116:18-117:12.

285.   Mr. Paraskevopoulos has applied to over 130 residency programs since his termination by CMMC, including programs at Kansas City University, Weill Cornell/NY Presbyterian, Lincoln Medical and Mental Health Center, University of California (San Francisco), and University at Buffalo. P00001-00028; Irog Responses, p. 19, 21-22.

286.   Since his termination, Mr. Paraskevopoulos has been unable to find any position in another residency program, or a paying position as a medical professional.  Paraskevopoulos Decl. ¶13.

287.   Most recently, from March 2017 to the present, Paraskevopoulos has worked as a partner of Stile Carpentry Ltd. in Ontario, Canada. Irog Responses p.19.

Date:  December 6, 2018                    Respectfully submitted,


                                           /s/David G. Webbert
                                           David G. Webbert, Esq.
                                           Carol J. Garvan, Esq.
                                           Johnson, Webbert & Young, LLP
                                           160 Capitol Street, P.O. Box 79
                                           Augusta, Maine 04332-0079
                                           Tel: 207-623-5110
                                           dwebbert@work.law
                                           cjgarvan@work.law

                                           *Attorneys for Plaintiff*

## Certificate of Service

I hereby certify that on December 6, 2018 I electronically filed this filing with the Clerk of Court using the CM/ECF system which will send notification of such filing(s) to all counsel of record.


Date: December 6, 2018            /s/David G. Webbert
                                 Johnson, Webbert & Young, LLP
                                 160 Capitol Street, P.O. Box 79
                                 Augusta, Maine 04332-0079
                                 Tel: 207-623-5110
                                 dwebbert@work.law