United States District Court
District Of Maine

| | | |
|---|---|---|
| Leo S. Paraskevopoulos, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Docket No. 2:17-cv-00166-JAW |
| | ) | |
| Central Maine Medical Center, | ) | |
| | ) | |
| Defendant. | ) | |

**Plaintiff's Objection to Defendants' Motion for Partial Summary Judgment**

**Introduction**

CMMC's motion for summary judgment[1] (1) depends on legal propositions that have been explicitly overruled by statute or intervening Supreme Court precedent, or are otherwise plainly erroneous and (2) alleges facts that are contradicted by piles of evidence in the record.

First, to justify its key contention that bipolar disorder is not a disability under federal law, CMMC relies entirely on cases decided before the 2008 ADA Amendments Act (ADAA). The ADAA expressly rejected pre-2008 court decisions finding that individuals were not "people with disabilities" based on "an inappropriately high level of limitation necessary to obtain coverage under the ADA."[2] As explained in the statutory text itself, the amendments were intended "to convey that it is the intent of Congress that the primary object of attention in cases brought under the ADA should be whether entities covered under the ADA have complied with

---

[1] ECF No. 69 ("Def's Mtn").
[2] Pub. L. No. 110-325, §§ 2(a)(6), 2(b)(5), 122 Stat. 3553, 3553-54 (2008). The regulations implementing the ADAA explain that "it should easily be concluded" that "bipolar disorder . . . substantially limit[s] brain function." 29 C.F.R. §1630.2(j)(3)(iii).

their obligations, and to convey that the question of whether an individual's impairment is a disability under the ADA should not demand extensive analysis."[3]

Second, CMMC erroneously relies solely on a 2002 decision—superseded in 2008 by the ADAA—to argue that Plaintiff does not meet the protected status of "regarded as" disabled because 'there is no evidence that CMMC regarded Plaintiff as substantially limited in one or more major life activity."[4] But the ADAA explicitly amended the definition of "regarded as" so that the plaintiff need not prove "whether or not the impairment limits or is perceived to limit a major life activity."[5]

Third, CMMC misstates basic legal principles when it asserts that "Plaintiff's discrimination and retaliation claims are subject to a 300-day time limit." To the contrary, it is settled law that in Maine the statute of limitations is six years under the Rehabilitation Act.[6]

Finally, in direct violation of the bedrock summary judgment rule that the Court construe all facts and take all reasonable inferences in the non-movant's favor, CMMC's brief selectively quotes from documents, cherry-picks stray facts in its favor, and disregards the mountain of evidence supporting Plaintiff's claims. For example, Defendant insists that it is an undisputed fact that Plaintiff never specifically requested accommodations regarding overnight shifts, ignoring at least ten separate accommodation requests by Leo from July 2012 through January 2014. And Defendant repeatedly cites portions of emails and other documents out of context, relying, for example, on stray negative statements about Leo's performance while disregarding positive statements in those same emails.[7]

---

[3] Pub. L. No. 110-325, §2(b)(5), 122 Stat.
[4] Def's Mtn 8 (citing only *Bailey v. Georgia-Pac. Corp.*, 306 F.3d 1162, 1169 (1st Cir. 2002)).
[5] 42 U.S.C. § 12102(3).
[6] *See, e.g.*, *Klane v. Mayhew*, No. 1:12-cv-00203-NT, 2013 U.S. Dist. LEXIS 42053, *8 (D. Me. Mar. 26, 2013).
[7] *See, e.g.*, Def's Statement of Undisputed Material Facts ("DSMF") 22, 75, 76, 94.

## Case Overview

After graduating from medical school and passing his Step I and Step II U.S. Medical Licensing Examinations, Leo Paraskevopoulos ("Leo") began his three-year residency at CMMC in July 2011. PSAMF ¶¶134-136. He successfully completed 13 rotations in his first year and another 18 rotations in his second year, passed his Step III Licensing Examination in December 2013, and received high praise from supervisors and colleagues for his hard work, positive attitude, and trusting relationship with patients. *Id*. ¶¶137-149.

Although CMMC's mission is to care for the sick and injured, it failed to care appropriately for the health of its own medical resident, who was subjected to grueling working conditions. Even as he worked around the clock to take care of patients, Leo himself was struggling with serious mental illness. *Id.* ¶¶150-52, 160, 176. CMMC allowed Dr. Donald Woolever, Director of the Family Medicine Residency Program, to unilaterally make decisions about reasonable accommodations for Leo's mental illness, even though Woolever had no knowledge or training in this area. *Id.* ¶¶128-133. Indeed, throughout his tenure as Director, Woolever followed a facially unlawful disability policy providing that if a resident with a disability has exhausted their available FMLA leave, that "shall" be grounds for termination–and that illegal policy remains in effect today. *Id.* ¶¶122-127.[8]

---

[8] As noted in Plaintiff's Statement of Additional Material Facts, Woolever made substantive changes in his errata sheet to a portion of the cited testimony, providing only the conclusory reason "Clarification."  When a witness makes changes to his testimony, the original answer remains a part of the record and may be used in summary judgment and trial proceedings.  *See Combined Energies v CCI, Inc*., 628 F.Supp.2d 226, 232 n.4 (D. Me. 2009); *CSC Holdings, Inc. v. Alberto*, 379 F.Supp.2d 490, 493 n.1 (S.D.N.Y. 2005); *see also Mata v. Caring for You Home Health, Inc.,* 94 F. Supp. 3d 867, 872 (S.D. Tex. 2015) (striking answers that "wholly contradict[ed] the deponent's original answer and [were] supported only by insufficiently vague and conclusory reasons for the change").

From July 2012 through January 2014, CMMC repeatedly discouraged, ignored, and outright refused Leo's increasingly desperate requests for accommodation for his Bipolar Disorder and related symptoms. *Id.* ¶¶151-175, 190-281. Leo first asked about medical leave in July 2012, but CMMC told him not to request leave and put him on probation just days later. *Id.* ¶¶151-153. On December 6, 2012, Leo asked for leave to seek a medical evaluation, but CMMC fired him *the next day*. *Id.* ¶¶160-166. CMMC eventually rescinded the termination, but then labeled Leo's medical leave a disciplinary suspension and required him to enroll in the Maine Professionals Health Program (MPHP), a program geared toward substance abuse, and required Leo to work with MPHP liaison Dr. Margaret Palmer, who also worked as a paid private consultant for CMMC earning about $10,000 per year. *Id.* ¶¶171-175.

Leo's treating psychiatrist, Dr. Cindy Boyack. released Leo to return to work in February 2018, but sternly cautioned CMMC about the dangerous effects sleep deprivation—and particularly overnight call—could have on Leo's bipolar condition. *Id.* ¶¶178-185, 190. In the ten months that followed, CMMC refused or willfully ignored at least eight express requests for accommodation to reduce the devastating triggering effects sleep deprivation had on Leo's depressive and hypomanic symptoms, including that CMMC consider a reduced schedule, exchange of night for day shifts, or another brief medical leave. *Id.* ¶¶190-193, 201-212, 219-223, 230-232, 246-251. When Leo took one day of leave for symptoms of bipolar in April 2013, Woolever questioned his integrity and professionalism. *Id.* ¶¶200-2016.

In an audio-recorded meeting in November 2013, Leo tried to hand Woolever and his advisor, Dr. Bethany Picker, a written accommodation request, but they refused to take the request or even let Leo read it aloud: Woolever told Leo, "No you may not read that, that you may not read . . . . If you were not cleared for work you would not have returned to the

4

residency. I am not interested in that piece of paper . . . . I am not able to listen to that. . . . That is for you to deal with your providers, I am not your medical provider," and Picker told Leo, "You can't have it both ways Leo." *Id.* ¶¶254-258.

CMMC refused to consider accommodations to Leo's schedule on the grounds that overnight work was an essential function for its residents. *Id.* ¶¶230-241. CMMC persisted in this refusal even after it received information from Dr. Boyack that Maine Medical Center had made scheduling accommodations for over a dozen residents with bipolar disorder, and even though 28-hour shifts are *not* required by CMMC's residency's accrediting body and many family physicians work relatively short hours requiring no overnight work. *Id.* ¶¶230, 266-273.

