## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | | |
|---|---|---|
| *LEO S. PARASKEVOPOULOS,* | ) | |
| | ) | |
| *Plaintiff* | ) | |
| | ) | |
| *v.* | ) | *No. 2:17-cv-00166-JAW* |
| | ) | |
| *CENTRAL MAINE MEDICAL CENTER,* | ) | |
| | ) | |
| *Defendant* | ) | |

## RECOMMENDED DECISION ON DEFENDANT'S MOTION
## FOR PARTIAL SUMMARY JUDGMENT

In this employment discrimination action, defendant Central Maine Medical Center ("CMMC" or the "defendant") moves for summary judgment as to all claims in Count I of plaintiff Leo Paraskevopoulos's two-count complaint, namely, claims of disability discrimination, failure to accommodate, and retaliation in violation of the Maine Human Rights Act ("MHRA"), 5 M.R.S.A. § 4551 *et seq.*, the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, and Section 504 of the Rehabilitation Act ("Rehabilitation Act"), 29 U.S.C. § 701 *et seq.*, and interference with and retaliation for leave taken pursuant to the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.*, and the Maine Family Medical Leave Requirements law ("MFMLR") 26 M.R.S.A. § 844.  *See* Defendant's Partial Motion for Summary Judgment ("Motion") (ECF No. 69) at 1-2; Second Amended Complaint (ECF No. 10) ¶ 122.  The defendant also seeks summary judgment with respect to any punitive damages requested in connection with those claims.  *See* Motion at 1-2.  The plaintiff has filed a cross-motion for partial summary judgment on an unrelated theory, *see generally* ECF No. 66, which is the subject of a separate recommended decision.

In the main, the defendant argues that, after duly accommodating the plaintiff's disability,

it terminated him because of his poor performance.  The plaintiff counters that he was fired because of his disability, either because he sought accommodations for it, or because his unaccommodated disability produced the poor performance cited by the defendant.  Because the parties dispute genuine issues of material fact, I recommend that the court deny the Motion, except to the limited extent that it is conceded by the plaintiff.[1]  Specifically, I recommend that the court grant the defendant's motion for partial summary judgment with respect to (i) the plaintiff's MHRA and ADA claims based on discrete adverse actions that occurred more than 300 days before his MHRC complaint was filed and (ii) any requested punitive damages pursuant to his Rehabilitation Act, FMLA, and MFMLR claims, and otherwise deny it.

## I. Applicable Legal Standards

## A. Federal Rule of Civil Procedure 56

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Ahmed v. Johnson*, 752 F.3d 490, 495 (1st Cir. 2014).  "A dispute is genuine if 'the evidence about the fact is such that a reasonable jury could resolve the point in favor of the non-moving party.'"  *Johnson v. Univ. of P.R.*, 714 F.3d 48, 52 (1st Cir. 2013) (quoting *Thompson v. Coca-Cola Co.*, 522 F.3d 168, 175 (1st Cir. 2008)).  "A fact is material if it has the potential of determining the outcome of the litigation."  *Id.* (quoting *Maymi v. P.R. Ports Auth.*, 515 F.3d 20, 25 (1st Cir. 2008)).

---

[1] The plaintiff concedes that claims based on discrete adverse actions occurring more than 300 days before he filed his Maine Human Rights Commission ("MHRC") complaint are time-barred pursuant to the ADA and the MHRA, although that evidence remains relevant as to whether later discrimination took place.  *See* Plaintiff's Objection to Defendant['s] Motion for Partial Summary Judgment ("Opposition") (ECF No. 75) at 30.  In addition, he does not contest the defendant's entitlement to summary judgment as to any punitive damages sought pursuant the Rehabilitation Act, the FMLA, and the MFMLR, although he continues to press his request for punitive damages pursuant to the ADA and the MHRA.  *Compare* Motion at 22 *with* Opposition at 29.

The party moving for summary judgment must demonstrate an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). In determining whether this burden is met, the court must view the record in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences in its favor. *Johnson,* 714 F.3d at 52. Once the moving party has made a preliminary showing that no genuine issue of material fact exists, the nonmovant must "produce specific facts, in suitable evidentiary form, to establish the presence of a trialworthy issue." *Brooks v. AIG SunAmerica Life Assur. Co.*, 480 F.3d 579, 586 (1st Cir. 2007) (quoting *Clifford v. Barnhart,* 449 F.3d 276, 280 (1st Cir. 2006) (emphasis omitted)); Fed. R. Civ. P. 56(c). "As to any essential factual element of its claim on which the nonmovant would bear the burden of proof at trial, its failure to come forward with sufficient evidence to generate a trialworthy issue warrants summary judgment to the moving party." *In re Spigel*, 260 F.3d 27, 31 (1st Cir. 2001) (citation and internal punctuation omitted).

"This framework is not altered by the presence of cross-motions for summary judgment." *Cochran v. Quest Software, Inc.,* 328 F.3d 1, 6 (1st Cir. 2003). "[T]he court must mull each motion separately, drawing inferences against each movant in turn." *Id.* (citation omitted); *see also, e.g., Wightman v. Springfield Terminal Ry. Co.,* 100 F.3d 228, 230 (1st Cir. 1996) ("Cross motions for summary judgment neither alter the basic Rule 56 standard, nor warrant the grant of summary judgment *per se.* Cross motions simply require us to determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed. As always, we resolve all factual disputes and any competing, rational inferences in the light most favorable to the [nonmovant].") (citations omitted).

**B. Local Rule 56**

The evidence that the court may consider in deciding whether genuine issues of material fact exist for purposes of summary judgment is circumscribed by the local rules of this district. *See* Loc. R. 56. The moving party must first file a statement of material facts that it claims are not in dispute. *See* Loc. R. 56(b). Each fact must be set forth in a numbered paragraph and supported by a specific record citation. *See id.* The nonmoving party must then submit a responsive "separate, short, and concise" statement of material facts in which it must "admit, deny or qualify the facts by reference to each numbered paragraph of the moving party's statement of material facts[.]" Loc. R. 56(c). The nonmovant likewise must support each denial or qualification with an appropriate record citation. *See id.* The nonmoving party may also submit its own additional statement of material facts that it contends are not in dispute, each supported by a specific record citation. *See id.* The movant then must respond to the nonmoving party's statement of additional facts, if any, by way of a reply statement of material facts in which it must "admit, deny or qualify such additional facts by reference to the numbered paragraphs" of the nonmovant's statement. *See* Loc. R. 56(d). Again, each denial or qualification must be supported by an appropriate record citation. *See id.*

Local Rule 56 directs that "[f]acts contained in a supporting or opposing statement of material facts, if supported by record citations as required by this rule, shall be deemed admitted unless properly controverted." Loc. R. 56(f). In addition, "[t]he court may disregard any statement of fact not supported by a specific citation to record material properly considered on summary judgment" and has "no independent duty to search or consider any part of the record not specifically referenced in the parties' separate statement of fact." *Id.*; *see also, e.g., Borges ex rel. S.M.B.W. v. Serrano-Isern*, 605 F.3d 1, 5 (1st Cir. 2010); Fed. R. Civ. P. 56(e)(2) ("If a party fails

to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion[.]").