At deposition, Woolever admitted that if Leo had been granted accommodations of reduced hours or no overnight work, it is possible he would have been able to graduate from the program. *Id.* ¶274. Instead, CMMC refused to even engage in discussions with Leo about scheduling accommodations or additional medical leave and fired him in January 2014. *Id.* ¶¶278-281. Despite hundreds of applications, Leo has not been able to gain admission to any other residency program, and has instead started a carpentry business. *Id.* ¶¶286-288.

## Argument

### I.     There Are Genuine Issues of Material Fact as to Whether CMMC Failed to Accommodate Plaintiff and Failed to Engage in the Interactive Process.

State and federal disability discrimination laws place "an affirmative duty on employers to offer a reasonable accommodation to a disabled employee."[9] Under the MHRA, as well as the ADA and the Rehabilitation Act, an employer discriminates against an employee on the basis of disability if it fails to "make reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability, unless [the employer] can

---

[9] *Enica v. Principi*, 544 F.3d 328, 338 (1st Cir. 2008).

demonstrate that the accommodation would impose an undue hardship on the operation of the business."[10] A "showing of intent or animus is not required" to prove failure to accommodate.[11] Furthermore, "the duty to provide a reasonable accommodation is a continuing one . . . not exhausted by one effort," and "requires a great deal of communication between the employee and employer."[12] An employer's unnecessary delay in determining and implementing an effective accommodation can, itself, violate the law.[13]

A reasonable juror could conclude that (1) Leo has bipolar disorder, a disability within the meaning of the law; (2) Leo was able to perform the essential job functions of a CMMC resident with or without reasonable accommodations, and (3) despite knowledge of Leo's disability, CMMC outright refused to provide Leo with reasonable accommodations and failed in its duty to engage in the interactive process.[14]

### A.  A reasonable juror could conclude Leo was disabled under federal law.

The jury could easily conclude that Leo—who was diagnosed with bipolar disorder, received intensive psychiatric treatment throughout the last year of his residency, and, even with ongoing treatment, suffered from severe symptoms including hypomania, an inability to sleep or

---

[10] 42 U.S.C. § 12112(b)(5)(A); *see also* 5 M.R.S. § 4553(2)(E) (similar).  In assessing reasonableness, the Supreme Court has held that the employee need only show that an accommodation seems reasonable on its face, that is, ordinarily or "in the run of cases." *U.S. Airways, Inc. v. Barnett*, 535 U.S. 39 (2002). Once that minimal showing has been made, the employer has the burden of demonstrating undue hardship on the facts of the particular case. *Id.*

[11] *Enica*, 544 F.3d at 338.  Because no showing of intent is required, the "solely because of" language in Section 504(a) of the Rehabilitation Act does not apply to failure to accommodate claims, and the elements of a failure to accommodate claim are identical to those under the ADA.  *See id.*, 544 F.3d at 338 n.11 (stating, in the context of a denial of reasonable accommodation claim, that "the same standards apply to both the Rehabilitation Act and ADA" and that therefore the court "rel[ies] on precedent construing both statutes").  Likewise, the Maine Law Court looks to cases interpreting the ADA to construe the similar reasonable accommodation provisions of the MHRA. *See, e.g. Doyle v. Dep't of Human Servs.*, 2003 ME 61, ¶ 14 n.7, 824 A.2d 48.

[12] *Garcia-Ayala v. Lederle Parenterals, Inc.*, 212 F.3d 638, 648 & n.13 (1st Cir. 2000) (citation omitted). Under both the ADAA and MHRA, once an employer becomes aware of an employee's need for accommodation, the employer has an affirmative obligation to engage in the interactive process. *See Humphrey v. Memorial Hospitals Assoc.*, 239 F.3d 1128, 1137-1138 (9th Cir. 2001) (ADA requires interactive process).

[13] *Calero-Cerezo v. United States*, 355 F.3d 6, 24 (1st Cir. 2004) (holding that if employer "obstructs" or delays interactive process, that is not a good faith effort to accommodate).

[14] Plaintiff is pursuing an independent claim for failure to engage in the interactive process only under federal law and not under the MHRA.

eat, and deep depression—was disabled under federal law.[15] CMMC relies solely on cases that *pre-date* the 2008 amendments to the ADA—amendments that expressly rejected the strict standards for "disability" imposed by courts and admonished that the definition of disability "shall be construed in favor of broad coverage . . . to the maximum extent permitted."[16]

Leo first received medical treatment for depression in December 2011, informed CMMC of his depression and possible need for leave in July 2012, and again notified CMMC in early December 2012 that he was experiencing depression and needed leave for a mental health evaluation. PSAMF ¶¶150-153, 160-163. In mid-December 2012, he was diagnosed with bipolar disorder. *Id.* ¶176. If left untreated, bipolar disorder is associated with a much higher rate of suicide than in the average population, and involves severe depression compared to the average person's experience of circumstantial depression. *Id.* ¶177. Even with ongoing treatment, Leo suffered from symptoms of both hypomania and depression "the entire time" psychiatrist Dr. Boyack treated him, from December 2012 through January 2014. *Id.* ¶189. His symptoms included insomnia, deep pain, depression, and an inability to eat. *Id.* ¶183-184.[17] In November 2013, nearly a year into treatment, Dr. Boyack viewed Leo as still experiencing symptoms of untreated hypomania, and attempted to educate CMMC that the behaviors they perceived in Leo were "residual hypomanic symptoms and not necessarily his base behavior" and he could benefit from further treatment. *Id.* ¶¶246-253. Hypomanic symptoms can include grandiosity and a distorted view of how others perceive you, and can cause you to be disliked by others. *Id.* ¶¶187-89, 253.

---

[15] CMMC concedes that Leo had a disability under the MHRA, as bipolar disorder is listed as a *per se* disability under the state law, 5 M.R.S. §4553-A(1)(B

[16] 42 U.S.C. §12102(4)(A); *see also* 29 C.F.R. §1630.2. *See* Def's Mtn. 7-8.

[17] Leo's insomnia was severe and was a primary focus of his weekly treatment sessions with his psychiatrist; as she explained, on one occasion he did not sleep a single hour during a week of night float. PSAMF ¶242.

On this record, a jury could easily conclude that Leo's bipolar disorder was a disability – that is, a mental impairment that substantially limited him in multiple major life activities, including brain function, eating, sleeping, thinking, and interacting with others.[18] The EEOC's regulations expressly state that "it should easily be concluded" that "bipolar disorder . . . substantially limit[s] brain function."[19] Moreover, under the ADAA, Leo's condition must be assessed without regard to mitigating measures, such as psychiatric treatment.[20] As Dr. Woolever conceded, if left untreated, bipolar disorder is associated with high rates of suicide and severe depression compared to the general population. PSAMF ¶177.

### B. A reasonable juror could conclude that Leo could perform the essential functions of a family medicine resident with reasonable accommodations.

After his return from medical leave in March 2013, Leo repeatedly requested ongoing reasonable accommodations, including (1) a reduced schedule; (2) credit for the eight months of night calls he had completed in his second-year of residency rather than requiring him to repeat those night calls; (3) the same amount of call but exchanging night for day shifts; or (4) another short medical leave. PSAMF ¶¶190-91, 219-23, 230, 246-47, 257, 279. And Woolever conceded at deposition that at least some of these accommodations were "possible," *Id.* ¶268, and that if Leo "had been granted an accommodation in November of 2013 of reduced hours or leave or not working nights and his performance improved," it is possible he would have been able to graduate from the residency program. *Id.* ¶¶268, 274.

Indeed, the record shows that Leo performed well upon his return from medical leave. The monthly reports submitted by his advisor, Dr. Picker, to MPHP stated that Leo was performing satisfactorily in all areas in May and June 2013, and he was taken off probation on

---

[18] *See* 29 C.F.R. §1630.2(i) (non-exhaustive list of major life activities).
[19] 29 C.F.R. §1630.2(j)(3)(iii) ("Predictable assessments").
[20] 29 CFR 1630.2(j)(1).