## II. Factual Background

The parties' statements of material facts, credited to the extent that they are either admitted or supported by record citations in accordance with Local Rule 56, with disputes resolved in favor of the plaintiff as the nonmovant, reveal the following.[2]

Between July 2011 and January 2014, the plaintiff was a medical resident enrolled in the defendant's three-year family medicine residency, which is accredited by the American Council for Graduate Medical Education ("ACGME"). Defendant's Statement of Material Facts with Opposing Statement ("Defendant's Consolidated SMF"), commencing at page 1 of Parties' Consolidated Statement of Material Facts (Defendant's Motion for Summary Judgment) ("Parties' Consolidated SMF") (ECF No. 86), ¶¶ 1, 4, 14; Plaintiff's Statement of Additional Facts with Defendant's Reply Statement ("Plaintiff's Consolidated SMF"), commencing at page 128 of Parties' Consolidated SMF, ¶ 278.[3] The defendant's residency program was headed by Dr. Donald Woolever, who has served as the director since 2009. *Id.* ¶ 8.

In December 2011, the plaintiff was treated for depression. *Id.* ¶ 150. In February 2012, he received a letter from Dr. Deborah Taylor, the program's associate director, citing two instances of tardiness. *Id.* ¶¶ 15-16. In July 2012, the plaintiff met with Dr. Taylor, told her he was "feeling

---

[2] Statements that are qualified are assumed to be admitted subject to that qualification, unless a qualification indicates otherwise. To the extent that I have incorporated one side's qualification into the statement of the other, I have determined that the qualification is supported by the record citation(s) given. I have omitted qualifications that are unsupported by the citation(s) given or are redundant. To the extent that I have taken into consideration a denial of a statement, I have determined that the denial is supported by the citation(s) given.

[3] The parties maintain sequential paragraph numbering in their Consolidated SMF. For ease of reference, I henceforth refer only to the Parties' Consolidated SMF; however, I note that all paragraphs commencing with paragraph 122 are from the Plaintiff's Consolidated SMF.

fatigued, depressed[,] and mentally unwell," and asked if he should request a medical leave of absence to seek treatment. *Id.* ¶¶ 151-52. Dr. Taylor advised the plaintiff not to seek a leave of absence but instead to seek counseling, providing him the contact information for the defendant's "Employee Assistance Program." *Id.* ¶¶ 29, 152. Later that month, the plaintiff received a memorandum of understanding placing him on probation for an initial term of six months and outlining the terms of his probation. *Id.* ¶¶ 18-19.[4] In November 2012, the plaintiff received feedback, both positive and negative, from Dr. Stephanie Youd, his advisor. *Id.* ¶¶ 21-22, 154-55. She informed the plaintiff that there would be a meeting with Dr. Woolever on December 7, 2012. *Id.* ¶ 22.

On December 4, 2012, Drs. Woolever, Youd, and Dieter Kreckel, one of the plaintiff's supervising attending physicians, met to discuss the plaintiff's record and whether he should continue in the program. *Id.* ¶¶ 23-24. On December 6, the plaintiff sent an email to Dr. Youd stating, in part, "I have complained of feelings of anxiety, depression, getting distracted by environmental triggers and fatigue during the last year and a half . . . . I think a medical mental health evaluation would be beneficial because I can certainly say I'm intrinsically motivated and want to improve, I feel frustrated when I'm not improving at the rate expected." *Id.* ¶ 160.

On December 7, 2012, the plaintiff met with Drs. Woolever, Youd, and Kreckel as well as Lisa Burger, a representative of the defendant's human resources department. *Id.* ¶¶ 31, 161. The plaintiff was given a choice between resignation and termination, after which he explained that he had emailed Dr. Youd the previous day concerning his need for time off to seek a medical evaluation. *Id.* ¶¶ 32-33, 162-163. Prior to this, Dr. Woolever had been unaware of the plaintiff's

---

[4] Paragraph 18 mistakenly states that the plaintiff received the memorandum in July 2013 rather than July 2012. Parties' Consolidated SMF ¶ 18. I have corrected that typographical error.

communication to Dr. Youd. *Id.* ¶¶ 34, 164. Dr. Woolever gave the plaintiff until December 10 to decide whether to resign or be terminated. *Id.* ¶ 166.

Following the meeting, Dr. Woolever emailed the residency faculty that the plaintiff was choosing between resignation or termination, and Ms. Burger prepared a termination notice. *Id.* ¶¶ 167-68. On December 9, 2012, the plaintiff sent an email to the residency faculty in which he shared his desire for medical leave. *Id.* ¶ 169. Following the plaintiff's email to faculty, Dr. Bethany Picker, a member of the faculty who became the plaintiff's academic advisor in March 2013, emailed Dr. Woolever to say, "I agree with you, [Dr. Woolever], that it seems this card has only been played because the consequences are so immediate and dire." *Id.* ¶¶ 42, 170.

On December 10, 2012, the plaintiff was informed that his termination had been revoked and that he would be permitted to take a medical leave that also was to be characterized as a disciplinary suspension. *Id.* ¶¶ 37, 171. When the plaintiff went out on leave in December 2012, Dr. Woolever required him to enroll in the Maine Professionals Health Program ("MPHP"), which is "very substance abuse oriented." *Id.* ¶ 172. The plaintiff met with MPHP representative Dr. Margaret Palmer, a psychologist who generally works with "impaired" physicians and focuses on substance abuse problems. *Id.* ¶¶ 39, 41, 173-74. Dr. Palmer referred him to a psychiatrist, Dr. Cindy Boyack. *Id.* ¶ 173.

In December 2012, Dr. Boyack diagnosed the plaintiff with bipolar disorder. *Id.* ¶ 38. Sleep deprivation is among the factors that can trigger the plaintiff's bipolar symptoms. *Id.* ¶¶ 112, 178, 181. However, the defendant requires its family medicine residents to complete overnight shifts and has never made an exception to that requirement. *Id.* ¶¶ 57, 179-80.[5] The plaintiff

---

[5] The defendant's residency program involves two kinds of overnight shifts: 28-hour "call shifts" and "night floats," which are 14-hour overnight shifts for five nights in a row. Parties' Consolidated SMF ¶ 58.

exhibited symptoms of bipolar disorder that Dr. Boyack believed were exacerbated by working overnight shifts. *Id.* ¶¶ 181-85, 187-89.

In February 2013, Dr. Boyack contacted Dr. Palmer to inquire if the defendant could be "flexible" with the plaintiff regarding overnight shifts and advised a "gradual" return to work, but internally, Drs. Woolever and Palmer expressed skepticism about whether the program could accommodate the plaintiff on a part-time basis. *Id.* ¶¶ 44, 190-92. While the plaintiff told Dr. Woolever he was able to return to work on or shortly after February 23, 2019, Dr. Woolever delayed his return to work to March 18, 2013, at which point the plaintiff had been out of work for more than three months. *Id.* ¶¶ 194-96.