July 1. *Id.* ¶¶213-14, 216. By Picker's admission, it was only *after* CMMC required Leo to start doing overnight call again in July (including repeating eight months of already completed call), that Picker's evaluation of Leo's performance shifted from "satisfactory" to borderline or unsatisfactory. *Id.* ¶¶217-18, 227-28.[21]  Such a shift should not have been surprising: as Dr. Boyack repeatedly explained to CMMC at the time, sleep deprivation is a well-known trigger for symptoms of bipolar disorder, and overnight shifts were very risky for Leo as they completely threw off his sleep-wake cycle, stimulated his bipolar, and led to hypomania. *Id.* ¶¶178-85, 212, 230, 246-47.  Undergoing forced sleep deprivation while working night shifts, Leo experienced bipolar symptoms virtually the entire time he worked at CMMC. *Id.* ¶183, 189.

CMMC's primary contention, that it is undisputed that working overnight shifts is an essential function of a family medicine resident, does not withstand scrutiny. As both Woolever and Picker testified, working a twenty-eight hour shift "is not a requirement of [CMMC's] accrediting body"; instead, it is a program requirement specific to CMMC. *Id.* ¶273.[22] In the real world, many family medicine physicians have jobs that do not require overnight call or  28-hour shifts. For example, some family practice doctors work day hours at a clinic with no overnights; other physicians work relatively short hours, for example, ten hours, four days a week. *Id.* ¶¶269-71.

Moreover, as Dr. Boyack explained to CMMC in August 2013, Maine Medical Center, an excellent institution with a better reputation and a more selective admissions process than CMMC, "has had more than a dozen residents with that same diagnosis [as Leo], for whom accommodations around 24 hour call had to be made." *Id.* ¶¶230, 235. When CMMC received

---

[21] Moreover, as discussed below, even after July 2013, Leo's performance remained strong by multiple measures.
[22] Although CMMC claims it is undisputed that the residency program "has to certify that the resident has the ability to work in environments that require 24-hour functioning" (Def Br. 9), that claim is flatly contradicted by the evidence that these overnight shifts are *not* required by the accrediting body. PSAMF ¶273.

this information, it had no knowledge of what residency programs these dozen MMC residents were in, and did nothing to follow up or investigate.[23] *Id.* ¶233, 239. Woolever has no explanation "whatsoever" for why MMC could make these accommodations in its residency programs while CMMC said it could not. *Id.* ¶234.

CMMC asks the Court to give special "deference" to its "academic" judgment that overnight 28-hour shifts are essential and Leo could not possibly be accommodated,[24] but such deference is not merited when, as here, there is "no way of ascertaining whether the institution had made a professional effort to evaluate possible ways of accommodating a handicapped student or had simply embraced what was most convenient for faculty and administration."[25] Neither Woolever nor anyone else at CMMC ever investigated or researched whether the other Maine medical institutions accommodated residents with bipolar, or whether it was feasible to make accommodations for family medicine residents having to work overnight because of health issues. *Id.* ¶¶233-37, 241. Throughout his nine-year tenure as Program Director, Woolever *never* seriously considered modifying the requirement that residents in his program work between midnight and 6am—in his view, even if a resident had a medical condition that could be triggered by fatigue and the consequences could be life threatening, that resident should still be

---

[23] Moreover, although CMMC now claims vaguely that a "family medicine residency is different than a psychiatry residency" (Def's Mtn. n.3), CMMC has admitted that it lacked information to know whether psychiatrists are expected to handle emergencies after midnight as much or more than primary care doctors. PSAMF ¶239.
[24] Def's Mtn. 8-9.
[25] *Wynne v. Tufts Univ. Sch. Of Med.*, 932 F.2d 19, 25 (1st Cir. 1991) (denying summary judgment to medical school on student's ADA claim and refusing to defer to academic institution's judgment because of its lack of professional effort). Moreover, the circuit cases relied on by Defendant to support deference to academic institutions all involve traditional student-school relationships, rather than the much different resident-hospital employment relationship. The reasoning behind giving deference in the academic institution context—that courts may be particularly ill-equipped to evaluate academic performance—does not apply here. This Court is well-equipped to analyze whether the job requirements at issue are "essential" under the governing law and regulations, as it has in countless other employment disability discrimination cases. And *Shin v. Univ. of Md. Med. Sys. Corp.*, 369 F. App'x 472, 482 (4th Cir. 2010) is readily distinguishable because the Fourth Circuit deferred to the medical institution on whether an accommodation was feasible only because the plaintiff presented *no* evidence of the feasibility of the requested accommodation (a reduced patient load).

required to perform 28-hour shifts. *Id.* ¶240, 272. This Court should not defer to such obviously poor judgment.

CMMC allowed Woolever to unilaterally make decisions about reasonable accommodations in the residency program, without any input from the "experts" in CMMC's Employee Health department, even though neither Woolever nor Picker had knowledge or training regarding ADA accommodations. *Id.* ¶128-33. And throughout his lengthy tenure, Woolever approved and followed a facially unlawful "Disability" policy codified in the program's Resident Employment Agreement, which states that once a resident with a disability has exhausted FMLA available leave, that "shall" be grounds for termination. *Id.* ¶¶122-26. CMMC's manifestly illegal disability discrimination policy evidences an institution-wide disregard for the federal and state rights of its employees, like Leo, who need reasonable accommodations for their disability.[26]

In the absence of any training, investigation, research, or explanation of why working from midnight to 6am is an "essential" function, CMMC resorts to the argument that if Leo had not worked overnight shifts, "he would not have had an equivalent experience to his other resident peers."[27] But insisting on a rigid "equivalent experience" for all employees, without regard to disability, undermines the basic premise of disability discrimination law: in order to ensure equality for people with disabilities, the employer is required to make job *modifications* to accommodate an employee's mental or physical limitations.[28] As the ADA expressly contemplates, employers have to provide reasonable accommodations for employees with

---

[26] *See, e.g., Rooney v. Sprague Energy Corp.*, 581 F. Supp. 2d 94, 98 (D. Me. 2008) (relying on company's "manifestly illegal policy" disability policy of accommodating temporarily injured employees but not employees with long-term disabilities as evidence of disability discrimination).
[27] Def's Mtn. 9.
[28] 42 U.S.C. § 12112(b)(5)(A).

disabilities in order to "to remove societal and institutional barriers" that stand in the way of truly equal opportunities for all employees.[29]

The governing EEOC factors for assessing whether a job function is essential, although not mentioned by CMMC, further demonstrate that overnight shifts were not essential here.[30] CMMC does not identify any pre-existing job description requiring overnight work, and the governing accrediting body does not require overnight or 28-hour shifts. PSAMF ¶273. The amount of time spent on the job performing overnight work is not significant—indeed, CMMC claims Leo's overnight shifts were infrequent in the second half of 2014.[31] If Leo did not perform overnight shifts, there would be no risk or other detrimental consequences for the residency program or its patients: Woolever and Picker both admitted it would not have been any hardship for CMMC to not require Leo to do night call, and CMMC itself decided to take night float away from other second-year residents to assign those extra shifts to Leo. *Id.* ¶¶266-68. Finally, while CMMC maintains it has never made (or even considered) an exception to its night-call requirements, it was aware that just such exceptions were made for bipolar medical residents and interns at MMC. *Id.* ¶¶230-35.

### C. A reasonable juror could conclude that CMMC failed to reasonably accommodate Leo's known disability and failed to engage in the interactive process.

### i. CMMC failed to reasonably accommodate Leo's disability.

Leo made at least ten specific accommodation requests, including:

- June 2012: Leo asked about medical leave and was told not to request it. *Id.* ¶151.

---

[29] Pub. L. No. 110-325, §2(a)(6), 122 Stat. 3553.
[30] 29 C.F.R. §1630.2(n)(3) (listing relevant factors including employer judgment, job descriptions, amount of time spent performing the function, consequences of not requiring the function, experience of employees in the same or similar jobs).
[31] Def's Mtn. 10.

- December 6, 2012: Leo asked for leave for a mental health evaluation and was fired the next day; CMMC later rescinded the termination but placed Leo on disciplinary suspension. PSAMF ¶¶160-71.