In April 2013, there was a dispute between the plaintiff and Dr. Woolever over the plaintiff's one-day absence from work due to depression symptoms. *See id.* ¶¶ 48, 200-06. On April 23, 2013, the plaintiff was called into a meeting with Dr. Woolever, who informed him that his use of one sick day for his bipolar disorder and his email to another individual, Kim Elliot, suggesting a schedule change had caused Dr. Woolever to question his integrity, professionalism, and readiness to function as a normal full-time resident. *Id.* ¶¶ 201-02. The plaintiff asked Dr. Woolever if he would be allowed to use accrued sick leave to take intermittent leave for bipolar symptoms such as unusually deep depression. *Id*. ¶ 203. Dr. Woolever responded that he was concerned about the fact that the plaintiff had called out sick one day that week because of depression symptoms of his bipolar disorder. *Id*. The plaintiff told Dr. Woolever he felt that he was providing him with a negative consequence for calling out sick due to symptoms of his disease, whereupon Dr. Woolever stated, "it sounds like you are threatening me, if you go there things will end up very badly for you." *Id.* ¶ 204. Thereafter, the plaintiff took approximately three other

sick days and several vacation days in December 2013 to study for the U.S. Medical Licensing Step III examination, a full two-day licensing exam. *Id.* ¶¶ 49, 265.

On April 26, 2013, the plaintiff met with Dr. Picker, who informed him that the defendant was going to increase his workload to full time, including overnight shifts. *Id.* ¶ 207. The plaintiff "mentioned the ADA and how it is on the front of the resident handbook" and "mentioned that he feels that if his hours get pushed and he does not succeed then the answer should be to reduce hours and not end his residency here." *Id.* ¶ 209. In a letter to Dr. Palmer dated April 30, 2013, Dr. Boyack expressed "concerns about the deleterious effects of sleep deprivation" on the plaintiff, stating that "he may well require ongoing accommodations regarding work hours in particular in order to ensure he continues to have a successful recovery[.]" *Id.* ¶ 212.

In May and June of 2013, a time period when the plaintiff was not yet working night shifts, Dr. Picker reported to the MPHP that he was performing satisfactorily in all areas. *Id.* ¶¶ 213-14. As of July 1, 2013, the plaintiff was no longer on probation. *Id.* ¶¶ 50, 216. The next day, Dr. Woolever informed the plaintiff that he would have to repeat the second year of his residency, including all overnight call and night float requirements. *Id.* ¶ 217. The plaintiff asked if he could be credited for the night shifts he had already completed, reiterating his concern that night shifts would trigger his bipolar symptoms, but his request was denied. *Id.* ¶¶ 219-23, 226.

On July 16, 2013, after Dr. Woolever rejected that request, the plaintiff offered to complete two consecutive weeks of night float. *Id.* ¶ 59. The plaintiff wanted to participate fully in the program and did not want Dr. Boyack to prohibit him from working overnight shifts unless it was absolutely necessary to do so. *Id.* ¶¶ 61, 248. The plaintiff informed Kirk Miklavic, one of the defendant's human resources employees, that he and Dr. Woolever had "worked things through." *Id.* ¶ 53.

After returning to night shifts, the plaintiff was rated as performing "unsatisfactorily" in two of three areas. *Id.* ¶¶ 227-28. On August 19, 2013, Dr. Boyack called Dr. Palmer and expressed concern about the plaintiff working overnight because lack of sleep can trigger bipolar symptoms. *Id.* ¶¶ 60, 230. She told Dr. Palmer, who summarized the conversation for others including Dr. Woolever, that Maine Medical Center "has had more than a dozen residents with [bipolar disorder] for whom accommodations around 24 hour call had to be made." *Id.* ¶ 230. On August 20, 2013, Dr. Woolever responded that he had "some concerns about [Dr. Boyack's] call recommendations[,]" noting that "not doing 24 hour call or Night Float . . . does not seem like an equivalent experience to [the plaintiff's] other resident peers." *Id.* ¶ 231. He stated that he did not "see many other alternatives for our program, so I am still feeling reluctant to make that accommodation at this point." *Id.*

As of August 22, 2013, Dr. Boyack's treatment notes reflected a need to monitor the plaintiff closely, "especially regarding sleep deprivation on call and night float," "based on a history where a previous episode of night float, [the plaintiff] literally did not sleep all week, not one hour of sleep in a week." *Id.* ¶ 242.

Between August 2013 and January 2014, the defendant received mixed feedback, some positive and some negative, about the plaintiff's performance. *Id.* ¶¶ 71-76, 86-94, 98-101, 137-42, 146-49, 244-45. For example, in January 2014, the plaintiff failed the Neonatal Resuscitation Program examination for a second time, which was unprecedented for a resident in Dr. Woolever's experience. *Id.* ¶¶ 88-93. However, the plaintiff never failed a rotation during his residency and passed his U.S. Medical Licensing Examination, Step III, in December 2013. *Id.* ¶¶ 138, 142.

On November 14, 2013, the plaintiff met with Dr. Woolever and was informed that he was going to be placed back on probation, with a more formal meeting scheduled for November 18,

2013. *Id.* ¶ 77. The following day, Dr. Boyack called Dr. Picker, again expressing concern about the plaintiff's overnight shifts and their effect on his bipolar disorder and his behavior. *Id.* ¶¶ 246-47, 249-51. Dr. Boyack shared with Dr. Picker that she was "considering pulling [the plaintiff] from call and wanted to know how that would be received." *Id.* ¶ 253. Dr. Picker told her that she did not think it would be "received well." *Id.*

During the plaintiff's November 18, 2013, meeting with Drs. Woolever and Picker, he told Dr. Woolever he wanted to give him a print-off "explicitly explaining problems I've had with my disability." *Id.* ¶ 255. Dr. Woolever refused to take the piece of paper or to let the plaintiff read it. *Id.* That day, the defendant placed the plaintiff back on probation pursuant to terms including a provision that "no schedule change requests will be granted" during the probationary period. *Id.* ¶ 262.

The defendant admits that it would not have been a hardship to excuse the plaintiff from performing night float shifts or 28-hour call shifts in 2013, that 28-hour shifts are not a requirement of the defendant's accrediting body, and that not all family medicine physicians are required to handle overnight call as part of their job duties. *Id.* ¶¶ 266-68, 273.

On January 21, 2014, the plaintiff was unexpectedly called into a meeting with Drs. Woolever and Picker and Mr. Miklavic. *Id.* ¶¶ 103, 278. Dr. Woolever informed him that he was being terminated from the program. *Id.* ¶ 104. The plaintiff asked for scheduling accommodations or a leave of absence, but Dr. Woolever told him that was not an option. *Id.* ¶ 279. Dr. Woolever initially stated that the plaintiff would not be given the option of resigning because he had not previously availed himself of it; however, the plaintiff ultimately was provided that option and resigned. *Id.* ¶¶ 280-81.