- February 1, 2013: Dr. Boyack explained Leo was on target for a "gradual" return to work starting mid-February, said he "absolutely" should not take call in the initial weeks back, and asked the program to be "flexible" with him. CMMC maintained it "does not offer any kind of part-time option" while acknowledging some residencies do. PSAMF ¶¶190-93.

- April 26, 2013: Picker told Leo they planned to increase his schedule to full-time, including 28-hour shifts, and they would consider dismissing him if he could not work that schedule. Leo expressly mentioned the ADA and told Picker that if he was pushed to work night call and he was not successful, the answer should be to reduce his hours, as lack of sleep exacerbated his bipolar. PSAMF ¶¶207-11.

- April 30, 2013: Dr. Boyack explained by letter to CMMC that "lack of sleep is very risky" for Leo, expressed continued "concerns" about sleep deprivation, and advised "he may well require ongoing accommodations regarding work hours in particular in order to ensure he continues to have a successful recovery." No one at CMMC responded to or acted on Dr. Boyack's letter. PSAMF ¶212.

- Early July 2013: Leo asked if he could "maintain credit" for the night call shifts that he had worked over the previous calendar year, because he was worried that "sleep deprivation is the known worst trigger for bipolar symptoms," and he hoped the "faculty would accommodate giving [him] credit for [his] previous completed night calls to reduce the amount of night calls."[32] Woolever said no, and when Leo appealed to human resources, they told him to go back to Woolever.[33] PSAMF ¶¶219-24.

- August 19, 2013: Dr. Boyack expressed "increasing[] concern" about Leo having to do 24-hour call "as it stimulates his bipolar," suggested that CMMC think about having him do as many calls but ending by midnight, and noted over a dozen residents at MMC had accommodations for bipolar. Woolever responded to Palmer (whom CMMC insisted on using as an intermediary rather than communicating directly with Dr. Boyack) that he had "concerns about her call

---

[32]Picker testified she "honestly do[es]n't know" what reason there would be to require Leo to repeat night calls he had already completed. PSAMF ¶225. Although CMMC now contends it required Leo to repeat his already completed night shifts based on an accreditation "continuity" requirement, that requirement would have been avoided if Woolever agreed to return Leo to work in February 2013 as Leo requested, *id.* ¶¶194-96, and Leo may have been eligible for a waiver of this requirement, *id.* ¶198.

[33] CMMC misleadingly claims that Plaintiff asked to work two weeks straight of night float in July 2013. Def's Mtn 16. But Leo said he would be open to that only *after* he specifically asked Woolever that he not be required to do additional night float, was told no, appealed to HR, and was told to go back to Woolever. *Id.* ¶¶221-24. Woolever was the final decision maker on accommodations and was permitted to unilaterally make decisions about accommodation requests in his program. *Id.* ¶¶130-31, 232, 264.

recommendations," did not see many alternatives, and was "feeling reluctant" to make the accommodation. PSAMF ¶¶230-31.

- November 15, 2013: Dr. Boyack expressed concern that Leo was experiencing ongoing hypomanic symptoms and conveyed concern regarding Leo's taking overnight call, as it could lead to hypomania. Picker responded that in the past, the residency program had not been open to such a schedule change and that such a request would not be received well. PSAMF ¶¶246-53.

- November 18, 2013: Leo tried to give Woolever and Picker a written document, and then tried to read aloud from it, which requested a discussion of reasonable accommodations including "reducing work hours," "exchanging overnight shifts for day shifts," and "another short medical leave of absence." Woolever and Picker refused to take accept the written request from Leo and refused to let him read it aloud. PSAMF ¶¶255-61.

- January 21, 2014: at the termination meeting, Leo again requested scheduling accommodations or a leave of absence. Woolever said no. PSAMF ¶279.

A reasonable jury could easily conclude that Leo provided clear and specific notice to CMMC of his disability and repeated requests for accommodations. CMMC now claims Picker and Woolever did not understand Leo was asking for accommodations at the November 18, 2013 meeting. But as Woolever conceded, if an employer refuses to allow an employee to submit a written accommodation request and refuses to let the employee state the request aloud, it can be very hard to know what they were requesting. *Id.* ¶259. Based on the recording of the November 18 meeting, a reasonable juror could reject Picker's and Woolever's implausible claims that they had no idea Leo was trying to ask for accommodations. *Id.* ¶¶255, 258.

CMMC also now faults Leo for not renewing his accommodation request after November 18, but on that same day CMMC had forced Leo to sign a probation agreement saying no schedule accommodations were permitted. *Id.* ¶¶ 262-63. As CMMC's Human Resources Director agreed, Woolever was the final decision maker for Leo's residency, and it was reasonable for Leo to follow the instructions in his November 18 probation agreement. *Id.* ¶264.

In addition, CMMC had a legal obligation to reconsider its termination decision once Leo clearly renewed his request for leave at the January 21, 2014 termination meeting.[34] That duty to reconsider is particularly critical when, as here, the employee has a mental illness that may make communication more difficult.[35]

Finally, CMMC repeatedly asserts that it could not be liable for failing to accommodate Leo because it did provide him with some initial accommodations—including medical leave and a temporarily reduced schedule when he returned.[36] That argument fails as a matter of law because "the duty to provide a reasonable accommodation is a continuing one . . . not exhausted by one effort."[37] Moreover, CMMC's initial two responses to Leo's accommodation requests were an illegal denial followed by an illegal, albeit temporary, termination. When Leo first asked about medical leave in July 2012, CMMC told Leo not to request leave. PSAMF ¶¶151-52. In December 2012, CMMC eventually agreed to provide medical leave to Leo, but only after it had (1) terminated his employment one day after his leave request, (2) internally decided that Leo was only "play[ing]" a "card" by raising his disability and need for leave, (3) days later replaced his termination with a disciplinary suspension, and (4) mandated that he enroll in the substance-abuse focused MPHP. *Id.* ¶¶160-75. And when Leo later took one sick day for symptoms of bipolar, Woolever questioned his integrity and threatened him not to do so again. *Id.* ¶¶200-206.

A jury could readily conclude that CMMC failed to provide Leo with the requested accommodations of reduced hours, exchanging night shifts for day shifts, or another short

---

[34] *See Criado v. IBM Corp.*, 145 F.3d 437, 444-45 (1st Cir. 1998) (holding, when employer claimed it did not have notice of employee's need for leave at time of termination due to a "miscommunication," the employer had a duty to reinstate employee "once her physician explained her condition and prognosis and asked for additional leave"). (citing *Bultmeyer v. Fort Wayne Community Sch.*, 100 F.3d 1285, 1286 (7th Cir. 1996), for its "holding that although physician's letter requesting an accommodation for disabled employee came after employer's decision to terminate, employer should have "reconsidered the decision to terminate his employment").
[35] *Id.*
[36] Def. Mtn. 14, 15.
[37] *Criado v. IBM Corp*, 145 F.3d 437, 444-45 (1st Cir. 1998) (holding that "[a]llowing a disabled employee a one-month leave of absence does not absolve an employer's duty to accommodate").

medical leave, all of which were reasonable and any one of which could have enabled him to successfully complete the residency program.

### ii.   CMMC failed to engage in an interactive process in violation of federal law.

CMMC separately failed in its ongoing obligation to engage in an interactive process to identify appropriate accommodations, which "may itself constitute evidence of a violation of the [ADA]."[38] A jury could easily find a failure to engage here based on evidence that "in the face of plaintiff's increasingly desperate requests for an accommodation, the defendants simply stonewalled."[39]

CMMC's obligations were not limited to approving or denying the employee's requested accommodation. Instead, it had a responsibility to engage in a meaningful dialogue to identify the employee's "precise limitations" and "the potential reasonable accommodation that could overcome those limitations," 29 C.F.R. §1630.2(o)(3), which "requires a great deal of communication between the employee and employer."[40] The employer's role is particularly important in a case "involving an employee with mental illness," because "the communication process becomes more difficult, and [i]t is crucial that the employer [is] aware of the difficulties, and help the other party determine what specific accommodations are necessary."[41]

Here, the jury could easily conclude that CMMC failed in its duty to engage in a good-faith interactive process.[42] The interactive process "would have little meaning if it was

---

[38] *Calero-Cerezo v. U.S. DOJ*, 355 F.3d 6, 24 (1st Cir. 2004).