Following the plaintiff's resignation, Dr. Woolever wrote the plaintiff a letter of recommendation. *Id.* ¶ 108. In February 2016, after the plaintiff filed a complaint with the MHRC and the Equal Employment Opportunity Commission, the program director of a residency program for which the plaintiff had applied contacted Dr. Woolever for an employment reference, seeking more detail on the plaintiff's difficulties in the program that had been referenced in the letter. *Id.* ¶¶ 109, 282. Dr. Woolever refused to speak with her, and CMMC informed her that it could not release any more information than was contained in the letter and that she should contact its lawyers for more information. *Id.* ¶¶ 282-83. Dr. Woolever issued another letter providing such details after the plaintiff agreed to sign a waiver releasing any claims he might have against CMMC based on that letter. *Id.* ¶¶ 109-110, 283.

## III. Discussion

### A. Disability-Related Claims

The defendant first seeks summary judgment as to all of the plaintiff's disability-related claims, that is, his claims for disability discrimination, failure to accommodate his disability, and retaliation in violation of the ADA, MHRA, and Rehabilitation Act. *See* Motion at 5-19. In the alternative, the defendant argues that the plaintiff's discrimination and retaliation claims are time-barred to the extent that the conduct at issue predates January 20, 2014. *See id*. at 22-23. For the reasons that follow, I recommend that the court deny the defendant's motion for summary judgment as to this set of claims except to the extent that the plaintiff concedes that claims based on discrete adverse actions occurring more than 300 days before he filed his MHRC complaint are time-barred pursuant to the ADA and the MHRA. *See* Opposition at 30.

"The ADA, broadly speaking, makes it illegal for employers either to discriminate because of a person's disability, or to retaliate against someone because [he or] she opposes an act made unlawful by the ADA." *Collazo-Rosado v. Univ. of P.R.*, 765 F.3d 86, 92 (1st Cir. 2014) (citations

omitted). "Claims of discrimination under the ADA can take one of four forms: intentional discrimination (or "disparate treatment"), disparate impact, hostile work environment, and failure to accommodate." *Floyd v. Lee*, 968 F. Supp. 2d 308, 315 (D.D.C. 2013) (citations and footnote omitted). "An ADA plaintiff may assert a claim for retaliation even if [he or] she fails to succeed on a disability claim." *Freadman v. Metropolitan Prop. & Cas. Ins. Co.*, 484 F.3d 91, 106 (1st Cir. 2007). In this case, the plaintiff presses claims for both intentional discrimination (disparate treatment) and failure to accommodate, as well as a claim that the defendant retaliated against him for opposing disability discrimination.

"Courts construe and apply the MHRA along the same contours as the ADA." *Brown v. Bank of Am., N.A.*, 5 F. Supp. 3d 121, 137 (D. Me. 2014) (citation and internal quotation marks omitted). While, as discussed below, the parties disagree on whether the ADA causation standard diverges from that of the Rehabilitation Act, the Rehabilitation Act also "is interpreted substantially identically to the ADA." *Katz v. City Metal Co.*, 87 F.3d 26, 31 n.4 (1st Cir. 1996).

### 1. Claim of Disability Discrimination

"To satisfy the requirements of a prima facie case of disparate treatment, a plaintiff must establish that (1) [he or] she suffers from a disability or handicap, as defined by the ADA; (2) [he or] she was nevertheless able to perform the essential functions of [his or] her job, either with or without reasonable accommodation; and (3) the defendant took an adverse employment action against [him or] her because of, in whole or in part, [his or] her protected disability." *Freadman*, 484 F.3d at 99 n.7.[6]

---

[6] The parties dispute whether the Rehabilitation Act imposes a higher causation standard than the ADA. *See* Motion at 11-12; Opposition at 23-24; Defendant's Reply to Plaintiff's Objection to Defendant's Motion for Partial Summary Judgment ("Reply") (ECF No. 79) at 3-5. The defendant argues that, for purposes of the Rehabilitation Act, the plaintiff is required to show that his disability was the "sole reason" for his termination. Motion at 11-12; Reply at 3-5. The plaintiff asserts that this is an "open question" in the First Circuit but argues that, even if the higher standard applies, he meets it. Opposition at 23-24 (quoting *Leary v. Dalton*, 58 F.3d 748, 752 (1st Cir. 1995)). For the reasons

A plaintiff may prove his or her case "by presenting direct evidence of discrimination" or "indirectly by using the *prima facie* case and burden shifting methods that originated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)." *Ramos-Echevarría v. Pichis, Inc*., 659 F.3d 182, 186 (1st Cir. 2011) (citation and internal quotation marks omitted).

Direct evidence is "'a smoking gun' showing that the decision-maker *relied upon* a protected characteristic in taking an employment action." *PowerComm, LLC v. Holyoke Gas & Elec. Dep't*, 657 F.3d 31, 35 (1st Cir.), *reh'g denied*, 662 F.3d 41 (1st Cir. 2011) (emphasis in original). In the absence of such evidence, pursuant to the *McDonnell Douglas* burden-shifting approach:

> If the plaintiff is able to make out the three prima facie elements, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for its employment decision and to support that reason with credible evidence. If the defendant is able to provide such a reason, the burden shifts back to the plaintiff to establish that the defendant's proffered reason is simply pretext designed to cover up discrimination against the plaintiff. Ultimately, the burden of proving unlawful discrimination rests with the plaintiff.

*Kirouac v. Donahoe*, No. 2:11-cv-00423-JAW, 2013 WL 2638045, at *20 (D. Me. June 12, 2013) (citations omitted). "The employer's burden of articulating a non-discriminatory reason is only a burden of production, not a burden of persuasion; the burden of proving unlawful discrimination rests with the plaintiff at all times." *Freadman*, 484 F.3d at 99.

A plaintiff need not, as a matter of law, "produce additional evidence beyond that which establishe[s] pretext": "once a factfinder is satisfied that an employer's reasons for taking an adverse action are pretextual, it may find for the plaintiff on causation without further evidence." *Richard v. Reg'l Sch. Unit 57*, 901 F.3d 52, 58 (1st Cir. 2018) (emphasis in original). However, a

---

discussed below, I agree that, on the record construed most favorably to the plaintiff, a trier of fact could deem his disability the sole reason for his termination. Therefore, I need not and do not reach the question of which standard applies in Rehabilitation Act cases.

"finding of pretext d[oes] not guarantee [the plaintiff] a win[.]"  *Id.*  A plaintiff "needs to show that the proffered reason is pretextual <u>and that retaliation [or discrimination] was the true reason.</u>" *Id.* (citation and internal quotation marks omitted) (emphasis in original).

### a. Plaintiff's *Prima Facie* Case

The defendant first argues that summary judgment is warranted because the plaintiff cannot meet any of the elements of a *prima facie* case of discrimination.  *See* Motion at 6-11.