[39] *Id*.; *see also id*. at 23 (quoting ADA regulations stating that "it may be necessary for the covered entity to initiate an informal, interactive process with the qualified individual.")(citation omitted); *see also Delgado Echevarria v. AstraZeneca Pharm. LP*, 856 F.3d 119, 133 (1st Cir. 2017) (explaining that "an employee's request for accommodation sometimes creates a duty on the part of the employer to engage in an interactive process" (internal quotation marks and alteration omitted)).

[40] *Criado*, 145 F.3d at 444.

[41] *Id*. (quotations omitted, alterations in original).

[42] *See, e.g., Bell v. O'Reilly Auto Enters., LLC*, 2018 U.S. Dist. LEXIS 65995 (D. Me. 2018), at *20-21 (denying summary judgment to employer because a jury could find that the employer did not engage in a meaningful interactive process when "none of its employees . . . contacted . . . [the employee's] healthcare provider, to clarify

interpreted to allow employers, in the face of a request for accommodation, simply to sit back passively, offer nothing, and then, in post-termination litigation, try to knock down every specific accommodation as too burdensome."[43] As detailed above, CMMC summarily denied (or willfully ignored) Leo's many accommodation requests and failed to engage in a dialogue with Leo or his treating psychiatrist to explore workable accommodations. Indeed, Woolever admitted at his deposition that he was not curious to explore how CMMC could achieve its same goals and still provide a healthy environment for bipolar residents. PSAMF ¶236.

The audio-recorded November 18 meeting vividly illustrates CMMC's refusal to engage in the interactive process: Picker and Woolever refused to allow Leo to give them the letter about his disability, refused to let him read it, and even refused to let him explain his bipolar symptoms, telling him they were "not interested in that piece of paper" and that "is for you to deal with your [medical] providers." PSAMF ¶¶255, 258. Woolever conceded at deposition that, if the interaction occurred precisely as it can be heard on the audio-recording, that would be a failure to engage in dialogue about reasonable accommodations. *Id.* ¶256.

## II.   There Are Genuine Issues of Material Fact as to Whether CMMC Retaliated Against Plaintiff for his Protected Accommodation Requests.

Leo's ADA and Rehabilitation Act retaliation claims are governed by the three-step *McDonnell Douglas* burden-shifting framework.[44] First, he must produce evidence of a prima

---

the requested scheduling accommodation"); *Willinghan v. Town of Stonington*, 847 F. Supp. 2d 164, 189 (D. Me. 2012) ("[I]f there is a dispute between the parties as to whether the breakdown in the interactive process was caused by the employee's failure to produce medical reports or the employer's failure to ask for them, the factual dispute must be resolved by a factfinder, which precludes summary disposition.").

[43] *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296 (3d Cir. 1999).

[44] *See D.B. v. Esposito*, 675 F.3d 26, 41 (1st Cir. 2012) (applying *McDonnell Douglas* and stating that "[t]he standard for retaliation claims under the Rehabilitation Act is the same as the standard for retaliation claims under the ADA.") (citation omitted). The Law Court has held that the application of the *McDonnell Douglas* framework to retaliation claims under Maine's Whistleblowers' Protection Act (WPA) is "unnecessary" at the summary judgment stage, and that instead "the parties are held to the same standard as in all other cases." *Brady v. Cumberland Cnty.*, 2015 ME 143, ¶ 39, 126 A.3d 1145. Although that decision applied only to WPA claims, the same rationale applies to retaliation claims under the MHRA. *See, e.g.*, *Ouellette v. Hannaford Bros. Co.*, No. CV-16-0011, 2018 Me. Super. LEXIS 14, at *9 (Me. Super. Ct. 2018) ("Because retaliation under the MHRA has the same elements as

facie case of retaliation.  Once he makes that showing, "the burden shifts to the defendant to articulate a legitimate, non-retaliatory explanation for the adverse action.  If the defendant does so, the burden shifts back to the plaintiff to show that the proffered legitimate explanation is pretextual, meaning that the defendant was motivated by a retaliatory animus."[45]

### A. Plaintiff has Produced Sufficient Evidence to Establish a Prima Facie Case of Retaliation.

To make out a prima facie case of retaliation, Leo must produce evidence that "(1) [he] engaged in protected conduct, (2) [he] was subjected to an adverse action by defendant, and (3) there was a causal connection between the protected conduct and the adverse action."[46] He has met that burden, which is "'not onerous' and is 'easily made.'"[47]

<u>First</u>, Leo engaged in protected activity when he repeatedly and clearly requested reasonable accommodations for his disability.[48] As detailed above, Leo made at least ten requests for reasonable accommodations between July 2012 and January 2014, including before he was placed on probation in July 2012, and before he was first terminated in December 2012.

---

[45] *Esposito*, 675 F.3d at 41. CMMC is incorrect in asserting that it is "insufficient for a plaintiff merely to undermine the veracity of the employer's proffered justification." Def's Mtn. 13 (quoting 1998 First Circuit decision; citations omitted).  In 2000, the Supreme Court explicitly rejected that pretext-plus standard then being followed by the First Circuit and several other circuits, whereby a "plaintiff must introduce sufficient evidence for [a] jury to find both that [the] employer's reason was false and that [the] real reason was discrimination," and the Supreme Court instead clarified that "[t]he factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination." *Reeves v. Sanderson Plumbing Prods*., 530 U.S. 133, 146-47 (2000); *see also id*. at 140 (citing First Circuit decision in *Woods v. Friction Materials, Inc.*, 30 F.3d 255 (1st Cir. 1994) as among circuits in the pretext-plus camp).

[46] *Id.*

[47] *Kosereis v. Rhode Island*, 331 F.3d 207, 213 (1st Cir. 2003) (internal citations omitted); *see also Brady v. Cumberland Cnty.*, 2015 ME 143, ¶ 14, 126 A.3d 1145 (stating that, under Maine law, a prima facie case of retaliation "requires only 'a small showing that is not onerous and is easily made'" (citation omitted)).

[48] *See Wright v. CompUSA, Inc.*, 352 F.3d 472, 478 (1st Cir. 2003); *see also Soileau v. Guilford of Me*., 105 F.3d 12, 16 (1st Cir. 1997) (holding that an employee could make out a claim for retaliation based on requesting a reasonable accommodation even though he was not disabled within the meaning of the ADA).

Second, Leo's initial request for medical leave in July 2012 set off a series of adverse actions by CMMC that culminated in his termination from the residency program in January 2014.  And after Leo was terminated and filed his MHRC complaint, CMMC further retaliated against Leo: rather than speaking to a prospective employer seeking a reference as Woolever would usually do for former residents, Woolever told the employer that he could not release any information other than what was in Leo's written reference letter, and that the employer should direct any questions to CMMC's lawyers—a response that "does not help a [resident's candidacy."[49] PSAMF ¶¶282-84.

Third, Leo has produced ample evidence of a causal connection between his protected activity and the later adverse actions.[50] It is settled that "protected conduct closely followed by adverse action may justify an inference of retaliatory motive."[51] On November 15, 2013, Dr. Boyack requested scheduling accommodations for Leo, and on November 18, Leo met with Woolever and presented him with a written explanation of his disability and request for reasonable accommodations. On November 18, CMMC put Leo back on probation and restricted him from making any schedule change requests, a restriction not placed on other residents. Then, just over two months later, on January 21, 2014, he was terminated from the residency program. The First Circuit has held that a gap of two months between the plaintiff's protected activity and

_____

[49] *See Robinson v. Shell Oil Co.*, 519 U.S. 337, 346 (1997) (reversing holding that a negative employment reference was not an adverse employment action).