Turning to the first element, as the defendant notes, *see* Motion at 7, the ADA defines disability, in relevant part, as "(A) a physical or mental impairment that substantially limits one or more major life activities of [an] individual" or "(C) being regarded as having such an impairment[,]" 42 U.S.C. § 12102(1).  The defendant argues that the plaintiff's condition does not meet the ADA's definition of disability because (i) a diagnosis of bipolar disorder "does not automatically make him disabled under federal law[,]" (ii) the plaintiff has presented no evidence "that he was substantially limited in the performance of a major life activity or that he was regarded as being so limited[,]" and (iii) there is no evidence that the defendant did regard him "as disabled or as having a disability."  Motion at 7-8.[7]

The plaintiff counters that, in so arguing, the defendant relies on caselaw predating the 2008 amendment of the ADA, which broadened the definition of disability.  *See* Opposition at 7. The plaintiff is correct.  *See* 42 U.S.C. § 12102(4) ("The term 'substantially limits' shall be interpreted consistently with the findings and purposes of the ADA Amendments Act of 2008."). Moreover, the record reflects that the plaintiff experienced symptoms of "insomnia, deep pain, depression, and an inability to eat[,]" Opposition at 7 (citing Parties' Consolidated SMF ¶¶ 183-84), which, at the least, implicate "eating" and "sleeping," both of which the ADA defines as

---

[7] The defendant concedes that bipolar disorder meets the definition of disability under the MHRA.  *See* Motion at 7 n.1.  Indeed, bipolar disorder is specifically enumerated in the MHRA.  *See* 5 M.R.S.A. § 4553-A(1)(B).

"major life activities[,]" 42 U.S.C. § 12102(2)(A). While the defendant argues that the plaintiff

lacks evidence of substantial limitation, *see* Motion at 7, a reasonable juror could find, for instance,

that an inability to sleep for a week constitutes a substantial limitation in the major life activity of

sleeping, *see* Opposition at 7 n.17 (citing Parties' Consolidated SMF ¶ 242).

A reasonable juror also could infer from the undisputed facts alone that the defendant

regarded the plaintiff as having an impairment. Most notably, the defendant required the plaintiff

to enroll in the MPHP, which it had previously used when it "had an impaired physician or a

physician who was in trouble of some sort." Parties' Consolidated SMF ¶¶ 172, 174. In so doing,

the defendant also effectively referred the plaintiff to a mental health professional, Dr. Palmer,

who in turn referred him to Dr. Boyack. *See id.* ¶¶ 173-74. Finally, both the plaintiff and Dr.

Boyack informed the defendant on multiple occasions that he was impaired. *See id.* ¶¶ 200-01,

203-04, 230, 246, 249-55.

Turning to the second element, the defendant contends that the plaintiff fails to generate a

triable issue that he was able to perform the essential functions of his job. *See* Motion at 8-11,

Reply at 1-3. The core dispute here is whether overnight shifts are an essential function of the

defendant's residency program. *See id.;* Opposition at 8-12. As the defendant notes, *see* Motion

at 8, the First Circuit has defined an essential function of a job as "one that is fundamental to a

position[,]" *Sepúlveda-Vargas v. Caribbean Rests., LLC*, 888 F.3d 549, 553 (1st Cir. 2018)

(citation and internal quotation marks omitted). The defendant cites *Shin v. Univ. of Md. Med. Sys.

Corp.,* 369 F. App'x 472 (4th Cir. 2010), *Zukle v. Regents of Univ. of Cal.*, 166 F.3d 1041, 1047-

48 (9th Cir. 1999), and *Laurin v. Providence Hosp.*, 150 F.3d 52 (1st Cir. 1998), for the proposition

that courts generally defer to the judgment of academic institutions and medical professionals in

determining whether a function is essential. *See* Motion at 8-9. It argues that the court should do

the same here, deferring to its judgment that overnight shifts were essential because (i) the family medicine residency program "has to certify" that its graduates are able to work in "environments that require 24-hour functioning" and, (ii) absent overnight shifts, the plaintiff would "not have had an equivalent experience to his other resident peers[,]" the defendant having made no exceptions to its overnight shift requirement. Motion at 9; *see also* Reply at 1-3.

While the *Shin* and *Laurin* cases are factually similar to this case, all three cases are distinguishable. In both *Shin* and *Zukle,* the court deferred to the defendant's judgment after noting that the plaintiff had failed to present any contrary evidence. *See Shin*, 369 F. App'x at 482 ("Because Dr. Shin provided no evidence to bring this fact into dispute, and we can find none, we defer to the views of Appellees on the standards for professional and academic achievement."); *Zukle*, 166 F.3d at 1050 ("The Medical School presented uncontradicted evidence that giving Zukle reduced clinical time would have fundamentally altered the nature of the Medical School curriculum."). In this case, by contrast, the plaintiff offers evidence that (i) the relevant accrediting body does not require that family medicine residents work 28-hour shifts, suggesting that the defendant did not have to certify that its graduates were able to work in a 24-hour environment, *see* Opposition at 9 & n.22 (citing Parties' Consolidated SMF ¶ 273), and (ii) many family medicine physicians work in settings requiring no overnight shifts, *see id*. at 9 (citing Parties' Consolidated SMF ¶¶ 269-71).

*Shin* is further distinguishable in that it involved an accommodation request that would have prevented the plaintiff, a former medical intern, from meeting the accreditation requirements of the ACGME, a factor that is notably missing here. *Compare Shin*, 369 F. App'x at 478 *with* Parties' Consolidated SMF ¶ 273.

*Laurin* is distinguishable in that, there, the defendant hospital presented uncontradicted evidence, with respect to its denial of the plaintiff nurse's request to be excused from shift-rotation, that "it was essential that the Hospital cover the shortage of 'straight-evening' and 'straight-night' nurses by making shift-rotation an 'essential function' of all non-senior daytime nursing positions in its 24-hour maternity unit." *Laurin*, 150 F.3d at 59. The court observed, "since maternity-room patients need nursing services twenty-four hours a day, normally it will not be possible for the hospital-employer to allow its maternity nurses to work only the more desirable or convenient shifts, where to do so would jeopardize its ability to staff its maternity unit during the less desirable evening and night shifts." *Id.* (footnote omitted). No such difficulty faced the defendant here; on the contrary, both Drs. Woolever and Picker admitted that it would not have caused the defendant any hardship to allow the plaintiff to forgo overnight shifts. *See* Parties' Consolidated SMF ¶¶ 266-68.

Finally, the plaintiff persuasively argues that "insisting on a rigid 'equivalent experience' for all employees . . . undermines the basic premise of disability discrimination law[,]" which requires employers to "make job *modifications* to accommodate an employee's mental or physical limitations." Opposition at 11 (footnote omitted) (emphasis in original). For the defendant to argue that overnight shifts are an essential job function *because* all of its residents must have an "equivalent experience" puts the cart before the horse. Its residents must have an equivalent experience only insofar as they all perform the essential functions of the job.

Accordingly, the plaintiff has shown that there is a triable factual dispute as to whether overnight shifts are an essential function of the plaintiff's residency program.