[50] The First Circuit has held that, because the Rehabilitation Act incorporated the causation standard from the retaliation provision of the ADA, which makes discrimination "because" an individual engages in protected activity unlawful, both statutes require that  the plaintiff prove that retaliatory motive was a "but-for" cause of the adverse action.  *See Palmquist v. Shinseki*, 689 F.3d 66, 74 (1st Cir. 2012); *see also Hazen Paper Co. v. Biggins*, 507 U.S. 604, 617 (1993) ("a disparate treatment claim cannot succeed unless the employee's protected trait actually played a role in that process and had a determinative influence on the outcome" but plaintiff "need not . . . prove that [protected trait] was the predominant, rather than a determinative, factor in the employment decision"). Similarly, Maine courts requires that a plaintiff's protected activity be "a substantial, even though perhaps not the only, factor motivating an employee's dismissal." *Walsh v. Town of Millinocket*, 2011 ME 99, ¶ 25, 28 A.3d 610; *see also Caruso v. Jackson Lab.*, 2014 ME 101, ¶ 17, 98 A.3d; *MHRC v. City of Auburn*, 408 A.2d 1253, 1268 (Me. 1979) (holding that under the MHRA the plaintiff is not required to establish that the adverse action occurred "solely" because of the unlawful employment discrimination).

[51] *Hodgens v. General Dynamics Corp.*, 144 F.3d 151, 168 (1st Cir. 1998).

his termination is sufficient to meet the "relatively light burden" of establishing causation at the prima facie stage."[52]

Moreover, extensive evidence shows that CMMC reacted with resistance and often outright hostility to Leo's requests for reasonable accommodation.[53] As detailed above, over more than a year and a half, CMMC responded to virtually every one of Plaintiff's requests for accommodation with an adverse action or hostility or both. While this evidence alone is sufficient to create a strong inference of a retaliatory motive, the inference is even stronger when in the context of CMMC's refusal to even consider any of Leo's proposed accommodations.

An especially obvious instance of retaliation occurred on November 18 when CMMC made Leo sign a probation agreement that categorically prohibited him from requesting changes to his schedule and threatened dismissal from the program if he did. PSAMF ¶262-64.   This probation agreement prohibited Leo from requesting the exact accommodation he had repeatedly requested since his return from leave in early 2013.  It is a reasonable, if not mandatory, inference for a jury to conclude that an employer who responds to protected activity by requiring an employee to sign an agreement not to engage in further protected activity as a condition of his continued employment is motivated by hostility to that protected activity.

## B. A Reasonable Juror Could Conclude that CMMC's Proffered Non-Retaliatory Reason for Plaintiff's Termination is Pretext.

Contrary to CMMC's claim that undisputed facts establish that "Plaintiff's performance after two and a half years in the residency program was substantially below an acceptable level

---

[52] *Mariani-Colon v. Dep't of Homeland Sec.*, 511 F.3d 216, 224 (1st Cir. 2007); *see also Esposito*, 675 F.3d 26, 42 (1st Cir. 2012) (noting in a Rehabilitation Act case that "close temporal proximity between protected conduct and an adverse action sometimes 'may suffice for a prima facie case of retaliation'"); *Zades v. Lowe's Home Ctrs*., Inc., 446 F. Supp. 2d 29, 44 (D. Mass. 2006) (causation proven when "Plaintiff requested accommodations in the two months prior to her termination").
[53] In addition, Woolever made statements to Leo directly indicating retaliatory animus: when Woolever indicated his disapproval of Leo calling out sick because of his bipolar disorder, Leo stated that he felt as though he was being given a negative consequence because he suffered from a disease. Woolever asked if that was a threat and stated, "if you go there things will end badly for you." PSAMF ¶204.

despite the faculty's repeated efforts to correct his performance,"[54] a reasonable jury could find

that Leo's performance was objectively satisfactory and that it is pretext when CMMC claims

that his performance was so bad that it had to fire him.  A plaintiff can show pretext "either

indirectly by showing that the employer's stated reasons for its adverse action were not credible,

or directly by showing that that action was more likely motivated by a discriminatory reason."[55]

Leo has shown both.

First, as detailed above regarding Leo's prima facie case,[56] CMMC's demonstrated

hostility to Leo's requests for accommodation could allow a reasonable juror to find that his

termination was actually motivated by retaliatory animus. An employer being "hostile" to and

ignoring a plaintiff's request for accommodation is sufficient to find pretext in an ADA

retaliation case.[57]

Second, a jury could conclude, based on the objective evidence of good performance in

the record, that CMMC's reason is false.  Leo successfully completed 13 rotations in the first

year of his residency, and successfully completed 18 rotations in the second year of his

residency; he never failed a rotation.  PSAMF ¶137-38.  In December 2013, shortly before he

was terminated, Leo passed the step III U.S. Medical Licensing Examination. *Id*. ¶142.

Moreover, supervising physicians who worked directly with Leo in his second year of residency

praised his knowledge base, cognitive skills, and relationships with patients. According to a

highly favorable letter of recommendation written by Woolever at the end of Leo's residency—

the substance of which Woolever has testified is accurate—Leo "demonstrated a solid medical

---

[54] Def's Mtn. 19.

[55] *Tex. Dep't of Cmty. Affairs v.  Burdine*, 450 U.S. 248, 256 (1981).

[56] "[T]he evidence and inferences that properly can be drawn from the evidence presented during the employee's prima facie case may be considered in determining whether the employer's explanation is pretextual."  *Hodgens v. General Dynamics Corp.*, 144 F.3d 151, 161 (1st Cir. 1998).

[57] *Zades v. Lowe's Home Ctrs.*, 446 F. Supp. 2d 29, 44 (D. Mass. 2006) (holding that plaintiff had shown pretext when "Plaintiff requested accommodations in the two months prior to her termination," and her supervisor "was hostile to the requests, allowing [them] only after a 'to-do' about the issue, and ignoring the request").

knowledge base" and "performed well on his American Board of Family Medicine In-Training Exams;" he "developed trusting relationships with his patients," he "took ownership of his patient care responsibilities and was a strong patient advocate," he "worked closely with other members of the health care team to ensure that his patients could gain access to the care they needed." PSAMF ¶¶143-45.  Dr. Guay, an urgent care physician who worked closely with Leo for more than 200 hours during the last two months of his residency, praised him as an "intelligent, compassionate physician," and stated that his "knowledge base is certainly adequate and he is in possession of excellent cognitive skills." PSAMF ¶¶146-47.  And Dr. Mundruczo, a CMMC ICU physician who worked closely with Leo in his second year, stated that Leo was "interested, hard-working, well-liked and respected by his peers," and that his "knowledge base was commensurate for his level of training." PSAMF ¶148-49.

Contemporaneous evaluations of Leo during his residency support these favorable assessments.  Leo received hundreds of "Daily Precepting Feedback" forms that evaluated his demonstrated abilities in the areas of "Medical Knowledge," "Understanding," "Application to Patient," "Professionalism," and "System-Based Resources," and the vast majority of these forms—including those from the last two months of his residency—evaluated positively in each of these areas.  *Id.* ¶¶139-141.  Moreover, Leo also received positive feedback before being placed on probation. *Id.* ¶¶244-45.

When presented with both the positive and negative evaluations of Leo's performance— rather than the cherry-picked negative comments presented in CMMC's brief—a reasonable juror could conclude that Leo's overall performance was contemporaneously rated as satisfactory and that a determining factor in his termination was CMMC's documented hostility to Leo's requests for accommodation.

### III.    There Are Genuine Issues of Material Fact as to Whether CMMC Discriminated Against Plaintiff Because of his Disability.

To prevail on a disability discrimination claim, a plaintiff must show by a preponderance of the evidence that he (1) has a disability within the meaning of the ADA; (2) is qualified to perform the essential functions of the job, with or without reasonable accommodations; and (3) was subject to an adverse employment action based in whole or part on his disability.[58] Like his retaliation claims, Leo's discrimination claims are governed by the *McDonnell Douglas* burden-shifting framework.[59]

As the First Circuit has summarized, "[t]he ultimate question is whether the employee has been treated disparately 'because of [a protected status],'" and "[t]his is so regardless of whether the employer consciously intended to base the [adverse employment action] on [a protected status], or simply did so because of unthinking stereotypes or bias."[60] In addition, a plaintiff may "prove discrimination by circumstantial evidence alone."[61] And the First Circuit has repeatedly rejected the "requirement that in order to survive summary judgment a plaintiff must allege 'at least one piece of evidence that explicitly referred to the plaintiff's membership in a protected class.'"[62]

CMMC asserts that, unlike the MHRA and the ADA, under the Rehabilitation Act, Leo has to prove that he was terminated "solely because of" his disability.[63] But the  only case cited by CMMC does not hold that sole causation is the standard in a discrimination claim under

---

[58]  *Katz v. City Metal Co.*, 87 F.3d 26, 30 (1st Cir. 1996).