The defendant also argues that, even if working overnight shifts was not an essential function of the plaintiff's job, his performance in other essential functions was deficient. *See*

Motion at 10-11. However, many of the statements of material facts on which the defendant relies for this point are denied or qualified, or do not speak to the issue of performance deficiencies. *See* Parties' Consolidated SMF ¶¶ 18, 22, 37, 44-45, 75-76, 98-100. Moreover, the plaintiff presents undisputed evidence that he received positive performance reviews, *see id.* ¶¶ 137, 139-49, 155, 213-14, 244-45, as well as evidence that he was performing satisfactorily in May and June 2013 when not required to work overnights, *see id.* ¶¶ 213-14, but performing unsatisfactorily in some respects in July 2013 after he resumed night call, *see id.* ¶¶ 227-28. Resolving this factual issue in favor of the nonmovant, there is a genuine dispute as to the overall quality of the plaintiff's job performance and factors affecting the quality of that performance.

Turning to the third and final element of the plaintiff's *prima facie* case, the defendant contends that the plaintiff fails to generate a triable issue that his residency was terminated either solely or partly because of his disability. *See* Motion at 11-12. The defendant emphasizes that it had concerns about the plaintiff's performance before it ever learned that he might have any mental health issue, decided to terminate his employment on that basis in December 2012, rescinded that decision when it learned of his desire for a mental health evaluation, accommodated the plaintiff with a leave of absence and a graduated schedule upon his return to work, and ultimately terminated his employment in January 2014 solely on the basis that his performance problems persisted. *See id.* However, in support of that argument, the defendant relies heavily on statements of material facts that are either qualified or denied, *see id.* (citing, *inter alia*, Parties Consolidated SMF ¶¶ 22, 25-26, 33-36, 38, 101-02), reflecting a core factual dispute in this case.

Specifically, the plaintiff attacks the defendant's narrative in two ways. First, he argues that, to the extent that his performance suffered, it did so because of his disability, and therefore, even taking the defendant's posited rationale at face value, he was terminated because of his

disability. *See* Opposition at 26-27 (citing *Ward v. Mass. Health Research Inst., Inc.*, 209 F.3d 29, 38 (1st Cir. 2000) (reversing summary judgment in favor of employer when employee's "tardiness flow[ed] directly from [his] arthritis[,]" generating a triable issue as to whether his discharge for tardiness was disability-based). Second, he contends that, far from accommodating him, the defendant, through supervisors, expressed overt hostility toward his disability (both internally and in conversations with him) and sabotaged him by, *inter alia*, making him repeat overnight shifts that he had already completed. *See* Opposition at 27-28.

Resolving all factual disputes and any competing rational inferences in the light most favorable to the nonmovant, a reasonable juror could find that the plaintiff's disability was the sole cause of his termination.

### b. Defendant's Employment Decision Rationale

The defendant meets its burden of articulating a non-discriminatory reason for its termination of the plaintiff's employment, repeating its argument that it took this action on the basis of his deficient job performance. *See* Motion at 12-13.

### c. Plaintiff's Showing of Pretext/Disability Discrimination

Turning to the final prong of the *McDonnell Douglas* burden-shifting test, for the reasons discussed above, the plaintiff meets his burden of generating a triable issue as to whether the defendant's stated reasons for his job termination were pretextual and, ultimately, whether the real reason was animus based on his disability.

### 2. Claim of Failure To Accommodate Disability

"In order to survive a motion for summary judgment on a reasonable accommodation claim, the plaintiff must produce enough evidence for a reasonable jury to find that (1) he is disabled within the meaning of the ADA, (2) he was able to perform the essential functions of the

job with or without a reasonable accommodation, and (3) [the employer], despite knowing of [the employee]'s disability, did not reasonably accommodate it." *Freadman*, 484 F.3d at 102 (citation and internal quotation marks omitted). The employee "has the burden of showing that [he or] she sufficiently requested the accommodation in question." *Id*. at 102 (citation, internal quotation marks, and footnote omitted). "The employee's request (1) must be sufficiently direct and specific, and (2) must explain how the accommodation requested is linked to some disability." *Id*. (citation and internal quotation marks omitted). The employee "must also show that the proposed accommodation is reasonable – that it would enable [him or] her to perform the essential functions of [his] or her job, and that at least on the face of things, it is feasible for the employer under the circumstances." *Id*. at 103 (citation and internal quotation marks omitted). "Under the ADA, employers are required to provide reasonable accommodation to an otherwise qualified applicant or employee with a disability, unless the employer can demonstrate that the accommodation would impose an undue hardship on the employer's business." *Carmichael v. Verso Paper, LLC*, 679 F. Supp. 2d 109, 129 (D. Me. 2010).[8]

For the reasons discussed above, the plaintiff makes out the first two elements of his failure to accommodate claim, which are identical to the first two prongs of a *prima facie* case of disability discrimination. The defendant argues, however, that he falls short of making out a triable case as to the third element because (i) the defendant provided the plaintiff with several accommodations, and (ii) he did not clearly ask for additional ones, leaving the defendant in the dark about his needs. *See* Motion at 14-18. While the defendant reiterates its argument that overnight shifts are an

---

[8] The same standards apply in MHRA and Rehabilitation Act cases. *See, e.g., Calero-Cerezo v. U.S. Dep't of Justice*, 355 F.3d 6, 11-12 & n.1 (1st Cir. 2004); *Shuper v. Falmouth Mem'l Library*, No. 2:14-cv-00506-GZS, 2014 WL 7334163, at *3 (D. Me. Dec. 19, 2014).

essential function of a family medicine resident's job, it does not argue that excusing the plaintiff from that duty would have imposed an undue hardship.  *See id.* at 17-18.

To support its contention that it adequately accommodated the plaintiff, the defendant marshals a list of steps it took to ease his professional burden, including granting him a medical leave of absence and allowing him a gradual return to work on a reduced schedule, with no overnight shifts between March 2013 and July 2013.  *See id*. at 15-16 (citing Parties' Consolidated SMF ¶¶ 35-37, 44-46).  However, all of those statements of material facts are either qualified or denied, save one.  *See* Parties' Consolidated SMF ¶¶ 35-37, 44-46.

To support its contention that the plaintiff never clearly communicated any additional need for accommodations, the defendant cites another series of qualified and disputed facts, including that (i) Dr. Boyack "never made a request that [the plaintiff] not work overnight shifts" other than with respect to his return to work in March 2013, (ii) the plaintiff "requested to work two weeks straight of night float in July 2013, wanted to participate fully in the program, and did not want Dr. Boyack to prohibit him from overnight shifts[,]" (iii) in the summer of 2013, the plaintiff told Mr. Miklavic that he had "worked everything out with Dr. Woolever[,]" (iv) at the meeting on November 18, 2013, neither Dr. Woolever nor Dr. Picker "understood Plaintiff to be asking for an accommodation of any sort[,]" and the plaintiff never stated that the document he tried to provide constituted such a request, (v) the plaintiff did not follow up by providing a copy of that document, (vi) the defendant granted the plaintiff the only medical leave he requested during his employment, and (vii) the plaintiff did not request medical leave again until after he was informed that his employment had been terminated.  Motion at 16-18 (citing Parties' Consolidated SMF ¶¶ 37, 45, 52-53, 59, 61, 82-85, 105).