[59] *Katz v. City Metal Co.*, 87 F.3d 26, 30 n.2 (1st Cir. 1996).

[60] *Burns v. Johnson*, 829 F.3d 1, 13 (1st Cir. 2016) (citation omitted); *see also id.* (quoting with approval *Chadwick v. WellPoint, Inc.*, 561 F.3d 38, 45 (1st Cir. 2009) (stating that "plaintiffs must present enough evidence to permit a finding . . . that the adverse employment decision was caused at least in part by a forbidden type of bias.") (citation omitted) (emphasis added)).

[61] *Chadwick*, 561 F.3d at 46 (quoting 42 U.S.C. § 2000e-2(m) (requiring a plaintiff merely to "demonstrate[]" that an employer used a forbidden consideration as a motivating factor with respect to an employment decision)).

[62] *Id.* at 46 (citation omitted).

[63] *See* Def's Mtn at 6.

section 504 of the Rehabilitation Act, but instead specifically states, to the contrary, that the causation standard under Section 504 is an "open question; but one that we need not reach here."[64]  The First Circuit has never reached that question. Given that the Rehabilitation Act was explicitly amended in 1992 to incorporate the ADA's standards for liability,[65] this Court should effectuate Congress's intent by applying the ADA's motivating-factor causation standard for substantive discrimination under both statutes (by contrast, as discussed above, the ADA requires but-for causation for retaliation claims). Even if it does not, however, the evidence is more than sufficient for a reasonable jury to conclude that Leo was terminated "solely because of" his disability.

First, for the reasons discussed above, a jury could easily find that Leo was actually disabled within the meaning of all three statutes at issue. In addition, Leo was "regarded as" having an impairment by CMMC.[66]  In arguing that Leo must prove that CMMC regarded him as "substantially limited in one or more major life activity," CMMC once again disregards the 2008 amendments to the ADA. The ADAA clearly states that an individual is "regarded as" having a disability if he has "an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity."[67] The amendments "quite clearly broadened the definition of being 'regarded as' having an impairment beyond what it had been under the previously controlling Supreme Court interpretation of that phrase."[68]

Throughout Leo's residency, CMMC regarded Leo has having an impairment, regardless of whether it believed his impairment met the definition of a disability under the ADA.  Indeed,

---

[64] *Leary v. Dalton*, 58 F.3d 748, 752 (1st Cir. 1995).
[65] *See* 29 U.S.C. § 794(d) (stating that "[t]he standard used to determine whether this section has been violated in a complaint alleging employment discrimination under this section shall be the standards applied under Title I of the [ADA]"),
[66] See 42 U.S.C. § 12102(2)(C); *id.* § 12102(3)(A).
[67] 42 U.S.C. § 12102(2)(C), 12102(3)(A)
[68] *Mercado v. P.R.*, 814 F.3d 581, 589 (1st Cir. 2016).

as far back as November 30, 2012, before Leo was terminated for the first time, Woolever stated to HR representative Lisa Burger "some concerns about [Leo's] mental health and/or substance abuse issues." PSAMF ¶156. Burger responded that "there may be an ADA component that will require us to step more gingerly." *Id*. ¶157. CMMC required Leo to enroll in the Maine Professionals Health Program, which is "substance abuse oriented" and is generally where CMMC sends "impaired" physicians who are "in trouble of some sort, whether it was a DUI, et cetera." *Id* ¶172-74. These actions—mentioning the ADA and referring Leo to a counseling program—show that CMMC regarded Leo as impaired before it learned he had bipolar disorder.

After he was diagnosed, Leo and Dr. Boyack regularly informed CMMC that he was experiencing symptoms of bipolar disorder that were impairing his functioning. Dr. Boyack repeatedly expressed concerns to CMMC about how overnight shifts were exacerbating Leo's symptoms of hypomania and depression, and explained to Dr. Picker that Leo's negative behavior could be symptoms of hypomania. PSAMF ¶¶230, 246, 249-250. Moreover, Leo himself told CMMC that he had missed a day of work because he was struggling with severe depression caused by his bipolar disorder. PSMF ¶¶200-203. In the face of this evidence, it is untenable for CMMC to argue that it is undisputed that it did not "regard Plaintiff as disabled or as having a disability" at any "time before during or after Plaintiff's residency" and that it "believed Plaintiff was capable of working overnight shifts and was tolerating such shifts well."

Second, Leo was capable of performing the essential functions of his job with an accommodation. For the reasons discussed above, working overnight shifts was not an essential function of Leo's residency. Moreover, to the extent that CMMC argues that Leo could not perform other essential functions of the residency, a juror could conclude that any performance issues Leo had were directly related to symptoms of his bipolar disorder, which in turn were

exacerbated by CMMC's illegal refusal to accommodate Leo regarding overnight shifts. PSAMF ¶249-50.[69]  Even in Picker's own assessment, Leo was performing satisfactorily in all areas after his return from leave in March 2013, and it was only after CMMC required him to resume night call (and repeat the 8 months of already completed call) that Dr. Picker reported he was no longer performing satisfactorily in "thought processes and interpersonal relations"—areas directly affected by his bipolar disorder.[70] *Id*. ¶213-14, 227-28.  And when Dr. Picker spoke to Dr. Boyack shortly before CMMC placed Leo on probation in November 2013, Dr. Boyack reiterated that behaviors flagged by Picker as performance issues were "residual hypomanic symptoms and not necessarily his base behavior" and that these hypomanic symptoms were likely triggered by sleep deprivation. *Id* ¶249-50.  Based on this evidence, a reasonable juror could conclude that, had Leo been given the reasonable scheduling accommodations he requested, his hypomanic symptoms could have been successfully treated and he would have been able to perform the essential functions of his job.

Third, Leo has produced evidence that he was terminated because of his disability. Indeed, he has made that showing even assuming that CMMC's stated rationale for Leo's termination is true (which Plaintiff vigorously disputes). As the First Circuit explained in *Ward*, if an employee is fired because of a performance problem that "flows directly from" his disability, he has been fired because of his disability. *Ward v. Mass. Health Research Inst., Inc.,*

---

[69] As Dr. Boyack explained, "sleep deprivation absolutely can trigger and contribute to symptoms of bipolar disorder, both hypomania and depression" and "lack of sleep – is considered a serious warning sign that you could be then getting into a worse state."  PSAMF ¶¶181, 185. When CMMC asked Leo to begin working night shifts again, Dr. Boyack informed Dr. Palmer that "lack of sleep is very risky for [Leo] or anyone with bipolar disorder, in terms of developing mood symptoms again." *Id*. ¶212. After Leo resumed working night shifts, Dr. Boyack contacted Dr. Palmer again to express concern that night shifts "stimulate[] his bipolar," and Dr. Boyack's own notes from the time reflect her concern "regarding sleep deprivation on call and night float," which was "based on a history where a previous episode of night float, [Leo] literally did not sleep all week, not one hour of sleep in a week." *Id*. ¶¶230, 242.

[70] Dr. Boyack testified that a "distorted view of how you are perceived by others" can be a symptom of hypomania, and that symptoms of hypomania "can cause an employee to be disliked by coworkers." PSAMF ¶¶187-88.

209 F.3d 29, 38 (1st Cir. 2000) (reversing summary judgment for employer on the causation prong when the employee was fired for tardiness that was a direct result of his difficulty moving due to severe arthritis). As in *Ward*, CMMC's stated reason for Leo's termination—deficient performance—flowed directly from symptoms of his bipolar disorder that made it difficult for him to interact with others and to get sufficient sleep.[71] As detailed above, Leo's psychiatrist informed CMMC that what many of what his supervisors viewed as performance issues were actually symptoms of his bipolar disorder, which could be controlled through treatment and reasonable accommodations including removal from overnight call, which he could make up for by working weekends.