The plaintiff's narrative of his accommodation requests differs significantly. In response to the defendant's account, he details "ten specific accommodation requests," Opposition at 12-14 (citing Parties' Consolidated SMF ¶¶ 151, 160-71, 190-93, 207-11, 212, 219-24, 230-31, 246-53, 255-61, 279), and observes that, although the defendant faults him for not renewing his accommodation request after November 18, 2013, he was forced to sign a probation agreement that day stating that no schedule accommodations would be permitted, *see id.* at 14 (citing Parties' Consolidated SMF ¶¶ 262-63).

These dueling narratives suggest that a reasonable juror could conclude that the defendant was aware of, but did not provide, certain accommodations sought by the plaintiff. As the plaintiff argues, *see id.* at 15, the fact that the defendant made some initial accommodations is not dispositive of his claim in its favor, *see, e.g.*, *Criado v. IBM Corp.*, 145 F.3d 437, 445 (1st Cir. 1998) ("The duty to provide a reasonable accommodation is a continuing one, . . . and not exhausted by one effort.") (citation and internal quotation marks omitted).

As noted above, the defendant makes no argument that the accommodation of excusing the plaintiff from overnight shifts would have imposed an undue hardship. Indeed, both Drs. Woolever and Picker admitted that it would not have. *See* Parties' Consolidated SMF ¶¶ 266-68.

Resolving all factual disputes and any competing rational inferences in the light most favorable to the nonmovant, a reasonable juror could find that the defendant did not reasonably accommodate the plaintiff's known disability.[9]

---

[9] The plaintiff clarifies that he is pursuing an independent claim for failure to engage in the interactive process pursuant to federal law but not the MHRA. *See* Opposition at 6 n.14. The defendant does not respond to his argument that he generates a triable issue as to this claim; *see id.* at 16-17; *see generally* Reply, and this point, as well, should be resolved by the trier of fact.

### 3. Retaliation Claim

"Where the plaintiff provides no direct evidence of retaliation, [the First Circuit has] relied on the burden-shifting framework established by the Supreme Court in *McDonnell Douglas*[.]" *Pagán-Colón v. Walgreens of San Patricio, Inc.*, 697 F.3d 1, 9 (1st Cir. 2012).

> [U]nder that framework, a plaintiff employee must carry the initial burden of coming forward with sufficient evidence to establish a prima facie case of retaliation. If he does so, then the burden shifts to the employer to articulate some legitimate, nondiscriminatory reason for the employee's termination. If the employer's evidence creates a genuine issue of fact, the presumption of discrimination drops from the case, and the plaintiff retains the ultimate burden of showing that the employer's stated reason for terminating him was in fact a pretext for retaliating against him for having taken protected . . . leave.

*Id*. (citation and internal punctuation omitted).

To make out a *prima facie* case of retaliation pursuant to the ADA and the MHRA, a plaintiff must show that (i) he or she engaged in a protected activity, (ii) he or she suffered an adverse employment action, and (iii) a causal connection existed between the adverse action and the protected activity. *See, e.g., Kelley v. Corr. Med. Servs., Inc.*, 707 F.3d 108, 115 (1st Cir. 2013); *Bilodeau v. Mega Indus.*, 50 F. Supp. 2d 27, 32 (D. Me. 1999). The showing required to meet the causation prong of a *prima facie* case pursuant to the Rehabilitation Act differs: a plaintiff must show that the protected conduct was "the but-for cause" of the adverse action. *Pollack v. Reg'l Sch. Unit 75*, 12 F. Supp. 3d 173, 190 (D. Me. 2014) (citation and internal quotation marks omitted).

### a. Plaintiff's *Prima Facie* Case

The defendant contends that the plaintiff cannot show a causal nexus between any protected activity and any adverse employment action because (i) there is no record evidence that he engaged in protected activity between the time he received his first written warning in February 2012 and the time he was first placed on probation in July 2012, (ii) the decision to terminate his employment

in December 2012 was made before he raised issues regarding his mental health or requested medical leave, (iii) the defendant thereafter accommodated him and took him off probation, and (iv) the defendant did not terminate his employment for more than a year after learning that he had bipolar disorder, and then only in response to performance issues that had nothing to do with his medical condition. *See* Motion at 18-19.

The plaintiff sees things differently. As noted above, he catalogues requests for accommodation on 10 separate occasions, including one prior to July 2012. *See* Opposition 12-14, 18. And, he argues that (i) his initial request for accommodation prompted a series of adverse actions, (ii) his requests for accommodation were followed closely by adverse actions, and (iii) he was required to sign a probation agreement that threatened termination were he to repeat his requests. *See id.* at 19-20; *Hodgens v. Gen. Dynamics Corp.*, 144 F.3d 151, 168 (1st Cir. 1998) ("[P]rotected conduct closely followed by adverse action may justify an inference of retaliatory motive.") (citation and internal quotation marks omitted).

The plaintiff's evidence suffices to make out a *prima facie* case of retaliation.

### b.  Defendant's Employment Decision Rationale

The defendant meets its burden of articulating non-discriminatory reasons for the adverse employment actions taken against the plaintiff, repeating its argument that it took those actions solely on the basis of his deficient job performance. *See* Motion at 19.

### c.  Plaintiff's Showing of Pretext/Retaliation

The plaintiff repeats the pretext argument made in connection with his discrimination claim, with one addition: he contends that evidence of the hostility shown when he requested accommodations "could allow a reasonable juror to find that his termination was actually motivated by retaliatory animus." Opposition at 20-22. Viewing the record in the light most

favorable to the plaintiff as nonmovant and drawing reasonable inferences in his favor, he generates sufficient evidence for a reasonable juror to conclude that the defendant's stated reason for taking those adverse employment actions was pretextual, and that the defendant would not have taken them but for retaliatory animus. *See, e.g.*, *Zades v. Lowe's Home Ctrs.*, *Inc.*, 446 F. Supp. 2d 29, 44 (D. Mass. 2006) (denying summary judgment as to plaintiff's retaliation claim when she produced evidence that she had "requested accommodations in the two months prior to her termination[,]" and an individual who played role in termination decision "was hostile to the requests").

### 4. Statute of Limitations

To the extent that the plaintiff's discrimination and retaliation claims survive the defendant's motion for summary judgment on the merits, the defendant asserts that they are time-barred as to unlawful employment practices occurring more than 300 days prior to his filing of his MHRC complaint (that is, prior to January 20, 2014). *See* Motion at 22-23.