Moreover, statements by Leo's supervisors demonstrate overt hostility toward his disability. When Leo sent an email to the residency faculty in December 2012 explaining that he was experiencing a mental health crisis and asking for the opportunity to take medical leave instead of being terminated, Picker emailed Woolever, "I agree with you, Raj, that it seems this card has only been played because the consequences are so immediate and dire." PSAMF ¶170 . Picker again relied on this negative stereotype that Leo was only playing a disability "card" to avoid consequences in November 2013, when she told Leo: "You can't have it both ways Leo, you can't have 'I want to be treated like a normal resident, treat me like a normal resident.' And then when it hits the fan, you pull it up.'" *Id*. ¶258. Woolever was even blunter in his expression of animus toward Leo's disability, telling Leo when he took a sick day because of particularly severe depressive symptoms that he questioned his integrity and professionalism. *Id*. ¶202.

---

[71] In *Ward*, the plaintiff received written warnings and negative performance evaluations based on his tardiness before his employer was made aware of his arthritis or his need for an accommodation. The plaintiff even falsified a timesheet entry after arriving late. 209 F.3d at 31-32. Nonetheless, the First Circuit held that, because his behavior "directly flowed" from his disability, he was entitled to have his discrimination claim heard by a jury. *Id.*

CMMC argues that Leo cannot show causation because, after it found out about his disability in 2012, it initially accommodated his request for leave and then terminated him in 2014 only after he had continued performance problems. But Leo's disclosure of his disability to CMMC triggered a series of adverse actions that culminated in his termination. Although Defendant claims it accommodated Leo's initial leave request, CMMC in fact terminated his employment and then placed him on a disciplinary suspension. Upon his return from leave, CMMC hobbled him at every turn, making him repeat overnight shifts he had already worked—despite numerous warnings from his doctor that his disability would get worse if he worked those shifts—and discouraging or outright prohibiting him from making scheduling changes or taking time off to deal with his symptoms.[72] Only after setting Leo up to fail did CMMC terminate him for alleged deficient performance.[73]

      <u>Fourth</u>, for the reasons described above, a reasonable juror could conclude that CMMC's stated reason for firing Leo—performance deficiencies—was pretextual and that CMMC was in fact motivated solely by Leo's disability.

## IV. There Are Genuine Issues of Material Fact as to Whether CMMC Violated the Federal and State Family Medical Leave Acts.

A reasonable juror could easily conclude that CMMC retaliated against Leo for exercising his right to request and take leave under the federal and state Family Medical Leave Acts and interfered with his exercise of those rights, including by engaging in a campaign of escalating retaliatory conduct for more than a year and obstructing and penalizing Leo for taking protected leave. As detailed above, Leo repeatedly engaged in protected conduct under the

---

[73] Moreover, a lack of temporal proximity "is not dispositive" of a plaintiff's prima facie case of causation at the summary judgment stage, particularly i , as here, there is other evidence of causation such as evidence of statements by decision makers suggesting discriminatory animus. *Williams v. URS Corp.*, 124 F. App'x 97, 101 (3d Cir. 2005) (stating that "an employer's refusal to properly support an employee can be tantamount to setting the employee up to fail, and thus may support an inference of discriminatory animus").

FMLA by requesting medical leave, and his requests were met with denials, hostility, threats, unwarranted discipline, and eventual termination.

### V.    The Jury Could Readily Conclude that CMMC Acted with Reckless Indifference and Thus Defendant is Not Entitled to Summary Judgment on Plaintiff's Punitive Damages Claims under the ADA and the MHRA.

Under the ADA, punitive damages are available merely upon a showing of "reckless indifference" to Leo's civil rights, without any need to prove "egregious" misconduct or actual malice.[74] Similarly, the MHRA "permits an award of punitive damages on proof of conduct found to be less than malicious, i.e., if a defendant acted with reckless indifference."[75] The "reckless indifference" standard "is not demanding" and does not require "evil motive or intent."[76]

### VI.    Plaintiff's Claims are Not Time-Barred and the Statute of Limitations is Six Years Under the Rehabilitation Act.

CMMC incorrectly asserts that "Plaintiff's discrimination and retaliation claims are subject to a 300-day time limit."[77] To the contrary, this Court has squarely held that a plaintiff is not required to exhaust administrative remedies for Section 504 Rehabilitation Act claims, but need only file the claim in court within the six-year statute of limitations.[78] Leo filed his court

---

[74] *Kolstad v. American Dental Ass'n*, 527 U.S. 526 (1999); *see also McDonough v. City of Quincy*, 452 F.2d 8. (1st Cir. 2006) (jury could award punitive damages because "the extent of federal statutory and constitutional law preventing discrimination . . . suggests that defendants had to know that such discrimination was illegal.").

[75] *Batchelder v. Realty Res. Hospitality, LLC*, 2007 ME 17, ¶22.

[76] *EEOC v. DCP Midstream, L.P.*, 603 F. Supp. 2d 220, 222 (D. Me. 2009).

[77] Def's Mtn at 22.

[78] See, e.g., *Klane v. Mayhew*, No. 1:12-cv-00203-NT, 2013 U.S. Dist. LEXIS 42053, *8 (D. Me. Mar. 26, 2013) ("Neither the ADA nor the Rehabilitation Act provides a statute of limitations for discrimination claims, so the Court applies Maine's six-year statute of limitations for civil actions."); *Richards v. City of Bangor*, 878 F. Supp. 2d 271, 278 (D. Me. May 25, 2012) (Recommended Decision), *aff'd by*, (D. Me., June 28, 2012) (holding that Maine's six-year statute of limitations for personal injury actions applies to the Rehabilitation Act); *Willinghan v. Town of Stonington*, 741 F. Supp. 2d 331, 335 (D. Me. 2010) (holding that plaintiff need not exhaust administrative remedies under the Rehabilitation Act).

complaint on March 7, 2017,[79] and thus all adverse actions dating back to March 7, 2011 are timely, including all of the alleged denials of reasonable accommodations beginning in 2012.

Although CMMC is correct that claims based on discrete adverse actions that occurred more than 300 days before his MHRC complaint was filed (such as the December 2012 termination) are time-barred under the MHRA and ADA, this evidence of past discriminatory acts is "still relevant and probative as to whether the later discrimination took place" under those statutes.[80]

## Conclusion

In the end, as the Court cautioned at our 56(h) conference, this is a "gigantic motion," and the resources spent on it likely would be better spent focusing on mediation or trial.[81]

Date:  December 6, 2018                    Respectfully submitted,

/s/David G. Webbert
David G. Webbert, Esq.
Carol J. Garvan, Esq.
Johnson, Webbert & Young, LLP
160 Capitol Street, P.O. Box 79
Augusta, Maine 04332-0079
Tel: 207-623-5110
dwebbert@work.law
cjgarvan@work.law

*Attorneys for Plaintiff*

---

[79] ECF No. 1, Ex. A.
[80] *O'Rourke v. City of Providence*, 235 F.3d 713, 726 (1st Cir. 2001) (citing *United Air Lines, Inc. v. Evans*, 431 U.S. 553, 558 (1977)); *see also, e.g., Crowley v. L.L. Bean, Inc.*, 143 F.Supp.2d 38, 55 n.20 (holding that even if past discriminatory acts were time barred and record did not support continuing violation, the past acts "would clearly be relevant to demonstrate important context for the later allegedly discriminatory behavior" and to show a "pattern of behavior").
[81] Transcript of 56(h) conference p. 22

**Certificate of Service**

      I hereby certify that on December 6, 2018 I electronically filed this filing with the Clerk of Court using the CM/ECF system which will send notification of such filing(s) to all counsel of record.


Date:   December 6, 2018           /s/David G. Webbert_____
                                           Johnson, Webbert & Young, LLP
                                         160 Capitol Street, P.O. Box 79
                                         Augusta, Maine 04332-0079
                                         Tel: 207-623-5110
                                         dwebbert@work.law