The plaintiff concedes that his MHRA and ADA claims "based on discrete adverse actions that occurred more than 300 days before his MHRC complaint was filed (such as the December 2012 termination) are time-barred[.]" Opposition at 30. However, he correctly notes that evidence of past discriminatory acts is "still relevant and probative as to whether the later discrimination took place[.]" *Id.* (quoting *O'Rourke v. City of Providence*, 235 F.3d 713, 726 (1st Cir. 2001)). *See also, e.g.*, *Crowley v. L.L. Bean, Inc.*, 143 F. Supp. 2d 38, 55 n.20 (D. Me. 2001) ("[A] discriminatory act which is not made the basis for a timely charge may still be relevant background evidence[.]").

At oral argument on the instant cross-motions, the defendant's counsel conceded that there is no such time bar with respect to the plaintiff's discrimination and retaliation claims pursuant to the Rehabilitation Act.

Accordingly, I recommend that the court grant the defendant's motion with respect to ADA and MHRA claims based on discrete adverse actions occurring more than 300 days before the plaintiff's MHRC complaint was filed.

## B. Medical Leave Act Claims

The defendant also seeks summary judgment as to the plaintiff's interference and retaliation claims pursuant to the FMLA and MFMLR. *See* Motion at 19-22.

As concerns an FMLA retaliation claim, "when there is no direct evidence of discrimination, the *McDonnell Douglas* burden-shifting framework applies to claims that an employee was discriminated against for availing himself of FMLA-protected rights." *Hodgens*, 144 F.3d at 160. "To make out a prima facie case of retaliation, [a plaintiff] must show that (1) he availed himself of a protected right under the FMLA; (2) he was adversely affected by an employment decision; [and] (3) there is a causal connection between the employee's protected activity and the employer's adverse employment action." *Id.* at 161. "The Court applies the same analysis to the FMLA and the MFMLR claims and does not otherwise differentiate between the two statutes." *Morin v. Hannaford Bros. Co., LLC*, Docket no. 1:17-CV-50-GZS, 2018 WL 2746570, at *13 n.14 (D. Me. June 7, 2018).

The defendant contends that the plaintiff cannot demonstrate a causal connection between his protected activity and any adverse employment action and, in any event, cannot generate a trial-worthy issue that the defendant's stated reason for taking such actions (the deficiency of the plaintiff's performance) is pretextual. Both the defendant's argument, and the plaintiff's response,

track points made in connection with the plaintiff's other claims.  *See* Motion at 19-22; Opposition at 28-29.  The outcome, hence, is the same here: there exists a triable issue of retaliation pursuant to the FMLA and the MFMLR.

To prevail on an FMLA or MFMLR interference claim, an employee must show that (i) "[he or] she fit the definition of an 'eligible employee[,]'" (ii) "[he or] she worked for an employer covered by the Act[,]" (iii) "[he or] she qualified for FMLA benefits for one of four statutory reasons[,]" (iv) "[he or] she gave her employer appropriate notice[,]" and (v) "the employer denied [him or] her benefits to which the FMLA entitled [him or] her."  *Morin*, 2018 WL 2746570, at *16 (citation and internal quotation marks omitted).  "[N]o showing as to employer intent is required."  *Id.* (citation and internal quotation marks omitted).  "The key issue is simply whether the employer provided its employee the benefits to which [he or] she was entitled per the FMLA."  *Id.* (citation and internal quotation marks omitted).

The defendant seeks summary judgment as to the plaintiff's interference claims on the basis that he was provided the employee benefits to which he was entitled and admits that he did not request a second medical leave, for which he was not eligible, until after he learned that his employment was going to be terminated in January 2014.  *See* Motion at 21-22.  Nonetheless, as the plaintiff rejoins, *see* Opposition at 28-29, a reasonable juror viewing the evidence in the light most favorable to him as nonmovant could find, at the least, that the defendant interfered with his rights to FMLA and MFMLR leave by discouraging and preventing him from making such requests, *see, e.g., Dressler v. Cmty. Serv. Commc'ns, Inc.*, 275 F. Supp. 2d 17, 23 (D. Me. 2003) ("[I]nterference includes not only refusing to authorize FMLA leave, but discouraging an employee from using such leave.") (citation and internal quotation marks omitted).

The plaintiff, hence, makes out triable issues of FMLA and MFMLR retaliation and interference.

## C. Punitive Damages

The defendant, finally, seeks summary judgment as to punitive damages on all of the plaintiff's claims. *See* Motion at 22. The plaintiff does not contest the defendant's argument that punitive damages are unavailable as matter of law pursuant to the Rehabilitation Act and the FMLA, *see id.*; Opposition at 29, and, thus, summary judgment appropriately is entered with respect to any request for punitive damages in connection with his Rehabilitation Act, FMLA, and MFMLR claims.[10]

The parties agree that, as to the ADA and MHRA claims, punitive damages are available on a showing of malice or reckless indifference but dispute whether, on the record presented, a reasonable juror could award punitive damages with respect to those claims. *See* Motion at 22; Opposition at 29. The plaintiff has the better argument. A reasonable juror crediting the plaintiff's evidence and drawing reasonable inferences therefrom could conclude that the defendant acted with reckless indifference to his civil rights.[11]

Accordingly, I recommend that the court grant the defendant's summary judgment motion with respect to punitive damages pursuant to the plaintiff's Rehabilitation Act, FMLA, and

---

[10] The defendant does not expressly move for summary judgment as to any request for punitive damages pursuant to the MFMLR. *See* Motion at 22. However, while the MFMLR provides for awards of two categories of liquidated damages, one of which is for willful violations, it does not provide for an award of punitive damages. *See* 26 M.R.S.A. § 848. Moreover, the plaintiff contests the entry of summary judgment only as to punitive damages awardable pursuant to the ADA and the MHRA. *See* Opposition at 29.

[11] For example, the plaintiff presents evidence that, on April 23, 2013, Dr. Woolever told him that, as a result of his use of one sick day for his bipolar disorder and his email to another individual suggesting a schedule change, Dr. Woolever questioned his integrity, professionalism, and readiness to function as a normal fulltime resident, *see* Parties' Consolidated SMF ¶¶ 201-02, both Drs. Woolever and Picker refused, during their November 18, 2013, meeting with the plaintiff, to take a document he described as explaining problems he had with his disability or permit him to read it aloud, *see id.* ¶ 255, and, on the same day, the defendant placed the plaintiff back on probation with a proviso that no schedule change requests would be granted during his probationary period, *see id.* ¶ 262.

MFMLR claims, but deny it with respect to punitive damages pursuant to his ADA and MHRA claims.

## IV. Conclusion

For the foregoing reasons, I recommend that the court **GRANT** the defendant's motion for partial summary judgment with respect to (i) the plaintiff's MHRA and ADA claims based on discrete adverse actions that occurred more than 300 days before his MHRC complaint was filed and (ii) any requested punitive damages pursuant to the Rehabilitation Act, FMLA, and MFMLR, and otherwise **DENY** it.

## *NOTICE*

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum, within fourteen (14) days after being served with a copy thereof. A responsive memorandum shall be filed within fourteen (14) days after the filing of the objection.*

*Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.*

Dated this 9th day of August, 2019.

/s/ John H. Rich III
John H. Rich III
United States Magistrate Judge